Nos. 22-2154 & 22-2155

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,
        Plaintiff – Appellee,

v.

BOBBY PENA,
        Defendant – Appellant.

# DEFENDANT-APPELLANT'S OPENING BRIEF

On Appeal from the United States District Court
For the District of New Mexico
The Honorable James O. Browning
District Docket Nos. 1:19-CR-03609-JB-1 & 1:19-CR-03611-JB-1

## ORAL ARGUMENT REQUESTED

Christopher A. Dodd
Brooke M. Jordy
DODD LAW OFFICE, LLC
500 Marquette Ave. NW, Suite 1330
Albuquerque, NM 87102
505.475.2742
chris@doddnm.com
brooke@doddnm.com

Vincent J. Ward
THE WARD LAW FIRM
PO Box 7940
Albuquerque, NM 87194
505.944.9454
vincent@wardlawnm.com

*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS

**Table of Authorities** ................................................................ iii

**Statement Regarding Prior or Related Appeals** .................................... 1

**Jurisdictional Statement** ............................................................ 1

**Issues Presented For Review** ....................................................... 1

**Statement of Case** .................................................................... 2

**Statement of Facts** ................................................................... 4

**Summary of Argument** .............................................................. 8

**Argument** ............................................................................. 16

  A.  The Standard of Review ......................................................... 16

  B.  The Probable Cause Standard .................................................... 16

  C.  The Warrant Affidavit Fails to Establish Probable Cause ...................... 17

     1.  The district court wrongly disregarded the militating effect of Special Agent Kucenski's opinion that Mr. Pena's (1) use of file sharing software and possession of storage devices and (2) the names of the file folders indicated a proclivity for collecting pornography, not child pornography. ..................................................................... 18

     2.  The district court's decision contradicts *Edwards*. ....................... 23

     3.  The file folder names are too ambiguous to infer illegal activity. ....... 25

  D.  The Good Faith Exception Should Not Apply to this Case ..................... 33

  E.  Evidence of Child Pornography Would Not Have Been Inevitably Discovered on Mr. Pena's Computer and Devices ............................... 35

  F.  If the Ruling on the Suppression Motion is Reversed, the Court Should Remand the False Claims Convictions for Resentencing Under the Sentencing Package Doctrine ..................................................... 40

**Conclusion** ........................................................................... 43

**Request for Oral Argument** ......................................................... 43

**Certificate of Compliance with Type-Volume Limit** ............................... 45

i

Attachment 1 - District Court's Memorandum Order and Opinion ....................... 46

Attachment 2 - District Court's Final Judgment .................................................. 114

Attachment 3 -
  *United States v. Ahrndt*, No. 3:08-CR-468, 2013 U.S. Dist. LEXIS 7223,
  2013 WL 179326 (D. Or. Jan. 17, 2013) (unpublished) ................................... 124

Attachment 4 -
  *United States v. Beatty*, No. 1:08-CR-51, 2009 U.S. Dist. LEXIS 1214731,
  2009 WL 5220643 (W.D. Pa. Dec. 31, 2009) (unpublished).......................... 133

# TABLE OF AUTHORITIES

## CASES

*Free Speech Coalition, Inc. v. Attorney General United States*,
787 F.3d 142 (3d Cir. 2015) ............................................................ 28, 29

*Nix v. Williams*,
467 U.S. 431 (1984) ......................................................................... 36

*Terry v. Ohio*,
392 U.S. 1 (1968) ............................................................................. 17

*United States v. Ahrndt*,
No. 3:08-CR-468, 2013 U.S. Dist. LEXIS 7223, 2013 WL 179326 (D. Or. Jan. 17,
   2013) (unpublished) ..................................................................... 12, 28

*United States v. Battershell*,
457 F.3d 1048 (9th Cir. 2006) ........................................................ 11, 27

*United States v. Beatty*,
No. 1:08-CR-51, 2009 U.S. Dist. LEXIS 1214731, 2009 WL 5220643 (W.D. Pa.
   Dec. 31, 2009) (unpublished) ....................................................... 11, 28

*United States v. Beck*,
139 Fed. Appx. 950 (10th Cir. 2005) .............................................. 31

*United States v. Bentley*,
850 F.2d 327 (7th Cir. 1988) .......................................................... 42

*United States v. Castellana*,
488 F.2d 65 (5th Cir. 1974) ............................................................ 37

*United States v. Danhauer*,
229 F.3d 1002 (10th Cir. 2000) ...................................................... 16, 20

*United States v. Doyle*,
650 F.3d 460 (4th Cir. 2011) .......................................................... 27

*United States v. Edwards*,
813 F.3d 953 (10th Cir. 2015) ......................................................... passim

*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008) .................................................................. 24

*United States v. Haymond*,
672 F.3d 948 (10th Cir. 2012) ................................................... 16, 20, 21

*United States v. Hicks*,
146 F.3d 1198 (10th Cir. 1998) .............................................................. 42

*United States v. Kilgore*,
856 Fed. App'x 783 (10th Cir. 2021) ............................................. 20, 21

*United States v. Knox*,
883 F.3d 1262 (10th Cir. 2018) ....................................................... 13, 33

*United States v. Loera*,
923 F.3d 907 (10th Cir. 2019) ......................................................... 36, 39

*United States v. Martin*,
426 F.3d 68 (2d Cir. 2005) .................................................................... 24

*United States v. Martinez-Cigarroa*,
44 F.3d 908 (10th Cir. 1995) ................................................................ 17

*United States v. Mendoza*,
118 F.3d 707 (10th Cir. 1997) .............................................................. 43

*United States v. Miknevich*,
638 F.3d 178 (3d Cir. 2011) ..................................................... 11, 26, 27

*United States v. Owens*,
782 F.2d 146 (10th Cir. 1986) ........................................................ 14, 36

*United States v. Pimienta-Redondo*,
874 F.2d 9 (1st Cir. 1989) .................................................................... 43

*United States v. Romero*,
692 F.2d 699 (10th Cir. 1982) ................................................................ 37

*United States v. Shue*,
825 F.2d 1111 (7th Cir. 1987) ............................................................... 42

*United States v. Valenzuela*,
365 F.3d 892 (10th Cir. 2004) ..................................................... 8, 9, 17

*Whiteley v. Warden, Wyo. State Penitentiary*,
401 U.S. 560 (1971) ............................................................................. 31

## STATUTES

18 U.S.C. § 3742(a)(2) ........................................................................... 1

28 U.S.C. § 1291 .................................................................................... 1

## OTHER AUTHORITIES

Daniel Cox et al., "How Prevalent is Pornography?"
*Institute for Family Studies* (May 3, 2022) ........................................ 29

**STATEMENT REGARDING PRIOR OR RELATED APPEALS**

This consolidated appeal involves two related cases: (1) *United States v. Pena*, 22-2154 and (2) *United States v. Pena*, 22-2155. The cases were consolidated for all procedural purposes pursuant to an Order issued on December 30, 2022. There are no other prior or related appeals.

**JURISDICTIONAL STATEMENT**

Mr. Bobby Pena appeals from the judgment of the United States District Court for the District of New Mexico. The district court, which had jurisdiction under 18 U.S.C. § 3231, entered final judgment on December 27, 2022. App. Vol. I at 217 & App. Vol. III at 742. Mr. Pena filed his notices of appeal on December 9, 2022 (App. Vol. I at 214 & App. Vol. III at 739), which were timely under Federal Rule of Appellate Procedure 4(b)(1)(A)(i). This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).

**ISSUES PRESENTED FOR REVIEW**

1.    Did the district court err in denying Mr. Pena's suppression motion in Case No. 21-2155?

2.    If the district court erred in denying Mr. Pena's suppression motion in Case No. 21-2155 (the child pornography case), should Mr. Pena be resentenced in Case No. 21-2154 (the procurement fraud case), as the cases were sentenced together under a single sentencing guideline calculation and the count of conviction in the

child pornography case greatly increased the applicable sentencing guidelines, well above the applicable guideline range for the offenses in the procurement fraud case?

## STATEMENT OF CASE

This appeal arises from two separate indictments against Mr. Pena. In Case No. 21-2154, the government charged Mr. Pena with 28 counts of false claims against the government under 28 U.S.C. §§ 287 and 2(b) stemming from his work as a contractor for Sandia National Laboratories (Sandia). App. Vol. I at 14-15. In Case No. 21-2255, the government charged Mr. Pena with a single count of possession of visual depictions of minors engaged in sexually explicit conduct under 18 U.S.C. §§ 2252(A)(5)(B), (b)(2), and 2256. App. Vol. II at 244-245.

The government obtained two warrants in the underlying investigation of Mr. Pena. A federal magistrate issued the first warrant on December 12, 2017, to search Mr. Pena's business location for evidence of procurement fraud. App. Vol. II at 313-327. The government seized a computer and nine electronic storage devices during the execution of the warrant. App. Vol. II at 325-327; App. Vol. II at 294. While reviewing the devices, a special agent discovered electronic file folders that in his opinion likely contained pornography. He drew this inference from the file folder names, which included the words "teen" and "young." App. Vol. II at 289-290. The special agent subsequently sought a second search warrant to search the computer and devices for evidence of child pornography. App. Vol. II at 273-296.

Mr. Pena filed a motion to suppress evidence in the child pornography case on August 6, 2021. App. Vol. II at 246-272. He asserted in his motion that the warrant lacked probable cause to believe his computer and electronic devices contained evidence of child pornography. He also argued that the good faith exception should not apply and that evidence of child pornography would not have been inevitably discovered while conducting the first search. The district court held an evidentiary hearing on October 7, 2021. App. Vol. III at 594-738. The agent who examined Mr. Pena's computer and electronic devices, Special Agent Matthew Kucenski, testified at the hearing. App. Vol. III at 598-674. He also attested to the warrant affidavit that is the subject of this appeal. App. Vol. II at 279-293. Mr. Pena offered the opinions of Brian Chase, a computer forensics expert with specialized knowledge in child pornography investigations. App. Vol. III at 675-696. On November 12, 2021, the district court issued an order denying Mr. Pena's motion to suppress. App. Vol. III at 526-593.

On February 10, 2022, Mr. Pena plead guilty in both cases pursuant to a plea agreement reserving his right to appeal the district court's denial of his motion to suppress. App. Vol. I at 16-34. A single Presentence Investigation Report was authored, which addressed the convictions in both cases, and under the grouping rules, the offense level of the child pornography conviction established the applicable guideline range. App. Vol. I at 36-55 & App. Vol. I at 46. On November

14, 2022, the district court sentenced Mr. Pena in both cases and entered a single judgment on December 27, 2022. App. Vol. I at 217-226 & App. Vol. III at 742-751. The court sentenced Mr. Pena to 41 months of incarceration on the sole count in the child pornography case to be served concurrently to the 41 months imposed for each of the 28 counts of conviction in the procurement fraud case, which also are to be served concurrently to each other. *Id.* The court further imposed five years of supervised release as to the sole count of conviction in the child pornography case, to be served concurrently to the three-year term of supervised release imposed for each of the 28 counts of conviction in the procurement fraud case. *Id*.

## STATEMENT OF FACTS

### The Case Began as a Procurement Fraud Investigation

The cases against Mr. Pena arose from an investigation into whether his business, De La Pena, LLC ("DLP"), submitted false invoices to Sandia National Laboratories ("Sandia") in Albuquerque, New Mexico. App. Vol. II at 315. DLP performed cleanroom services and air particle count monitoring for Sandia. Cleanrooms are used for scientific purposes, such as designing and manufacturing systems that require a certain level of cleanliness. *Id*. In June 2016, Sandia contacted the Department of Energy's Office of Inspector General ("DOE") to report possible fraud. *Id*.

For approximately nine months DOE investigators followed Mr. Pena while he worked at Sandia. App. Vol. II at 316. The government alleges Mr. Pena did not perform air particle counts yet submitted records of false counts to Sandia. *Id*. The investigation purportedly included a consensually monitored conversation between Mr. Pena and a Sandia representative, and the government interrogated Mr. Pena. App. Vol. II at 316-317. The government claims Mr. Pena admitted to procurement fraud during the interrogation. App. Vol. II at 317.

Based on these allegations, in December 2017, the government sought and obtained a warrant to search Mr. Pena's business office for evidence of procurement fraud. App. Vol. II at 313-327. The search resulted in the seizure of a laptop computer and nine portable electronic storage devices. App. Vol. II at 326-327.

### The Issuance of the Warrant to Search Mr. Pena's Laptop and Devices for Evidence of Child Pornography

DOE Special Agent Matthew Kucenski conducted a forensic examination of the laptop and devices. App. Vol. II at 289. Special Agent Kucenski also attested to the warrant affidavit in the child pornography investigation. App. Vol. II at 293. In the underlying litigation before the district court, the prosecution argued the following allegations in the warrant affidavit established probable cause:

**First**, while searching for evidence of procurement fraud, Special Agent Kucenski alleges,

On December 14, 2017, your Affiant began acquiring digital forensic copies of the Devices.  During that process, the contents were routinely viewed to ensure valid acquisition and determine the presence, or lack thereof, of encryption.  While doing so, large quantities of files and folders named to suggest the contents contained *pornography* were observed, including the following:

      i.     "HotYoungDoll" (sic)
     ii.     "HotYoungThing" (sic)
    iii.     "hotyoungthing-nude_xvid.avi"
     iv.     "Casting Couch Teen Site Rip"
      v.     "Teens Do Porn SiteRip" (sic)
     vi.     "teensx" (sic)
    vii.     "DblTemedTens" (sic)
   viii.     "Teen Sex Mania SiteRip" (sic)

App. Vol. II at 289-290 (emphasis added).

**Second**, while executing the first warrant to search for evidence of procurement fraud,

DOE OIG Special Agents asked BOBBY MARTIN PENA about the content of the Devices.  PENA explained they contained family photos and "porn."  Agents further asked PENA whether there was any child pornography on the Devices.  PENA stated "No", but caveated that assertion claiming he "rips" pornography from "torrent" files, referring to common Internet peer-to-peer ("P2P") file-sharing software.  PENA reported the files were downloaded to the Devices and left there.

App. Vol. II at 289.

**Third**, the warrant affidavit contains general statements about file sharing software, electronic devices, and the characteristics of people who collect child pornography.  For example, Special Agent Kucenski claimed in his warrant affidavit that "'peer-to-peer' (P2P) networks are often used to obtain and share child

6

pornography." App. Vol. II at 281. He also alleged that "[t]here are several P2P networks currently operating, including the BitTorrent program. P2P file sharing networks, including the BitTorrent network, are frequently used to trade digital files of child pornography." App. Vol. II at 282. Special Agent Kucenski then averred that "persons seeking to possess, distribute, and receive sexually explicit images of minors most often use the Internet to do so." App. Vol. II at 284.

**Fourth**, Special Agent Kucenski expressed the following opinion about Mr. Pena's purported sexual proclivities:

> Your Affiant knows through training and experience that some persons who distribute, possess, or produce child pornography engage in "collector behavior." Your Affiant believes that BOBBY MARTIN PENA may fall within this category of persons in light of indicators of large quantities of suspected pornographic materials on ten, large-capacity, USB storage devices. Some of the characteristics of "collector behavior" include:
>
> a. Persons who are "collectors" of child pornography often keep the material in their possession for years, because it is considered valuable contraband.
>
> b. Persons who are "collectors" of child pornography often transfer electronic files containing child pornography from device to device, either to make room on their devices, or for long-term storage.

App. Vol. II at 286.

Based on these allegations, the magistrate judge issued a warrant to search Mr. Pena's laptop computer and devices for evidence of child pornography. App. Vol. II at 278.

## SUMMARY OF ARGUMENT

1.    The district court erred in finding that probable cause existed to search Mr. Pena's computer and devices for evidence of child pornography.    As background, the warrant affidavit outlines four reasons for issuing the warrant.    One, Mr. Pena used file sharing software and possessed multiple electronic storage devices to collect pornography.    Two, because Mr. Pena purportedly collected large volumes of pornography, he possibly fit the profile of someone who also collected child pornography.    Three, one of the storage devices seized from Mr. Pena's office contained file names that included the words "teen" and "young."    The file names led the attesting agent to believe pornography would be found in the file folders. And four, Mr. Pena purportedly made "equivocal" statements during the execution of the first search warrant when asked whether child pornography would be found on the computer and devices.    These allegations are insufficient to establish probable cause for the following reasons.

**First**, the district court did not conduct the probable cause analysis correctly. While a "divide-and-conquer" analysis of the facts is not allowed, "neither may a court arrive at probable cause simply by piling hunch upon hunch." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).    Therefore, "a reviewing court must examine the facts individually in their context to determine whether rational inferences can be drawn from them that support a probable cause determination."

*Id*. (internal punctuation and citation omitted). Lastly, in determining whether probable cause to issue the warrant existed, the court looks "not only to the facts supporting probable cause, but also to those that militate against it." *Id*.

Here, the district court failed to consider the militating effect of the agent's opinions that (1) Mr. Pena's use of file sharing software and possession of electronic storage devices led him to believe Mr. Pena possessed <u>pornography</u>, not child pornography, and (2) the names of the file folders found on one of the devices led him to believe <u>pornography</u> would be found on Mr. Pena's computer and devices, not child pornography. While "[a] factor does not become irrelevant simply because it is readily susceptible to an innocent explanation," the special agent's inference that Mr. Pena possessed pornography rather than child pornography militates against probable cause in this case. *Id*. (internal quotations and citation omitted).

**<u>Second</u>**, the district court failed to follow *United States v. Edwards*, 813 F.3d 953 (10th Cir. 2015). Here, the warrant affidavit fails to identify a single instance where Mr. Pena used file sharing software or his storage devices to collect child pornography. Hence, to establish probable cause, the attesting agent opined that because Mr. Pena purportedly collected large volumes of pornography, he might fit the profile of someone who collected child pornography. This opinion runs afoul of *Edwards*.

In *Edwards*, this Court rejected an analogous argument that a defendant's participation in an online forum dedicated to child erotica established a reasonable probability that he shared characteristics with collectors of child pornography. *Id.* at 967. This Court found the allegation insufficient to establish probable cause because it rested on a logical fallacy—that it is incorrect to believe that people who collect child erotica also have a propensity to collect child pornography. Special Agent Kucenski's opinion suffers from the same erroneous belief.

If frequenting a child erotica forum is insufficient to establish probable cause to believe a defendant might possess child pornography, as in *Edwards*, then certainly the same holds true for a defendant who uses file sharing software and possesses electronic storage devices to collect pornography. In other words, people who use file sharing software and electronic storage devices to collect pornography do not necessarily collect child pornography. If any do, the number is likely slight. But whatever the percentage, Special Agent Kucenski's opinion is a logical fallacy that is insufficient to establish probable cause, especially post-*Edwards*.

**<u>Third</u>**, an inference of probable cause cannot be drawn from the file folders found on Mr. Pena's storage device. To begin with, the attesting agent did not view any pornographic materials in the file folder, much less any child pornography. Next, the attesting agent drew an inference that the file folders contained pornography, not child pornography. And finally, although the district court placed

10

significant weight on the inclusion of the words "teen" and "young" in the file folder names, and even disregarded the opinion of the attesting agent, the terms "teen" and "young" are far too ambiguous and not sufficiently descriptive to draw an inference that child pornography would be found in the file folders.

Case law instructs that detailed descriptions, provided either by law enforcement's summary of file contents, or by a file name's specific description of its contents, can contribute to a finding of probable cause where those descriptions are directly indicative of contraband. *See, e.g., United States v. Miknevich*, 638 F.3d 178, 185 (3d Cir. 2011) (determining that, along with the unique digital fingerprint, the highly graphic, specific file names containing ages, genders, and specific sexual activities created a strong inference sufficient to establish probable cause that the file would contain contraband); *United States v. Battershell*, 457 F.3d 1048, 1053 (9th Cir. 2006) (finding that the magistrate judge was not required to review potential materials, but may base the probable cause determination on the detailed, specific descriptions provided by a witness and by the affiant in the search warrant application); *United States v. Beatty*, No. 1:08-CR-51, 2009 U.S. Dist. LEXIS 1214731, 2009 WL 5220643 (W.D. Pa. Dec. 31, 2009), *affirmed* 437 Fed. App'x 185 (3d Cir. 2011) (unpublished) (concluding that the hash values and the highly graphic file names describing specific sexual acts involving children were sufficient to establish probable cause); *c.f. United States v. Ahrndt*, No. 3:08-CR-468, 2013

U.S. Dist. LEXIS 7223, at *28-9, 2013 WL 179326, at *10, (D. Or. Jan. 17, 2013) (unpublished) (holding that law enforcement's and the reporting party's nonspecific, partial recollections of file names were not sufficient to establish probable cause). If the terms are not specific to contraband, those terms are unhelpful in determining whether probable cause exists. Neither case law nor evidence presented in the warrant affidavit here support a finding that vague terms like "teen" and "young" are descriptive enough to indicate the possession of child pornography, as opposed to the possession of entirely legal pornography. This is especially true here since the allegedly suspicious names were associated with file folders that Special Agent Kucenski believed contained pornography as opposed to specific images or videos of child pornography.

**Fourth**, and finally, Mr. Pena did not make an "equivocal" statement during the execution of the first search. He said "no" when asked whether his computers and hard drives contained child pornography. The district court agreed but found Mr. Pena's statement that he used file sharing software to download pornography "suspicious." As previously discussed, however, no evidence exists that Mr. Pena used file sharing software to violate the child pornography laws. Because the warrant affidavit lacks any evidence linking Mr. Pena's use of file sharing software to any child pornography, this allegation is not reliable enough to draw any inferences from. It is merely a hunch.

12

2.      The good faith exception should not apply in this case.  Here, the warrant affidavit is devoid of any facts establishing Mr. Pena received, distributed, or possessed child pornography.  *See United States v. Knox*, 883 F.3d 1262, 1273-4 (10th Cir. 2018).  The seminal allegations against Mr. Pena are (1) he used file sharing software and electronic storage devices, (2) one of the electronic devices had file names that included the words "teen" and "young", and (3) he allegedly "equivocated" when he denied possessing child pornography because he said he used file sharing software.  With respect to the first and second allegations, the attesting agent inferred from the alleged facts that Mr. Pena possibly possessed and collected pornography, not child pornography.  With respect to the third allegation, Mr. Pena's purportedly equivocal statement, the district court found that Mr. Pena did not equivocate and the only inference that could be drawn from the allegation is that Mr. Pena's response was suspicious.

Hence, the only allegation in the warrant affidavit connecting Mr. Pena to the receipt, distribution or possession of child pornography is the attesting agent's opinion that people who collect large volumes of pornography using file sharing software and electronic storage devices might also collect child pornography.  As previously discussed, this opinion violates *Edwards*.  In *Edwards*, this Court applied the good faith doctrine but in doing so gave fair warning to the government.  "Where both the magistrate and district court failed to notice this logical defect, we are not

13

convinced it should have been obvious to Officer Cornwell, *at least not prior to this decision*." 813 F.3d at 973 (emphasis added). This Court should not stray from its pronouncement in *Edwards*. The warrant affidavit is devoid of any evidence connecting Mr. Pena to the receipt, distribution, or possession of child pornography. The only reason Special Agent Kucenski believed Mr. Pena possessed child pornography is because he also believed Mr. Pena collected large amounts of pornography. *Edwards* placed the government on notice that a logical fallacy of this nature cannot establish probable cause. Therefore, the good faith exception is inapplicable to this case.

      3.    The government would not have inevitably discovered child pornography while conducting the procurement fraud investigation. This Court has cautioned that "the inevitable discovery exception to the exclusionary rule cannot be invoked because of the highly speculative assumption of 'inevitability[.]'" *United States v. Owens*, 782 F.2d 146, 153 (10th Cir. 1986). Here, the special agent who conducted the search admitted Mr. Pena's devices contained 20 to 30 terabytes of data, or "millions and millions and millions" of files. App. Vol. III at 654. To search for evidence of procurement fraud, the assigned agent used keyword searches and did not manually search the data. *Id.* After the warrant was issued in this case, the agent who conducted the analysis spent a year searching for child pornography.

App. Vol. III at 624.  He estimated that his work on Mr. Pena's case took up 75 percent of his time.  App. Vol. III at 625.

Despite the vast volume of data, the district court was persuaded that the government would have inevitably discovered child pornography.  This is pure speculation.  The agent testified that he could not recall the specific details of his review.  He vaguely recollected coming across a file with the word, "banned," at a high level of the file folder structure on the device.  He also testified that the browsing history contained suspicious search terms like "lola" and there were links to Russian pornography.  Importantly, however, the agent did not discover any child pornographic images during this review.  Lastly, it is not believable that the government would have continued searching for evidence of procurement fraud. The agent used keyword searches to find documents related to the procurement fraud case.  Therefore, the government cannot meet its burden of establishing that it would have inevitably discovered evidence of child pornography.

4.    If this Court determines that the district court erred in denying Defendant's suppression motion, the sentence imposed for the false claims counts should be reconsidered by the district court after re-calculation of the appropriate sentencing guidelines, under the sentencing package doctrine.

# ARGUMENT

## A.     The Standard of Review

In an appeal of the denial of a defendant's motion to suppress evidence, this Court reviews "the district court's factual findings for clear error and consider[s] the evidence in the light most favorable to the Government." *United States v. Haymond*, 672 F.3d 948, 958 (10th Cir. 2012) (internal quotations and citation omitted). "Although reviewing courts should afford a magistrate's probable cause determination great deference, this [C]ourt [should] not defer if there is no substantial basis for concluding that probable cause existed." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000) (internal quotations and citation omitted).

## B.     The Probable Cause Standard

An "affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." *Edwards*, 813 F.3d at 960 (*quoting Danhauer*, 229 F.3d at 1006).

> This necessarily requires application of a common-sensical standard, based on the totality of the circumstances.  A warrant is based on probable cause if the magistrate makes a practical, common-sense decision that, given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id*. (internal quotations and citation omitted).

16

While "courts may not engage in a 'divide-and-conquer' analysis of the facts to determine whether probable cause existed[,] . . . neither may a court arrive at probable cause by piling hunch upon hunch." *Valenzuela*, 365 F.3d at 897 (10th Cir. 2004) (internal quotations and citation omitted). "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulable hunches, a result this Court has consistently refused to sanction." *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

> Thus, in assessing the totality of circumstances, a reviewing court must examine the facts *individually in their context* to determine whether the rationale inferences can be drawn from them that support a probable cause determination. A factor does not become irrelevant simply because it is readily susceptible to an innocent explanation. Thus, in determining probable cause . . . existed, we look not only to the facts supporting probable cause, but to those that militate against it.

*Valenzuela*, 365 F.3d at 897 (emphasis added) (internal quotations and citations omitted). "In other words, each fact must either be rationally suspicious in itself, or, despite being innocent on its face, must be rationally suspicious when viewed in the context with the other articulable facts." *United States v. Martinez-Cigarroa*, 44 F.3d 908, 911 (10th Cir. 1995).

## C.   The Warrant Affidavit Fails to Establish Probable Cause

The district court erred when it found Special Agent Kucenski's warrant affidavit was sufficient to establish probable cause. When the allegations are considered together, in their totality, the only rational inference that can be drawn

17

from the affidavit is that Mr. Pena possibly used file sharing software and electronic storage devices to collect pornography. The only allegation linking Mr. Pena to child pornography is Special Agent Kucenski's opinion that collectors of pornography are likely to also collect child pornography. Special Agent Kucenski's opinion, however, is unreliable and insufficient to establish probable cause as explained in *Edwards*.

1.  The district court wrongly disregarded the militating effect of Special Agent Kucenski's opinion that Mr. Pena's (1) use of file sharing software and possession of storage devices and (2) the names of the file folders indicated a proclivity for collecting pornography, not child pornography.

When read closely, the warrant affidavit contains two facts about Mr. Pena's sexual proclivities. One, Mr. Pena used file sharing software and storage devices to collect pornography. And two, one of Mr. Pena's storage devices contained electronic file folders that likely contained pornography because of the way they were named. Special Agent Kucenski, based on his knowledge and experience, inferred from these allegations that Mr. Pena collected pornography. The district court, on the other hand, inferred from these allegations that Mr. Pena may have collected child pornography.

The district court erred by disregarding Special Agent Kucenski's opinions and inferring illegal conduct instead. Turning to the first allegation, a reasonably prudent person could not reasonably infer that Mr. Pena used file sharing software

to receive, distribute, or possess child pornography without some evidence showing that Mr. Pena had *at some point* used the software for that purpose. Here, the warrant affidavit does not allege a single instance where Mr. Pena used file sharing software to search for, access, download, trade, distribute, receive, or possess any child pornographic materials. The only "evidence" Special Agent Kucenski presented to the magistrate was his opinion that people who collect child pornography often use file sharing software to obtain the materials and they tend to keep them for long periods.

According to the district court, the magistrate who issued the warrant "was entitled to rely on [Special Agent] Kucenski's expertise in determining that those who possess child pornography often use multiple devices and use peer-to-peer file sharing software, because [Special Agent] Kucenski also set out specific facts explaining why those who possess child pornography have many devices and use file sharing software." App. Vol. III at 583. This opinion is unhelpful, however, because no evidence was presented in the affidavit that Mr. Pena possessed child pornography.

*Edwards* is dispositive on this point. In *Edwards*, the district court relied on the attesting officer's opinion that "those who possess *child pornography* are also highly likely to possess *child erotica*." 813 F.3d at 965 (emphasis in original). The Court found the attesting officer's opinion irrelevant because the "warrant affidavit

19

[did] not allege that Mr. Edwards's was found in possession of child pornography."

*Id*. "Consequently, a statement that collectors of child pornography—a group that there was no evidence includes Mr. Edwards—are highly likely to also possess child erotica did not provide 'a substantial basis for concluding that probable cause existed' that child pornography would be found in Mr. Edwards' home." *Id*. (*quoting Danhauer*, 229 F.3d at 1006).

The same is true in Mr. Pena's case. No evidence was presented in the affidavit that Mr. Pena possessed child pornography. Therefore, Special Agent Kucenski's opinion that those who collect child pornography often use file sharing software and multiple electronic storage devices does not provide a substantial basis for concluding that probable cause would be found on Mr. Pena's computer and devices.

The government will surely take issue with Appellant's arguments that the warrant affidavit makes no connection between Mr. Pena's use of file sharing software and Mr. Pena's suspected possession of child pornography. In anticipation of this argument, and with respect to the issue of whether the warrant affidavit establishes any link at all, Appellant urges this Court to follow the logic in *United States v. Haymond*, 672 F.3d 948 (10th Cir. 2012) and *United States v. Kilgore*, 856 Fed. App'x 783 (10th Cir. 2021) (non-precedential).

In those cases, the warrant affidavits set forth specific facts connecting the defendants' online activities (i.e., use of file sharing software or activity on the Internet) to actual child pornographic materials.  In *Haymond*, for instance, this Court held that the warrant affidavit in that case established probable cause because while conducting an undercover investigation involving file sharing software called LimeWire the attesting agent "observed a user with an IP address linked to Mr. Haymond's residence who had numerous files of child pornography available for other LimeWire users to access, view, and download."  672 F.3d at 959.  Similarly, in *Kilgore*, the warrant affidavit established probable cause because it specified that "IP addresses assigned to Mr. Kilgore's [computers] had been linked to images of child exploitation" through monitoring of a social messaging application called Kik.  856 Fed. App'x at 785.

In contrast, Special Agent Kucenski's warrant affidavit does not allege that Mr. Pena ever used file sharing software to obtain and possess a single image or video of suspected child pornography.  No evidence exists, for example, that Special Agent Kucenski observed an IP address linked to Mr. Pena accessing child pornography through file sharing software, as was the case in *Haymond*.  Nor does the warrant affidavit contain any evidence that an IP address assigned to Mr. Pena's computer had been linked to any child pornographic materials, as was the case in *Kilgore*.

21

Therefore, the government cannot reasonably argue that the warrant affidavit in this case provides any meaningful connection between Mr. Pena's use of file sharing software and purported possession of child pornography. In context then, the allegations concerning Mr. Pena's use of file sharing software do not provide any basis, much less a reasonable basis, to believe child pornography would be found on Mr. Pena's computer and devices.

Appellant is not suggesting that a defendant must always be found in possession of child pornography before a warrant is issued to search for child pornography. Rather, Appellant is addressing the false pretext that Mr. Pena's use of file sharing software and possession of electronic storage devices somehow creates a reasonable basis to believe Mr. Pena falls into the category of people who use file sharing software to access child pornography. *Edwards* forecloses relying on such a fallacy.

Because neither the magistrate nor the district court could independently infer illegal conduct associated with Mr. Pena's use of file sharing software and possession of electronic storage devices, it was wholly unreasonable for the district court to disregard Special Agent Kucenski's conclusion that Mr. Pena use of file sharing software and possession of electronic storage devices indicated a sexual proclivity for collecting pornography, not child pornography. Accordingly, Special

Agent Kucenski's opinion that Mr. Pena likely collected pornography, rather than child pornography, militates against probable cause.

2.   <u>The district court's decision contradicts *Edwards.*</u>

Because there was no evidence presented in the affidavit that Mr. Pena used file sharing software to obtain child pornography or possessed child pornography, the crux of the warrant affidavit is that because Mr. Pena "may" fit the profile of someone who uses file sharing software and electronic storage devices to collect pornography, he may collect child pornography. As Special Agent Kucenski opined:

> Your Affiant knows through training and experience that some persons who distribute, possess, or produce child pornography engage in "collector behavior." Your Affiant believes that BOBBY MARTIN PENA may fall within this category of persons in light of indicators of large quantities of suspected pornographic materials on ten, large-capacity, USB storage devices. Some of the characteristics of "collector behavior" include:
>
> a.   Persons who are "collectors" of child pornography often keep the material in their possession for years, because it is considered valuable contraband.
>
> b.   Persons who are "collectors" of child pornography often transfer electronic files containing child pornography from device to device, either to make room on their devices, or for long-term storage.

App. Vol. II at 286. Special Agent Kucenski's opinion flies in the face of *Edwards*.

In *Edwards*, this Court rejected the attesting officer's opinion that Mr. Edward's participation in an online forum dedicated to child erotica established a reasonable probability that he likely also possessed child pornography. 813 F.3d at

967.  This Court found the allegations concerning Mr. Edward's interest in child erotica to be insufficient to establish probable cause because it rested on a logical fallacy.  This Court explained as follows:

> Officer Cornwell asserted various characteristics and proclivities of those who possess child pornography, such that "child pornography collectors reinforce their fantasies" by, among other things, "interacting, both directly and indirectly, with other like-minded adults" in such online forums or other communities. [. . .] In much the same way that Officer Cornwell's assertion that those who collect child pornography are also likely to collect child erotica fails to support a conclusion that possessors of child erotica are likely to possess child pornography, an assertion about the characteristics or proclivities of child pornography collectors does not establish a fair probability that Mr. Edwards would share those characteristics in the absence of evidence he is a collector or viewer of child pornography.  And there was no evidence presented to the magistrate judge here . . . that "the overriding, if not the sole, purpose" of the website in which Mr. Edwards participated was "to facilitate the receipt and distribution of child pornography."  Under these circumstances, the warrant affidavit does little to infuse Mr. Edwards's legal conduct with the suspicion necessary to support probable cause that he was in possession of illegal child pornography.

*Id.* at 967-68 (*quoting United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005)).

If belonging to a child erotica website does not establish probable cause to believe a person possesses child pornography, then collecting legal pornography is surely not sufficient either.  *See United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) ("It is an inferential fallacy of ancient standing to conclude that, because members of group A (those who collect child pornography) are likely to be members of group B (those who are attracted to children), then group B is entirely, or even

24

largely composed of, members of group A.") (internal quotations and citation omitted). Simply put, just because people who collect child pornography are likely to use file sharing software to perpetuate that crime does not mean that people who use file sharing software to view legal pornography fall into the category of collectors of child pornography.

Special Agent Kucenski's opinion is therefore a logical fallacy that cannot withstand the scrutiny *Edwards* demands.

3. <u>The file folder names are too ambiguous to infer illegal activity.</u>

Contrary to the district court's ruling, the file folder names are not nearly descriptive enough to draw any reasonable inferences from. To be clear, the warrant affidavit does not assert that Special Agent Kucenski observed child pornography, or any pornography for that matter, inside the file folders. Moreover, Special Agent Kucenski inferred from the file folder names that pornography, rather than child pornography, was likely stored inside. Notwithstanding the district court's acceptance of Special Agent Kucenski's opinions regarding file sharing software and collector behavior, the district court oddly rejected Special Agent Kucenski's opinion concerning the inference to be drawn from the file folder names.

The district court reasoned that with respect to the file folder names, the inquiry focused only on whether "[Special Agent] Kucenski provided sufficient information in the affidavit to allow a Magistrate Judge to independently assess

whether the devices would likely contain child pornography." App. Vol. III at 582. The district court's sole rationale for rejecting Special Agent Kucenski's opinion was that "[w]hile it is possible that the word 'teen' implies pornography involving legal adults, it is more likely that the word 'teen' indicates pornography involving a minor child aged thirteen through seventeen. There are more minor teens than adult teens." *Id*. The district court does not cite any legal authority for this proposition, and the warrant affidavit is obviously in conflict with the district court's finding on this issue.

While this appears to be an issue of first impression in this Court, helpful authority exists in other jurisdictions. The case law persuasively instructs that file and image names are reliable if they contain specific indicators associated with child pornography, such as particular ages or terms commonly associated with the possession and distribution of child pornography.

For example, in *Miknevich*, the title of the computer file at issue contained "highly graphic references to specific sexual acts involving children. The file name refer[red] to the ages of the children ('6yo' and '7yo') and to graphic sexual activities ('little norwegian angels stroking their erect clits')." 638 F.3d at 184. The attesting agent also recognized the hash value of the image to be known child pornography. *Id*. at 185. The court,

> acknowledged that in some circumstances a computer file name may not provide meaningful insight into its contents, especially where the

file name contains a term or name that is commonplace or otherwise capable of different interpretations. However, it does not necessarily follow that file names can never be regarded as a logical indication of the file's contents. *A file's name may certainly be explicit and detailed enough so as to permit a reasonable inference of what the file is likely to depict.* The unmistakable inference which arises from the file name here is that its contents included material pertaining to the sexual exploitation of children.

*Id*. (emphasis added); *see also United States v. Doyle*, 650 F.3d 460, 473 (4th Cir. 2011) (holding that a nude photograph of a child is not sufficient to establish probable cause).

Similarly, in *Battershell*, the court there found that describing an image as a "young" girl was sufficient to establish probable cause when accompanied by an age range, in this case "(8-10 YOA)." 457 F.3d at 1053. The *Battershell* court explained:

Officer Lobdell described the first image as showing a naked "young female (8-10 YOA)." In the very next sentence, Officer Lobdell described the second picture as showing "another young female having sexual intercourse." The word, "another," is an adjective whose meaning is defined by its reference to an immediately preceding noun. Here, it refers to a "young female (8-10 YOA)." Having just used the term "young female" to mean a girl between the ages of eight and ten, Officer Lobdell's use of the phrase "another young female" can only mean, grammatically, that he was describing another minor between the ages of eight and ten.

Furthermore, Officer Lobdell noted in his report that the second young female was having sex with an "adult" male. His use of the term "adult" for the male, juxtaposed with the term "young" for the female, suggests that the female was not an "adult." Officer Lobdell concluded that the details in the two enlarged images "confirmed that the pictures were illegal to obtain." *If Officer Lobdell did not think that the "young*

27

*female" in the second picture was a minor, then he would not have said that the photograph was illegal to obtain*.

*Id*. at 1053-54 (emphasis added).

Likewise, in *Beatty*, the court found that "[m]any, if not most, of the files at issue here are titles that contained highly graphic references to specific sexual acts—including ejaculation, sexual intercourse, oral sex, and anal sex—involving children ranging in age from 7 to 13 years." 2009 U.S. Dist. LEXIS 121473, at *23. According to the court, "[s]everal of the files also reference terms such as 'child_sex,' 'pedofilia,' 'illegal pedo sex,' 'incest,' or 'Lolita.'" *Id*. From these "highly descriptive file names," the court believed the inference of child pornography was "a strong one." *Id.; c.f. Ahrndt* at *31 (holding that partial recollections and characterizations of the image file names, which described 5 to 11 year old children engaged in sex acts, were too general and thus insufficient to establish probable cause).

The reasoning in these cases is sound and strikes an appropriate balance between preventing child exploitation and avoiding intrusive searches of people who collect lawful pornography. To put this in perspective, in a case involving a constitutional challenge to recordkeeping, labeling, and inspection requirements implemented as a result of the Adam Walsh Child Protection and Safety Act of 2006, the government presented evidence that a simple search for "teen porn" on Google resulted in 235 million hits. *Free Speech Coalition, Inc. v. Attorney General United*

*States*, 787 F.3d 142, 162 (3d Cir. 2015), *on rehearing*, 2015 U.S. App. LEXIS 15448 (3d Cir. Sept. 1, 2015).  In the same case, a government expert on the topic testified that the top three porn sites on the Internet contain 17.97 million pages with the words "young," "teen," "college," and "daughter," and "this figure amounts to 34.2% of all pages within these pornographic sites." *Id*. at 161.

Hence, the terms that form the basis for probable cause in this case are commonly used by people to search for adult pornography on legal porn sites.  This undermines the district court's conclusory decision that the term "teen" is more likely to describe child pornography than adult pornography.  And again, the attesting agent's opinion in the warrant affidavit contradicts the district court as well.

This issue is important because according to the Institute for Family Studies, 57 percent of men in their 30s and 40s have watched pornography in the past month and 42 percent in the past week.[1]  The implication of this appeal is clear: upholding the warrant in this case will open the door to intrusive searches of the electronic devices of millions of people who regularly search for, view, download, share, and collect legal pornography using common, non-specific search terms like "teen" and "young."

---

[1] *See* Cox, D. et al., "How Prevalent is Pornography?" *Institute for Family Studies* (May 3, 2022) (available at https://ifstudies.org/blog/how-prevalent-is-pornography) (last accessed on March 24, 2023).

In this case there is no evidence from the warrant affidavit or as reflected in controlling or even persuasive case law to support a finding that vague and ambiguous terms like "teen" and "young" are reasonably associated with possessing child pornography as opposed to other legal pornography. This is especially true here since the allegedly suspicious names were associated with file folders that Special Agent Kucenski believed contained pornography as opposed to specific images or videos of child pornography.

Thus, no inference of wrongdoing can be drawn from the files found on Mr. Pena's device.

4.     <u>Mr. Pena's Statement during the First Search did not Create an Inference of Illegal Conduct.</u>

Lastly, the government incorrectly argues Mr. Pena's statements during the execution of the first warrant supports a reasonable inference he possessed child pornography. This Court should reject this argument because Mr. Pena did not make an "equivocal" statement during the execution of the first search. He said "no" when asked whether his computers and hard drives contained child pornography. App. Vol. II at 289. The district court agreed (App. Vol. III at 583), and this Court should do the same.

While the district court believed Mr. Pena's statement that he used file sharing software to download pornography created "suspicion," as explained extensively above, Mr. Pena's truthful answer that he possessed pornography is not sufficient

either by itself or in combination with the other allegations included in the warrant affidavit to establish probable cause.

Moreover, the district court seemed persuaded by Special Agent Kucenski's testimony at the evidentiary hearing that Mr. Pena's comment created suspicion that he had something to hide. App. Vol. III at 583. For example, Mr. Pena immediately responded that he had "porn" on his computer and was concerned what investigators might find. The Court's reliance on Special Agent Kucenski's explanation at the hearing is inappropriate because "where the police do not present oral testimony to the reviewing magistrate, the appellate court must ascertain the existence of probable cause to support a warrant exclusively from the affidavit's four corners." *United States v. Beck*, 139 Fed. Appx. 950, 954 (10th Cir. 2005) (non-precedential) (*citing Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565, n.8 (1971)).

But more importantly, the warrant affidavit describes a completely different set of facts than what Special Agent Kucenski recollected at the evidentiary hearing. He wrote the following in the warrant affidavit:

> DOE OIG Special Agents asked BOBBY MARTIN PENA about the content of the Devices. PENA explained they contained family photos and "porn." Agents further asked PENA whether there was any child pornography on the Devices. PENA stated "No", but caveated that assertion claiming he "rips" pornography from "torrent" files, referring to common Internet peer-to-peer ("P2P") file-sharing software. PENA reported the files were downloaded to the Devices and left there.

App. Vol. II at 289.

Based on a plain reading of the warrant affidavit, investigators asked Mr. Pena about the contents of the devices. He said they contained "family photos" and "porn." Mr. Pena did not spontaneously blurt out that the devices contained pornography. He simply answered the investigators' question. The investigator then asked, is there any child pornography on the devices. Mr. Pena responded by saying, "no." The affidavit does not state that the investigators who spoke to Mr. Pena characterized his answers as "suspicious." To extent that the government wishes this Court to draw an inference that Mr. Pena used file sharing software to download child pornography, again, no evidence exists that he used the file sharing software for this purpose.

It is notable that Special Agent Kucenski did not execute the first warrant. He was not present when Mr. Pena allegedly made these statements. Under these circumstances, no reasonable inferences can be drawn from Special Agent Kucenski's use of the word "caveat" in his warrant affidavit—certainly not without all the additional details he provided at the evidentiary hearing, which he either would had to have known from being present at the execution of the warrant or had to have been told by the executing officers.

For the magistrate, district court, and this Court to infer that Mr. Pena was fearful child pornography would be discovered, the warrant affidavit should have been far more detailed and descriptive. Special Agent Kucenski's one word

description of the suspicion caused by Mr. Pena's direct answer to the investigators' questions amounts to nothing more than a hunch that Mr. Pena was worried child pornography would be found on the devices.

This allegation combined with all the other allegations establishes no more than the unremarkable inference that Mr. Pena probably used file sharing software to collect pornography—not child pornography—and then stored pornography on his devices—but certainly not child pornography. This Court should therefore reverse the district court and rule that the warrant lacked probable cause.

**D.   The Good Faith Exception Should Not Apply to this Case.**

For the reasons explained above, the warrant affidavit in this case is devoid of any factual support that would lead to the conclusion that Mr. Pena possessed child pornography versus legal pornography. When an agent is "wholly unwarranted in relying on a warrant" because the "affidavit submitted in support of the warrant is devoid of factual support," the good faith exception should not apply. *Knox*, 883 F.3d at 1274.

Here, the warrant affidavit alleges that (1) Mr. Pena used file sharing software and electronic storage devices, (2) one of the electronic devices had file names that included the words "teen" and "young", and (3) Mr. Pena allegedly "equivocated" when he denied possessing child pornography because he said he used file sharing software. Allegations one and two are irrelevant because Special Agent Kucenski

inferred from the alleged facts that Mr. Pena possibly possessed and collected pornography, not child pornography. The magistrate did not have any basis to draw a different conclusion because the uses of file sharing software are not common understanding to an ordinary person, and no one could derive that vague, and ambiguous terms like "teen" and "young" indicate child pornography as opposed to legal pornography. With respect to the third allegation, Mr. Pena's purportedly equivocal statement, the district court found that Mr. Pena did not equivocate and the only inference that could be drawn from the allegation is again that Mr. Pena possibly collected pornography, not child pornography.

This again leads to a single allegation connecting Mr. Pena to the receipt, distribution or possession of child pornography—Special Agent Kucenski's opinion that people who collect large volumes of pornography using file sharing software and electronic storage devices might also collect child pornography. As previously discussed, this opinion violates *Edwards*. In *Edwards*, this Court applied the good faith doctrine but in doing so gave fair warning to the government. "Where both the magistrate judge and the district court failed to notice this logical defect, we are not convinced it should have been obvious to Officer Cornwell, *at least not prior to this decision*." 813 F.3d at 973 (emphasis added).

*Edwards* controls this case. This Court placed the government and law enforcement on notice that drawing an illogical inference based on a sexual

proclivity that happens to be legal cannot be rescued by the good faith doctrine.  Not post-*Edwards*.

The only reason Special Agent Kucenski believed Mr. Pena possessed child pornography is because he also believed Mr. Pena collected large amounts of pornography.  The warrant affidavit is devoid of any evidence connecting Mr. Pena to the receipt, distribution, or possession of child pornography.  The government has had fair warning of the consequences of proceeding on the theory posited in the warrant affidavit.  Excusing the government's failure to comply with *Edwards* will render it meaningless.  Worse, rendering conflicting opinions in *Edwards* and this case will create an unworkable set of precedent in future cases.  Thus, this Court should not apply the good faith exception in Mr. Pena's case.

**E.    Evidence of Child Pornography Would Not Have Been Inevitably Discovered on Mr. Pena's Computer and Devices.**

The district court erroneously found Special Agent Kucenski would have inevitably discovered evidence of child pornography during the procurement fraud investigation.  This is untrue for the following reasons.  One, the number of data files was too large to manually search for evidence of procurement fraud, which made it unlikely that they would find child pornography.  Two, because of the vast amount of data, Special Agent Kucenski used keywords to search for evidence of procurement fraud, and the keywords he used would not have uncovered child pornography.  Three, Special Agent Kucenski's contention that he would have

inevitably discovered child pornography while scanning for evidence of user attribution, that is, ensuring that the data belonged to Mr. Pena, is too speculative to satisfy the government's burden of proof. Four, the reports introduced during the evidentiary hearing, such as internet search history, were created while specifically looking for child pornography, and therefore are immaterial to the issue of whether this information would have been inevitably discovered during the procurement fraud investigation. And five, Special Agent Kucenski lied under oath during the grand jury proceeding about whether he found child pornography on Mr. Pena's devices, which creates a serious concern about his overall credibility. This is particularly relevant since the district court took his "word" that he would have inevitably discovered child pornography.

To prevail the government must "prove by a preponderance of the evidence that the unlawfully-obtained evidence would have been discovered through lawful means." *United States v. Loera*, 923 F.3d 907, 928 (10th Cir. 2019). "The key to applying this doctrine is to place the government officers in the 'same positions they would have been in had the impermissible conduct not taken place,' and, from that vantage point, to ask whether the government would have inevitably discovered the evidence lawfully." *Id*. (*quoting Nix v. Williams*, 467 U.S. 431, 447 (1984)). "[T]he inevitable discovery exception […] cannot be invoked because of the highly speculative assumption of 'inevitability'[.]" *Owens*, 782 F.2d at 153. To be sure,

the Tenth Circuit has long "recognize[d] the danger of admitting unlawfully obtained evidence 'on the strength of some judge's speculation that it would have been discovered legally anyway[.]" *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982) (*quoting United States v. Castellana*, 488 F.2d 65, 68 (5th Cir. 1974)). As explained below, the government cannot satisfy its burden that child pornography would have inevitably been discovered during the procurement fraud investigation.

With respect to points one and two, Special Agent Kucenski conceded during the evidentiary hearing that the data files consisted of 20 to 30 terabytes, or "millions and millions and millions" of files, and it would have taken a "long time" to manually review the data for evidence of either procurement fraud or child pornography. App. Vol. III at 654. Because of this, Special Agent Kucenski used search terms while searching for evidence of procurement fraud. App. Vol. II at 301-302 & App. Vol. III at 653-655. The search terms included, "Bids," "Fib," "DLP," "Submittal," "Project," "T&B," "Completed," "Contract," "SNL," "Sandia," "Nebb," "Certificate," "Award," "Safety," "Liability," "Standard," "Nmaha," "Specifications/specs/spec," and "Drawing." App. Vol. II at 301-302. According to Brian Chase, the defense's computer forensics expert who testified at the evidentiary hearing, "[t]he searches for procurement fraud would have never revealed the presence of child pornography on the digital devices." App. Vol. II at 302. The government did not offer any evidence refuting this. Therefore, the

government cannot reasonably argue that the forensic investigation in the procurement fraud case would have revealed child pornography.

Third, the government's contention that Special Agent Kucenski would have inevitably discovered evidence of child pornography while scanning the files for user attribution is speculative, and not sufficiently reliable to satisfy the government's burden. Here, Special Agent Kucenski generally testified that "[a]t least in a couple of cases, the files were found at a pretty high level in the directory structure of the device. So it was only a folder or two down where other keywords started coming out that would suggest that something may be there." App. Vol. III at 627. The prosecution asked as a follow up, "[a]nd do you recall today what device specifically had the material—you said a keyword or two down, I don't remember your words." *Id*. In response, Special Agent Kucenski said, "I don't recall the specific device, the keywords that starting showing up, there was something called B-A-N-N-E-D, suggesting maybe that could be something illegal compared with pornography." App. Vol. III at 627-628.

The district court found Special Agent Kucenski's testimony sufficient to satisfy the government's burden. App. Vol. III at 592 ("If [Special Agent] Kucenski had not paused his search to obtain the Second Search Warrant, it is highly likely that he would have encountered more incriminating file folder names that indicated child pornography's presence, thus supporting probable cause for a search

warrant."). The district court's reliance on Special Agent Kucenski's testimony is improper because the testimony is too speculative to meet the preponderance standard.

Special Agent Kucenski knew or should have known that he would be asked questions about inevitable discovery at the hearing. Indeed, his testimony about not recollecting was made during direct examination by the prosecution. His testimony contrasts sharply with the testimony of the agent in *Loera*, where the district court made specific factual findings about which file folder had been searched and the exact name of the file folder. 923 F.3d at 928. Affirming on the flimsy testimony in this case would be a vast departure from the holding in *Loera*.

Fourth, although the district court made no factual findings on this point, the government argues Special Agent Kucenski would have discovered child pornography while looking at an Internet Artifacts Report that documented Mr. Pena's browsing history. In support, the government introduced a culled report with 200 entries using special software. App. Vol. II at 456-471. This evidence is immaterial to whether Special Agent Kucenski would have found evidence of child pornography because the entries were found while specifically looking for child pornography using specialized software and the browsing history contained on the devices consisted of hundreds of thousands of artifacts. App. Vol. III at 685-686.

Therefore, the evidence pertaining to Mr. Pena's browsing history is likewise unhelpful to the inevitable discovery analysis.

Fifth and finally, Special Agent Kucenski lied to during the grand jury proceeding about whether he found evidence of child pornography while searching for evidence of procurement fraud. App. Vol. III at 665-668. In fact, Special Agent Kucenski's warrant affidavit does not say that he found evidence of *child* pornography while searching for evidence relating to fraud. As explained through this brief, Special Agent Kucenski averred that he found evidence of *pornography*. The distinction between pornography and child pornography is substantial. He is an experienced agent who knew the impact his testimony would have on the grand jury. His false testimony should cause this Court pause before taking his word that he would have inevitably discovered child pornography while searching for evidence of procurement fraud.

For these reasons, this Court should reverse the district court's ruling that Special Agent Kucenski would have inevitably discovered child pornography during the course of the procurement fraud investigation.

**F.    If the Ruling on the Suppression Motion is Reversed, the Court Should Remand the Procurement Fraud Case for Resentencing Under the Sentencing Package Doctrine.**

If this Court reverses the denial of the suppression motion, it should remand the false claims convictions in the procurement fraud case for resentencing, as the

40

sentences for the child pornography conviction and the false claims convictions were part of a single sentencing package.

In these two cases, the district court conducted sentencing simultaneously. Granting a substantial downward variance, the district court imposed 41 months of incarceration for each of the 29 convictions with each to run concurrently to one another, for a combined, single sentence of 41 months.   Under the sentencing guideline range of 63 to 78 months (App. Vol. I at 204), this was a significant downward variance.   The guideline range was calculated in a single presentence investigation report and was based exclusively on the child pornography offense, as the Sentencing Guideline's grouping rules resulted in the false claims convictions being disregarded in the calculation of the applicable offense level.   *See* App. Vol. I at 46.   If this Court reverses the ruling on the suppression motion, the child pornography conviction will ultimately be vacated, and the correct applicable guideline range for the remaining counts of conviction will be dramatically reduced. The adjusted offense level for the child pornography offense was 29, whereas the adjusted offense level for the false claims group was 14.   App. Vol. I at 204; App. Vol. I at 46.   *Id.*   The total offense level would drop from 26 to 11, and the applicable guideline range would be reduced from 63-78 months to 8-14 months.   *Id.*   As a result, if this Court were not to remand the false claims convictions for resentencing,

a sentence of 41 months would reflect a substantial upward variance rather than the substantial downward variance granted by the district court.

The sentencing package doctrine warrants remand of both of these cases if this Court reverses the denial of the suppression motion. "When, on appeal, one or more counts of a multicount conviction are reversed and one or more counts are affirmed, the result is an 'unbundled' sentencing package. Because the sentences are interdependent, the reversal of convictions underlying some, but not all, of the sentence renders the sentencing package ineffective at carrying out the district court's sentencing intent as to any one of the sentences on the affirmed convictions. Thus, upon remand the district court has the authority to reevaluate the sentencing package and resentence the defendant to effectuate the original sentencing intent." *United States v. Hicks*, 146 F.3d 1198, 1202 (10th Cir. 1998) (*quoting United States v. Shue*, 825 F.2d 1111, 1114 (7th Cir. 1987)) (punctuation omitted). "[W]henever a reversal on appeal undoes a sentencing plan, or even calls the plan into question, the district court should be invited to resentence the defendant on all counts in order to achieve a rational, coherent structure in light of the remaining convictions." *United States v. Bentley*, 850 F.2d 327, 328 (7th Cir. 1988). "After an appellate court unwraps the package and removes one or more charges from its confines, the sentencing judge, herself, is in the best position to assess the effect of the withdrawal and to redefine the package's size and shape (if, indeed, redefinition

seems appropriate)." *United States v. Pimienta-Redondo*, 874 F.2d 9, 14 (1st Cir. 1989). This Court has recognized that the sentencing guideline provisions operate interdependently, that a sentence under the guidelines constitutes a sentencing package that takes into account all of the counts for which the defendant has been convicted, and that it is therefore appropriate to resentence a defendant upon one of the convictions being vacated. *United States v. Mendoza*, 118 F.3d 707, 710 (10th Cir. 1997).

Therefore, this Court should remand the false claims convictions for resentencing if it reverses the district court's ruling on the suppression motion.

## CONCLUSION

For the foregoing reasons, Defendant-Appellant Bobby Pena respectfully requests that the Court reverse the district court's denial of his motion to suppress and remand both of these cases for further proceedings and resentencing on the false claims convictions.

## REQUEST FOR ORAL ARGUMENT

Defendant-Appellant Bobby Pena respectfully requests oral argument in this appeal. These appeals present a complex question of digital search and seizure jurisprudence that is factually complex. Undersigned counsel believes that oral argument would assist the Court in answering any questions it may have about the complex issues involved.

Respectfully submitted,

Christopher A. Dodd
Brooke M. Jordy
DODD LAW OFFICE, LLC
500 Marquette Ave. NW, Suite 1330
Albuquerque, NM 87102
505.475.2742
chris@doddnm.com
brooke@doddnm.com

and

Vincent J. Ward
THE WARD LAW FIRM
PO Box 7940
Albuquerque, NM 87194
505.944.9454
vincent@wardlawnm.com
Attorneys for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this document contains 10,151 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in size 14 point, Times New Roman font.


Date:  April 28, 2023

Christopher A. Dodd
Attorney for Defendant-Appellant
DODD LAW OFFICE, LLC
500 Marquette Ave. NW, Suite 1330
Albuquerque, NM 87102
505.475.2742
chris@doddnm.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                  No. CR 19-3611 JB

BOBBY PENA,

     Defendant.

**MEMORANDUM ORDER AND OPINION**

     **THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence, filed August 6, 2021 (Doc. 29)("Motion to Suppress"). The Court held an evidentiary hearing on October 7, 2021. See Clerk's Minutes at 1, filed October 7, 2021 (Doc. 53). The primary issues are: (i) whether the Second Search Warrant, Search and Seizure Warrant at 1 (dated January 5, 2018), filed August 6, 2021 (Doc. 29-1)("Second Search Warrant") lacked probable cause to believe that Federal Bureau of Investigation ("FBI") Special Agent Matthew A. Kucenski would find evidence of child pornography on Defendant Bobby Pena's devices, because Kucenski stated that he believed pornography, rather than child pornography, would be found on the devices, and whether the Kucenski Aff., Affidavit, filed August 6, 2021 (Doc. 29-1)("Kucenski Aff."), in support of the Second Search Warrant is otherwise devoid of sufficient detail; (ii) if probable cause does not support the Second Search Warrant, whether Kucenski relied on the warrant in good faith; and (iii) if probable cause does not support the search warrant, whether Kucenski inevitably would have discovered the child pornography in the course of the fraud investigation that prompted the First Search Warrant, Application for a Search Warrant ¶ 11, at 3 (dated December 12, 2017), filed August 6, 2021 (Doc. 29-3)("First Search Warrant"). The Court concludes that: (i) the Kucenski

Attachment 1

Aff. provides sufficient factual detail in support of the search warrant, and, within the totality of the circumstances, the file folder names, Pena's use of peer-to-peer software, and the large number of devices indicating collector behavior, support sufficiently the probable cause determination of Magistrate Judge Jerry H. Ritter, United States Magistrate Judge for the United States District Court for the District of New Mexico; (ii) even if the search warrant lacks probable cause, Kucenski relied on Magistrate Judge Ritter's probable cause determination in good faith when he executed the search warrant and searched Pena's devices for child pornography evidence; and (iii) even if the search warrant lacks probable cause, Kucenski inevitably would have discovered more incriminating file folder names that would have supported the search warrant's issuance.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). "[H]earsay testimony is admissible at

Attachment 1

suppression hearings . . . and should be considered by a district court[.]" United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)(citing United States v. Matlock, 415 U.S. 164, 173 (1974)).[1]

---

[1]In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that the introduction of testimonial hearsay statements from witnesses not subjected to cross examination at trial violates a defendant's Sixth Amendment confrontation right. See 541 U.S. at 68-69. There is no binding precedent from the Supreme Court or the United States Court of Appeals for the Tenth Circuit concerning whether Crawford v. Washington applies to pretrial suppression hearings. The Tenth Circuit has indicated in unpublished caselaw that Crawford v. Washington does not bar hearsay statements at a suppression hearing. In United States v. Ramirez, the Tenth Circuit notes:

> It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings. See United States v. Garcia, 324 Fed. App'x. 705, 708 (10th Cir. [2009]), cert. denied, [558] U.S. [890] . . . (2009)(collecting cases). Nonetheless, even if we assume that the Confrontation Clause applies to the hearings at issue here, the admission of the confidential informant's statements was harmless.

388 F. App'x 807, 810 (10th Cir. 2010)(unpublished). Moreover, based on the same reasoning as the Tenth Circuit in United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010)(unpublished), the Court has concluded that hearsay statements are admissible in a detention hearing. See United States v. Hernandez, 778 F. Supp. 2d 1211, 1227 (D.N.M. 2011)(Browning, J.)(" Before Crawford v. Washington, courts held that the Confrontation Clause did not attach to detention hearings. Nothing in the Supreme Court's opinion in Crawford v. Washington undermines those holdings. Moreover, what authority exists after Crawford v. Washington rejects the proposition that Crawford v. Washington applies outside of trial."). Moreover, other Circuit Courts that have addressed this question have held that hearsay evidence's introduction at pre-trial proceedings does not violate the Confrontation Clause. See Peterson v. California, 604 F.3d 1166 (9th Cir. 2010)(concluding that the admission of hearsay evidence at a preliminary hearing does not violate the Confrontation Clause because the right to confrontation is a trial right). See also United States v. Mitchell-Hunter, 664 F.3d 45, 52 (1st Cir. 2011)(holding that the defendant did not have a confrontation right in a pretrial jurisdictional hearing). Consequently, the Court concludes that the admission of hearsay testimony at the suppression hearing does not violate Pena's confrontation rights.

1.   **Fraud Investigation.**

1.      Pena worked as a subcontractor to Sandia National Laboratories ("Sandia Labs") from May, 2008, to June, 2017.  <u>See</u> United States' Response in Opposition to Defendant's Motion to Suppress Evidence (Doc. 29) at 1, filed August 20, 2021 (Doc. 32)("Response").

2.      Doing business as De La Pena LLC, Pena provided specialized cleaning services, including air particle count monitoring, to Sandia Labs.  <u>See</u> Response at 1; Motion to Suppress at 6.

3.      In June, 2016, Sandia Labs contacted the Department of Energy's ("DOE") Office of Inspector General ("IG") to "report that [De La Pena, LLC] was submitting claims for work that was not performed."  First Search Warrant ¶ 11, at 3.

4.      "Specifically, based on Sandia [Labs] badge swipe records and other inquiries conducted by Sandia, [De La Pena, LLC] was not performing the required cleaning duties listed in the contract to include air particle count monitoring."  First Search Warrant ¶ 11, at 3.

5.      The DOE IG conducted surveillance on Pena and determined that he was not monitoring the air particle count but nonetheless was reporting air particle count data to Sandia Labs.  <u>See</u> First Search Warrant ¶¶ 12-16, at 4.

6.      On July 14, 2017, DOE IG Special Agents interviewed Pena.  <u>See</u> First Search Warrant ¶ 18, at 5.

7.      During the July 14, 2017, interview, Pena admitted that "he did not conduct required air particle count monitoring's [sic] and falsified the test results . . . for approximately two years."  First Search Warrant ¶ 18, at 5.

8.      Pena admitted to using his personal laptop to falsify the air count particle data that he submitted to Sandia Labs.  <u>See</u> First Search Warrant ¶¶ 18-19, at 5.

- 4 -

9.      Based on their surveillance and interview of Pena, on December 12, 2017, DOE

Special Agent Louis Gomez applied for a search warrant to search and seize Pena's electronic

devices located "within the Extra Space Storage Office building," which is where Pena's office

was located.  First Search Warrant ¶¶ 2, 20, at 2, 5.

10.     The First Search Warrant's purpose was to determine whether the equipment "was

used to generate, store, and submit false, fictitious or fraudulent claims."  First Search Warrant

¶ 20(c), at 5.

11.     Specifically, the First Search Warrant authorized law enforcement to search and

seize:

> 1.      All electronic records relating to violations of 18 U.S.C. § 287
> involving DE LA PENA, LLC or BOBBY MARTIN PENA including:
>
>> a) Data related to Sandia National Laboratories (Sandia) contracted
>> work
>>
>> b) Data related to air particle monitoring data at Sandia
>>
>> c) Invoices to Sandia
>>
>> d) Time records
>>
>> e) Sandia cleanroom floorplans
>>
>> f) Dates and times of work performed at Sandia
>>
>> g) Emails related to Sandia

and,

> 3.      For any computer hard drive or other [electronic] media that is called
> for by this warrant, or that might contain things otherwise called for by this
> warrant:
>
>> a) Evidence of user attribution showing who used or owned the
>> media at the time the things described in this warrant were
>> created, edited, or deleted, such as logs, registry entries, saved
>> usernames and passwords, documents, and browsing history;

- 5 -

b) Passwords, encryption keys, and other access devices that may
be necessary to access the media;

c) Documentation and manuals that may be necessary to access the
media or to conduct a forensic examination of the media.

First Search Warrant ¶¶ 1, 3, at 11.

12.     On December 12, 2017, the Honorable Steven C. Yarbrough, United States

Magistrate Judge for the United States District Court for the District of New Mexico, issued the

First Search Warrant with instructions to law enforcement to execute the search warrant before

December 26, 2017.  See First Search Warrant at 12.

**2.     Search of Pena's Electronic Devices**.

13.     On December 13, 2017, law enforcement officers executed the First Search Warrant

at Pena's office.  See Kucenski Aff. ¶ 37, at 17.

14.     During the First Search Warrant's execution, officers asked Pena about the

electronic devices' contents.  Kucenski Aff. ¶ 38, at 16.

15.     Pena told officers that the devices contain "family photos" and "porn."  Kucenski

Aff. ¶ 38, at 16.

16.     Officers asked Pena if the devices contain any child pornography, and he

responded, "No," and informed officers that he "rips"[2] pornography from "torrent" files.  Kucenski

Aff. ¶ 38, at 16.

---

[2]In this context, the Court concludes that "rips" refers to "extracting all or parts of digital
contents from a container. . . .  Ripping is often used to shift formats, and to edit, duplicate, or back
up media content."  See Ripping, Wikipedia, https://en.wikipedia.org/wiki/Ripping (last visited
November 9, 2021).

17.     "Torrent files" are files shared from Internet "peer-to-peer" ("P2P") file sharing software.  Kucenski Aff. ¶ 38, at 16.

> P2P file sharing networks, including the BitTorrent network, are frequently used to trade digital files of child pornography. These files include both image and video files. Users of the BitTorrent network wishing to share new content will use a BitTorrent program to create a "torrent" file for the file or grout of files they wish to share. A torrent file is a small file that contains information about the file(s) and provides a method for a user to download the file(s) referenced in the torrent from other BitTorrent users. Torrent files are typically found as the result of keyword searches on Internet sites that host or link to them.

Kucenski Aff. ¶ 10, at 10-11.

18.     On December 14, 2017, Kucenski observed files and folders on Pena's devices with titles such as "'HotYoungDoll' (sic), 'HotYoungThing' (sic), 'hotyoungthing-nude_xvid.avi' (sic), 'Casting Couch Teens Site Rip', 'Teens Do Porn SiteRip', 'teensx' (sic), 'DblTemedTens' (sic), 'Teens Obedience Lesson Site Rip', and 'Teen Sex Mania SiteRip' (sic)."  Kucenski Aff., at 16-17 (alteration in Kucenski Aff.).

19.     Kucenski attested that he "documented the findings, but did not open any of the files, nor view the actual content."  Kucenski Aff. ¶ 40, at 17.

20.     Kucenski attests in his Affidavit that those who distribute, possess, or produce child pornography exhibit "collector behavior."  Kucenski Aff. ¶ 24, at 14.

21.     Kucenski further attests that Pena "may fall within this [collector behavior] in light of indicators of large quantities of suspected pornographic materials on ten, large-capacity, USB storage devices."  Kucenski Aff. ¶ 24, at 14.

22.     Kucenski also attests that

[s]ome of the characteristics of "collector behavior" include:

      a.      Persons who are "collectors" of child pornography often keep the material in their possession for years, because it is considered valuable contraband.

      b.      Persons who are "collectors" of child pornography often transfer electronic files containing child pornography from device to device, either to make room on their devices, or for long-term storage.

Kucenski Aff. ¶ 24, at 14.

23.      Kucenski applied for the Second Search Warrant on January 5, 2018.  <u>See</u> Second Search Warrant at 1.

24.      Magistrate Judge Ritter issued the Second Search Warrant on January 5, 2018.  <u>See</u> Second Search Warrant at 1.

25.      The Second Search Warrant allowed Kucenski to search:

      1.      Dell laptop computer (S/N: 58YRPC2)

      2.      Western Digital external hard drive (S/N: WXC1E32ASTL9)

      3.      Seagate external hard drive (S/N: NA7P8TBM)

      4.      Seagate external hard drive (S/N: NA5JOG29)

      5.      Seagate external hard drive (S/N: NA7EG5TZ)

      6.      Seagate external hard drive (S/N: NA8F2B19)

      7.      Simple Tech external hard drive, ("BOM No: 96300-41001-013")

      8.      Toshiba external hard drive (S/N: 54LCTMEBT18B)

      9.      Western Digital external hard drive (S/N: WXGOAC927763)

      10.      Verbatim thumb drive (black in color)

      11.      Verbatim thumb drive (red in color)

Second Search Warrant at 3.

<span style="color:blue">Attachment 1</span>

26.     The Second Search Warrant authorized Kucenski's search of Pena's devices for

child pornography, defined as the

> visual depiction of sexually explicit conduct where (a) the production of the visual
> depiction involved the use of a minor engaged in sexually explicit conduct, (b) the
> visual depiction is a digital image, computer image, or computer generated image
> that is, or is indistinguishable from, that of a minor engaged in sexually explicit
> conduct, or (c) the visual depiction has been created adapted, or modified to appear
> that an identifiable minor is engaged in sexually explicit conduct, as well as any
> visual depiction, the production of which involves the use of a minor engaged in
> sexually explicit conduct.

Kucenski Aff. ¶ 4(a), at 8-9.

27.     Between January 9, 2018, and January 24, 2019, Kucenski conducted a

forensic analysis on Pena's devices, which

> revealed more than 8 million images and video files present on the devices
> analyzed; however, only 300,000 images and video files were reviewed to date
> (3.75%). Of the images and videos reviewed, approximately 1% were potentially
> illegal materials; 22% were images and videos of children that were not sexually
> explicit, but sexual in nature; and 36% were adult pornography.

Digital Forensic Analysis Report at 7, filed August 6, 2021 (Doc. 29-4)("Forensic Report").

28.     Specifically, the forensic analysis found fifty-eight videos of suspected child

pornography, 3,972 unique images of suspected child pornography, thirty-nine videos of suspected

child exploitation materials, and 63,841 images of suspected child exploitation materials.  See

Forensic Report at 7.

## PROCEDURAL BACKGROUND

On October 9, 2019, a federal Grand Jury returned an indictment charging Pena with

possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2256.

See Indictment, filed October 9, 2019 (Doc. 2).  Pena was arraigned on October 23, 2019.  See

Attachment 1

Clerk's Minutes at 1, filed October 23, 2019 (Doc. 9).  On August 6, 2021, Pena filed a Motion to Suppress Evidence.  See Motion to Suppress at 1.

    1.    **Motion to Suppress.**

In his Motion to Suppress, Pena first argues that the Second Search Warrant does not demonstrate probable cause that evidence of child pornography would be found on Pena's electronic devices, because Kucenski's affidavit demonstrated only that he believed there would be evidence of pornography, not child pornography, on the devices.  See Motion to Suppress at 12. Second, Pena argues that the good-faith exception does not apply, because the warrant affidavit does not contain facts which provide a basis of knowledge for Kucenski to believe child pornography would be found on the devices, and Kucenski should have exercised his independent judgment and known that the warrant lacked probable cause.  See Motion to Suppress at 3-4.  Pena also argues that the fact that he is also charged with procurement fraud allegations mitigates the social costs of excluding the child pornography evidence.  See Motion to Suppress at 3-4.  Finally, Pena argues that the United States cannot establish that it would have inevitably discovered evidence of child pornography while examining the devices for evidence of procurement fraud, because the devices contained over eight million image and digital files, and the United States has reviewed approximately 3.75% of the image and video files, of which only 1.34% meet the definition of child pornography.  See Motion to Suppress at 4.

    2.    **The Response.**

The United States responds.  See Response at 1.  First, the United States contends that, under the totality of the circumstances, Kucenski's affidavit articulates probable cause that Pena's devices contain child pornography.  See Response at 4.  The United States further argues that the good-faith doctrine applies here, because Kucenski was entitled to rely on Magistrate Judge

Ritter's probable cause determination and took the steps necessary to ensure that Pena's rights were not violated.  See Response at 4.  Finally, the United States contends that Kucenski inevitably would have discovered the evidence of child pornography, because he would have discovered more files in the course of his search for evidence of procurement fraud, and the First Search Warrant explicitly authorizes agents to search Pena's browsing history, which would have displayed terms related to child pornography.  See Response at 15.

**3.**      **The Reply**.

Pena replies to the United States' Response.  See Defendant's Reply in Support of His Motion to Suppress Evidence, filed September 3, 2021 (Doc. 42)("Reply").  In his Reply, Pena argues that the Second Search Warrant affidavit does not provide the necessary link to connect Pena's interest in "pornography" to "child pornography."  Reply at 1.  Pena further argues that Kucenski's affidavit states only that he believes the file folders contain pornography and not child pornography.  See Reply at 2.  Pena also contends that the United States mischaracterizes him as "equivocat[ing]" about possessing child pornography and argues that he expressly denied possessing child pornography.  Reply at 2.  Next, Pena contends that the fact that Kucenski sought a warrant does not overcome the warrant's lack of factual support to believe the devices contained child pornography.  See Reply at 2.  Finally, Pena argues that Kucenski would not inevitably discover evidence of child pornography, because there was a low probability that the United States would have discovered child pornography by clicking randomly on images or videos given the large volume of data.  See Reply at 3.

**4.**      **The Hearing**.

The Court held a hearing on October 7, 2021.  See Clerk's Minutes at 1.  The hearing began with the United States calling Special Agent Matthew Kucenski as a witness.  See Draft Transcript

- 11 -

of October 7, 2021, Hearing at 2:16-17 (Taken Oct. 7, 2021)(Mease)("Tr. at").[3]  Kucenski first

testified about his background and experience in computer forensics.  See Tr. at 5:3-10:8 (Mease,

Kucenski).  The United States then moved to have Kucenski certified as an expert in computer

forensics, and the Court agreed to allow Kucenski to offer opinion testimony in that area.  See Tr.

at 9:24-10:14 (Mease, Court, Dodd).  Kucenski acknowledged that he was not present for the First

Search Warrant's execution, but that he conducted forensic analysis on the items law enforcement

seized in conjunction with the First Search Warrant.  See Tr. at 12:11-14 (Mease, Kucenski); id.

at 12:25-14:4 (Mease, Kucenski).  Kucenski testified that the First Search Warrant did not limit

the record search for evidence of fraud to any specific file types.  See Tr. at 14:5-14 (Mease,

Kucenski).  Kucenski explained that the officers who executed the search warrant gave him the

devices on which to conduct the computer forensic analysis, and, in doing so, the officers informed

Kucenski that "Mr. Pena explained that there were family photos and pornography.  They

explained as to me that they then asked is there any child pornography on the devices, and the

impression that I took from the answer was that he was a little bit evasive about that answer."  Tr.

at 19:14-19 (Kucenski).  Kucenski then explained that, when he is given an electronic device, his

first step is to make a copy of the devices on which to conduct his analysis.  See Tr. at 22:2-9

(Kucenski).  During the copying process, Kucenski explained, he will look at the files -- something

he refers to as a "high level look" -- to ensure the copying is actually happening.  Tr. at 22:11-16

(Kucenski).  He then does a second review, which he refers to as "walking the scene," where he

looks around the device to understand the file layout.  Tr. at 23:7-19 (Kucenski).  Kucenski stated

that he found file names indicating child pornography's presence during one of these two

---

[3]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

preliminary searches of the device.  See Tr. at 23:7-19 (Kucenski).  Kucenski did not open any of

the files and stopped his search to obtain the Second Search Warrant.  See Tr. at 24:6-14

(Kucenski).  Kucenski acknowledged that he did not mention that he found child pornography in

the Kucenski Aff.  See Tr. at 25:10-15 (Mease, Kucenski).  Kucenski then testified that he made

the decision to seek the search warrant based also on Pena's statement about his device containing

pornography, Pena's use of torrents, and the large number of devices and files.  See Tr. at 25:16-

28:16 (Mease, Kucenski).  The large number of devices and files indicated child pornography,

Kucenski stated, because: "My training has taught me that people who are involved in child

pornography often keep, they collect it.  They keep it.  They move it from device to device to make

room for other things, but they keep it. . . . So that factors into the volume of data that was there."

Tr. at 27:22-28:4 (Kucenski).  Kucenski testified that, after Magistrate Judge Ritter issued the

Second Search Warrant, Kucenski expanded his search of Pena's devices to look for child

pornography.  See Tr. at 29:20-30:1 (Mease, Kucenski).  Kucenski stated that he spent one year

conducting forensic analysis on the devices and got through approximately three percent of the

data contained on Pena's electronic devices.  See Tr. at 30:2-17 (Mease, Kucenski).  Further,

Kucenski stated that the child pornography was not all in one place, but was mixed across the

devices.  See Tr. at 31:8-21 (Mease, Kucenski).  The United States asked Kucenski if he believed

that he would have come across the child pornography in the course of his forensic investigation

in the fraud case, even without the Second Search Warrant; Kucenski responded: "Yes, I do think

that that would have happened," Tr. at 32:10-20 (Mease, Kucenski), because, "[a]t least in a couple

of cases, the files were found at a pretty high level in the directory structure [of] the device, so it

was only a folder or two down where other key word[s] started coming out that would suggest that

something may be there."  Tr. at 32:22-33:1 (Kucenski).

- 13 -

Attachment 1

On cross-examination Pena walked Kucenski through Kucenski's review process of the fraud investigation, including key word searches and documents.  See Tr. at 54:10-55:25 (Dodd, Kucenski).  Kucenski testified that the data on the electronic devices included "millions and millions and millions of files," Tr. at 59:1-4 (Dodd, Kucenski), and "there was so much data . . . that [he] had trouble importing it into the different software programs," Tr. at 59:5-7 (Dodd, Kucenski).  Further, Kucenski explained that he used different document analysis tools for the fraud investigation and the child pornography investigation.  See Tr. at 59:25-61:7 (Dodd, Kucenski).  Specifically, Kucenski described using Nuix[4] -- which allows the user to structure searches of documents -- for the fraud investigation, and Griffeye[5] -- which allows the user to search for nudity in images -- for the child pornography investigation.  See Tr. at 60:22-62:4 (Dodd, Kucenski).  Next, Kucenski acknowledged that most of the child pornography was found on hard drive 4 and hard drive 7, and that he did not search hard drives 4 and 7 in connection with the fraud investigation, because the high-level review of the two hard drives indicated that they contained "only pornography."  Tr. at 68:1-17 (Dodd, Kucenski).  Additionally, Kucenski acknowledged that in his affidavit, he wrote only "that the files and folders are named to suggest the content contained pornography," Tr. at 69:7-10 (Dodd, Kucenski), because he was "not sure whether it is child pornography or other pornography," Tr. at 69:11-13 (Dodd, Kucenski).

---

[4]Nuix is a company that "produces investigative analytics and intelligence software for extracting knowledge from unstructured data."  Nuix Ltd, Wikipedia, https://en.wikipedia.org/wiki/Nuix (last visited Nov. 6, 2021).

[5]"Griffeye Analyze is used by law enforcement across the world for processing, sorting and analyzing large volumes of images and videos -- with a focus on cases containing child sexual abuse material."  Griffeye, Griffeye, https://www.griffeye.com/ (last visited Nov. 6, 2021).

Attachment 1

Next, Pena called Brian Chase as a witness.  See Tr. at 79: 6-7 (Dodd).  Pena moved to admit Chase as a digital forensics expert, and the Court allowed Chase to offer digital forensics opinion testimony.  See Tr. at 82:10-17 (Dodd, Court).  Chase testified that he spent twenty hours manually reviewing the data in this case and, in that time, "found very few images of child pornography" and found mostly adult pornography.  See Tr. at 84:16-19 (Chase).  Chase further testified that the files referenced in the affidavit for the Second Search Warrant contained only adult pornography, and the term "teen" often describes a person eighteen, nineteen, or even twenty years old.  See Tr. at 86:15-87:3 (Dodd, Chase).  On cross-examination, the United States asked: "[I]f an agent was just doing a general survey of the image files on the seized devices the same way that you were with using minimal search terms and just manually looking through the images he or she would eventually come across child pornography at some point?" Tr. at 95:24-96:4 (Mease); Chase responded: "I'm not sure I agree with that."  Tr. at 96:5 (Chase).  Chase clarified: "If you are looking through all of the images then eventually you would find one and given the amount of time but you'd have to be specifically clicking through images contained within folders that are clearly not related to any sort of procurement fraud."  Tr. at 96:11-16 (Chase).

The Court allowed the parties arguments on the Motion to Suppress.  See Tr. at 100:7-10 (Court).  Pena first argued that the Court must ascertain probable cause within the Second Search Warrant from the affidavit's four corners, because Kucenski did not testify in support of the warrant.  See Tr. at 101:1-21.  Second, Pena argued that the Second Search Warrant is based on the improper conclusion that "a person who uses peer to peer software and a person who collects pornography is likely to also possess and be interested in child pornography."  Tr. at 104:8-11 (Ward).  Third, Pena argued that the Second Search Warrant relies on boilerplate language rather

Attachment 1

than factual support and that, consequently, the good-faith exception does not apply.  See Tr. at 106:7-107:5 (Ward).

The United States responded, contending that probable cause supports the Second Search Warrant, because of "file names indicative of pornography," Tr. at 119:5-6 (Mease), Pena not asserting that he did not have child pornography on his device, see Tr. at 119:11-13 (Mease), Pena's use of peer to peer software, see Tr. at 119:24 (Mease), and the large amount of devices and data being consistent with collector behavior, see Tr. at 120:11-13 (Mease).  Moreover, the United States argued that the case agent relied on the issuance of the Second Search Warrant in good faith.  See Tr. at 122:1-3 (Mease).  Finally, Pena argued that agents would not have discovered inevitably child pornography on Pena's devices, because they would not have spent a significant amount of time conducting forensic analysis on a fraud investigation, and because Pena had a large number of files with only a small percentage of child pornography.  See Tr. at 129:1-130:22 (Ward).

**RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

Attachment 1

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."  United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.    Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121.  The Supreme Court

Attachment 1

has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118). See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)). The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the

Attachment 1

scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations. See, e.g., United States v. Knights, 534 U.S. at 119-20 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)). Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the

Attachment 1

privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (internal citations omitted).

### 2.      **Traffic Stops.**

A traffic stop is an investigative detention, see United States v. Toro-Pelaez, 107 F.3d 819, 823 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set forth in Terry v. Ohio, 392 U.S. 1 (1968)("Terry"), see United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon-Quijada, 107 F.3d 786, 792 (10th Cir. 1997).  In Terry, the Supreme Court authorized police officers to conduct limited seizures and to search a person's outer clothing when the officer has reasonable suspicion that criminal activity may be afoot.  See Terry, 392 U.S. at 30-31.  The Tenth Circuit has concluded that traffic stops fall into the category of Terry stops.  See United States v. Toro-Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."); United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

For officers to lawfully stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity."  United States v. Leos-Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity."  United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)).  Accord United

States v. Ramos, 194 F. Supp. 3d at 1156.  Reasonable suspicion is not determined by any one

factor but by the totality of the circumstances that the officer knew.  See United States v. Ceballos,

355 F. App'x 226, 229 (10th Cir. 2009)(unpublished)[6]; United State v. Elkins, 70 F.3d at 83 (citing

Alabama v. White, 496 U.S. 325, 330 (1990)).  Even if the officer does not form subjective

reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop

reasonable suspicion, the stop is proper.  See United States v. Ceballos, 355 F. App'x at 229

(holding that an officer's "subjective characterization of his actions is irrelevant").

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop.

See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the decision to

stop an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred.");  United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th Cir.

2002)(acknowledging that Whren v. United States "indicate[s] that probable cause is a *sufficient*

ground for a stop," but explaining that reasonable suspicion is all that is necessary (quoting United

States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)(emphasis in United States v. Ramstad

---

[6]United States v. Ceballos is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Ceballos, United States v. King, United States v. Reed, and United States v. Kilgore have persuasive value with respect to a material issue and will assist the Court in its disposition of this Order.

Attachment 1

and United States v. Callarman).  Even if the officer has an ulterior motive for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully stop a vehicle that he or she observes violating the traffic laws.  See Whren v. United States, 517 U.S. at 813-14;  United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)(unpublished)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.")(citing Whren v. United States, 517 U.S. at 813).  In other words, there is no constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the officer also has a constitutional basis for executing the stop.  United States v. Sedillo, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015).  See Knowles v. Iowa, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest")(quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)).  The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns."  Rodriguez v. United States, 575 U.S. at 354. Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose.  See Illinois v. Caballes, 543 U.S. 405, 407 (2005).  The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction.  Rodriguez v. United States, 1575 U.S. at 354.  See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense); United States v. Ramos, 194 F. Supp. 3d at 1157.  In short, absent reasonable

- 22 -

Attachment 1

suspicion to justify an extended detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop."  Illinois v. Caballes, 543 U.S. at 408.  Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist.  See Delaware v. Prouse, 440 U.S. 648, 658-60 (1979).  These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly.  See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012).  Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway. See New York v. Class, 475 U.S. at 115 (concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop").  The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations."  New York v. Class, 475 U.S. at 119.  See id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike checking license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door.  Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- is subject to a reasonable expectation of privacy. New York v. Class, 475 U.S. at 118.  Checking a vehicle's VIN therefore has a similarly close

Attachment 1

connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission.

Officers may also engage in routine questioning while conducting the traffic stop but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. at 327-28). See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required"). Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 575 U.S. at 355.

In Rodriguez v. United States, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." 575 U.S. at 350-51 (alterations in original)(internal quotation marks and citation omitted). There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents. See 575 U.S. at 351-52. After "the justification for the traffic stop was 'out of the way'" and without permission from the driver, the officer: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs. 575 U.S. at 352. "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs." 575 U.S. at 352. The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "*de minimis* intrusion

Attachment 1

on Rodriguez's personal liberty." 575 U.S. at 353.  The Supreme Court concluded that the dog

sniff, if performed without reasonable suspicion, measurably extended the detention and noted that

the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are --

or reasonably should have been -- completed." Rodriguez v. United States, 575 U.S. at 354.  See

United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable

duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the]

investigation")(alterations added).

### 3.   Vehicle Searches.

While an automobile stop may be made based on reasonable suspicion that the driver has

committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have

probable cause to believe that the vehicle contains contraband or other evidence of criminality to

execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir.

2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless

law enforcement officials receive consent, have a warrant, or otherwise establish probable cause

to support the search.").  Under the automobile-exception to the warrant requirement, however, a

warrant is generally not required.  See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United

States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S.

565, 580 (1991)).  The ongoing exigent circumstance that the vehicle might drive away has led the

Supreme Court to conclude that a warrant is not required to search a vehicle.  See Maryland v.

Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to search a vehicle[,] a search is

not unreasonable if based on facts that would justify the issuance of a warrant, even though a

warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809

(1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985).  Thus, as

Attachment 1

long as the investigating officer has probable cause to believe that the vehicle contains contraband

or evidence of criminality, he or she may search the vehicle without a search warrant.  See United

States v. Sedillo, 2010 WL 965743, at *11.

### 4.    Consensual Searches.

Searches conducted pursuant to consent constitute one exception to the Fourth

Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte,

412 U.S. 218, 219 (1973).  When an individual consents to a police search and the consent is

"freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States

v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S.

at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which

requires that: (i) the government "'proffer clear and positive testimony that consent was

unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no

'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir.

2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be

determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.

The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that

courts should consider when trying to determine whether a defendant's consent was voluntarily

given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive
> language or tone of voice indicating that compliance with an officer's request is
> compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;"
> (iii) the "prolonged retention of a person's personal effects such as identification,"
> or, conversely, "the prompt return of the defendant's identification and papers;"
> (iv) the "absence of other members of the public," or, conversely, whether the stop
> occurs in "a public location such as 'the shoulder of an interstate highway, in public

Attachment 1

view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997])(citing and quoting numerous sources). Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010)

(Browning, J)(some alterations in original). See United States v. Fox, 600 F.3d 1253, 1258 (10th

Cir. 2010). The inquiry is an objective one. See United States v. Ringold, 335 F.3d 1168, 1172

(10th Cir. 2003). "As long as a reasonable innocent person, as opposed to a person knowingly

carrying contraband, would feel free to leave, such encounters are consensual and need not be

supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795,

798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining

whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no

one factor is dispositive in a court's inquiry into the circumstances. For example, although an

officer's failure to advise a defendant that he or she is free to leave might suggest in some

circumstances that coercive law enforcement conduct caused the defendant's consent to search,

the Supreme Court has ruled that officers do not need to advise an individual of his or her right to

refuse to consent to a search for that individual's consent to be voluntary. See Schneckloth v.

Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers near a building's exits,

threatening no more than to question individuals if they seek to leave, "should not [result] in any

reasonable apprehension by any [individuals] that they would be seized or detained in any

meaningful way." United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).

Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation,

but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the

encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.

Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be

ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts

and circumstances of each case that is evidenced in our prior decisions involving consent

searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong

of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal.

Consent may instead be granted through gestures or other indications of acquiescence, so long as

they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d

at 789-90.  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting

that consent "need not be spoken, but 'may instead be granted through gestures or other indications

of acquiescence'").  For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the

Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See 335 F.3d

at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer

seized from a locked duffle bag.  See 173 F.3d at 765.  The officer then asked to see the suspect's

train passenger ticket and identification, inquired into his travel plans, and asked if he had any

luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or

not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage

and the suspect gave his consent.  See 173 F.3d at 765.  She asked him whether he had any

contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765.

When the officer encountered the suspect's locked bag, she asked him if he could open it.  See 173

F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket

and handed it to [the officer]."  173 F.3d at 766.  The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag."  173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage.  See 173 F.3d at 766.  The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include.  See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances.  See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found.  United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs").  See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the

Attachment 1

defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics).  Accordingly, in United States v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags.  173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")).  The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."  173 F.3d at 766.

**5. Probable Cause for Search Warrants.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant."  United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. at 239), aff'd, 749 F.3d 900 (10th Cir. 2014).  Probable cause requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d

Attachment 1

at 1006.  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The task of the Magistrate Judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(internal quotation marks omitted)(quoting Illinois v. Gates, 462 U.S. at 238).  See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).  In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application."  United States v. Rowland, 145 F.3d at 1205.

      "A reviewing court should accord great deference to a magistrate's determination of probable cause . . . ."  United States v. Reed, 195 F. App'x at 822.  The court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed."  Illinois v. Gates, 462 U.S. at 238-39 (alteration in original)(quoting Jones v. United States, 362 U.S. at 271).  This deference is appropriate to further the Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United

Attachment 1

States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates,

462 U.S. 213.  Because of the strong preference for warrants, "in a doubtful or marginal case a

search under a warrant may be sustainable where without one it would fall."  United States v.

Ventresca, 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is

not boundless."  United States v. Alabi, 943 F. Supp. 2d at 1253-54 (citing United States v. Leon,

468 U.S. 897, 914 (1984)).  "The court should not defer to a magistrate judge's probable-cause

determination where there is no substantial basis for concluding that the affidavit in support of the

warrant established probable cause."  United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M.

2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006).  Specifically, the court

should not defer to a Magistrate Judge's "probable cause determination if it is a mere ratification

of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the

totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v.

Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462

U.S. at 239).

## RELEVANT LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights,

the government will generally be prohibited from using that evidence in a criminal prosecution of

that person.  See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary

rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including,

e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right

against compelled self-incrimination or due process.")(internal citations omitted); United States v.

Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth

Attachment 1

Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013), aff'd, 597 F. App'x 991 (10th Cir. 2015).

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)).  "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence."  Utah v. Strieff, 136 S. Ct. at 2061.  To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search.  Brown v. Illinois, 422 U.S. at 603.  This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence

is obtained.  Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam).  The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence.  Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances."  Brown v. Illinois, 422 U.S. at 603-04.  The Supreme Court found sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent source doctrine.  See 468 U.S. at 799-801, 814.  There, agents had probable cause to believe that apartment occupants were dealing cocaine.  See 468 U.S. at 799-800.  They sought a warrant.  See 468 U.S. at 799-800.  In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep.  See 468 U.S. at 800-01.  The next evening, they obtained a search warrant.  See 468 U.S. at 800-01.  The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry."  468 U.S. at 814.  The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'"  Utah v. Strieff, 136 S. Ct. at 2062 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct."  Brown v. Illinois, 422 U.S. at 604.  See Utah v. Strieff, 136 S. Ct. at 2062 (observing that the third factor is particularly significant).  The exclusionary rule exists to deter police misconduct.  See Davis v. United States, 564 U.S. 229, 236-37 (2011).  The third factor reflects this rationale by favoring exclusion "only

Attachment 1

when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 136 S. Ct. at 2063. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, 136 S. Ct. at 2063. See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

    **1.**  **Good-Faith Exception.**

      Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011). To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)). The Supreme Court has explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)). Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." United States v. Davis, 564 U.S. at 238 (citations and internal quotation marks omitted).

Attachment 1

### a.     <u>Warrants Based on Illegally Obtained Information</u>.

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

<u>United States v. Sims</u>, 428 F.3d 945, 954 (10th Cir. 2005)(citation omitted). <u>See</u> <u>United States v. Cusumano</u>, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1260 (quoting <u>United States v. Herrera</u>, 444 F.3d 1238, 1249 (10th Cir. 2006)).

### b.     **United States v. Leon.**

In <u>United States v. Leon</u>, the Supreme Court faced the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from

Attachment 1

which he obtained evidence.  See 468 U.S. at 905.  The Supreme Court noted that excluding this evidence would not deter police misconduct.  See 468 U.S. at 918-19.  The officer had taken all of the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant, and, thus, his search, was valid.  See 468 U.S. at 918-19.  The Supreme Court explained that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court, thus, concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant."   United States v. Martinez, 696  F. Supp. 2d  1216, 1244  (D.N.M. 2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . .  "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that, "[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

Attachment 1

First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth." [United States v. Leon, 468 U.S.] at 923 . . . . Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role." *Id.* Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotation omitted). Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid. *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d 1281, 1316 (D.N.M. 2010)(Browning, J.).

### c.  Herring v. United States.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in the Dale County, Alabama, warrant database. See 555 U.S. at 137. In the search incident to that arrest, officers found drugs and a gun on Herring's person. See 555 U.S. at 137. Herring was then indicted on federal gun- and drug-possession charges. See 555 U.S. at 138. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. See 555 U.S. at 138. Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it. See 555 U.S. at 138. The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed. See 555 U.S. at 138.

The Supreme Court affirmed the Eleventh Circuit's affirmation of the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule. See 555 U.S. at 140-46. The Supreme Court agreed with the Eleventh Circuit that, although

Attachment 1

the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate.  See 555 U.S. at 140.  The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."  Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922).  Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 555 U.S. at 144.  The Supreme Court further explained that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional."  Herring v. United States, 555 U.S. at 143 (internal quotation marks omitted)(quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)).  As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 555 U.S. at 146.

### d.   Davis v. United States.

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent.  See 564 U.S. at 239.  At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth

- 39 -

Attachment 1

Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See Arizona v. Gant, 556 U.S. at 341-48.  The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144).  The Supreme Court stated: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144).  The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 564 U.S. at 240.

- 40 -

Attachment 1

2. **Inevitable-Discovery Exception**.

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"   United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444).   "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."   United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).   In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.   782 F.2d at 152.   Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."  810 F. Supp. 2d at 1274 (citations and internal quotation marks omitted).  On appeal, however, the Tenth Circuit clarified that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question.   See United States v. Christy, 739 F.3d at 540. The Tenth Circuit explained:

> In *Cunningham* and [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000),] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal."  *Cunningham*, 413 F.3d at 1204 n.1.  In Cunningham, police searched the defendant's home after getting his consent.  *Id.* at 1202.  The defendant later contested the search, claiming his consent was coerced.  *Id.*  We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred.  *Id.* at 1205.  In *Souza*, police illegally opened a UPS package that contained drugs.  223 F.3d at 1200, 1202.  We held the evidence

Attachment 1

admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred. *Id.* at 1206. Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.

. . . .

Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] *Larsen*, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203. The Tenth Circuit stated that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)). Applying the first factor, the Tenth Circuit stated:

[T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this

- 42 -

Attachment 1

case. Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office. Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205. Regarding the second factor, the Tenth Circuit stated:

[A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong. The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed. Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

United States v. Souza, 223 F.3d at 1205-06. The Tenth Circuit noted that a sergeant eventually obtained a search warrant. See United States v. Souza, 223 F.3d at 1206. Regarding the third factor, the Tenth Circuit stated that, unlike "*Cabassa*, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued." United States v. Souza, 223 F.3d at 1206. The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." 782 F.2d at 152-53 (internal quotation marks omitted)(quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)). The Tenth Circuit considered

Attachment 1

whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  See United States v. Owens, 782 F.2d at 152-53.  Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concluded:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.  In fact, such an intrusion would have been a significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband.  Alternatively, a friend could have returned to claim the closed bag.

782 F.2d at 153.  "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation."  United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery doctrine . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered."  413 F.3d at 1205.  The Tenth Circuit, in addressing the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- stated:

Attachment 1

Here, the officers took substantial steps to obtain a warrant before the contested search occurred. The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the [assistant United States attorney], the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately. The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204. Regarding the second factor -- the strength of the showing of probable cause at

the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home. Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway. The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05. Regarding the third factor -- whether a warrant

ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the

officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside

Mr. Cunningham's home." 413 F.3d at 1205. Regarding the fourth factor -- evidence that the

officers "jumped the gun," because they lacked confidence in their showing of probable cause and

wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

> There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue. [United States v. Souza,

Attachment 1

223 F.3d] at 1204.  Instead, the record indicates that the search occurred at the time
it did because of the coincidental arrival of Mrs. Cunningham.  Her presence on the
scene led to a series of events that culminated in her son's release from jail, his
return home, and his consent to search.  As a result, we are satisfied the government
has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East
76th Terrace on the evening of the search, the officers would have obtained a search
warrant and the evidence in question would have been found.  *Id.* at 1205.

United States v. Cunningham, 413 F.3d at 1205.  (citations omitted).  The Tenth Circuit, therefore,

applied the inevitable-discovery doctrine.  See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and

determined that the inevitable-discovery exception applied.  See 810 F. Supp. 2d at 1275-79.

Regarding the first factor -- the extent to which the warrant process had been completed at the time

those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any

steps to obtain a warrant before entering Christy's residence.  The United States concedes that they

did not attempt to obtain a warrant before entering Christy's residence. . . .  This factor thus weighs

against applying the inevitable discovery exception."  810 F. Supp. 2d at 1275 (citations omitted).

As to the second factor -- the strength of the showing of probable cause at the time the search

occurred -- the Court concluded:

The Court finds that Carvo had strong probable cause that Christy
committed crimes.  At the time of the search, Carvo believed he had probable cause
for the California crime of unlawful sexual intercourse, because Christy and K.Y.
exchanged naked pictures through electronic mail transmissions over the internet
and then arranged a meeting in the middle of the night for K.Y. to run away with
Christy.

. . . .

. . . . Because Carvo knew that K.Y. and Christy were exchanging naked
pictures, "the belief that there was a sexual relationship or sexual interest between
the two was reasonable."  These circumstances are sufficient to form "a reasonable
ground for belief of [Christy's] guilt," for the California crime of unlawful sexual
intercourse.  Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted),
for the California crime of unlawful sexual intercourse.

- 46 -

Carvo also had strong probable cause for the federal crime of coercion or enticement.  Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

. . . .

. . . . Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement.  Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and

footnote omitted).  Regarding the third factor, -- whether a warrant ultimately was obtained, albeit

after the illegal entry -- the Court held:

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy.  United States v. Cunningham, 413 F.3d at 1205.  Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation.  Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so.  Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI.  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he

- 47 -

would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature."  If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant.  Carvo is cross designated to acquire both state and federal search warrants.  This factor thus weighs in favor of application of the inevitable-discovery doctrine.

United States v. Christy, 810 F. Supp. at 1278-79 (second and third alterations in original)(citations omitted).  As to the fourth factor -- the existence of evidence that the officers jumped the gun, because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Court determined:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue." *United States v. Cunningham*, 413 F.3d at 1205.  The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence.  This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279.  Consequently, the Court applied the inevitable-discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision.  See 739 F.3d at 539-44.  Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant challenged the Court's ruling only on factors two and four -- the strength of the probable cause showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep the warrant requirement."  United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)).  Regarding the second factor -- the strength of the showing of probable cause at the time the unlawful search occurred -- the Tenth Circuit stated:

Attachment 1

The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y. Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y. Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy. Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable. Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law. The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted). Analyzing the fourth factor -- evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit explained:

Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause. Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. Instead, the deputies forced entry because they believed K.Y. was in danger. Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not. But that is beside the point. The record fully supports the reasonableness of the deputies' assessment of danger. The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations omitted). The Tenth Circuit concluded, therefore, that the Court properly applied the United States v. Souza factors. See 739 F.3d at 542.

### ANALYSIS

The Court concludes that the Kucenski Aff. establishes probable cause and, therefore, is a sufficient basis for the Second Search Warrant. Next, the Court concludes that, even if there is not probable cause for the Second Search Warrant, Kucenski relied on the Second Search Warrant in good faith and, thus, the good-faith exception to the exclusionary rule applies. Finally, the Court concludes that, even if the Second Search Warrant lacks probable cause and the good-faith

Attachment 1

exception does not apply, the Court will not exclude the child pornography evidence, because Kucenski inevitably would have discovered more evidence to justify a subsequent search warrant to search for child pornography during the fraud investigation.  Accordingly, the Court denies Pena's Motion to Suppress.

I.      **THE KUCENSKI AFFIDAVIT ESTABLISHES PROBABLE CAUSE, AND THUS, PROVIDES A SUFFICIENT BASIS FOR THE SECOND SEARCH WARRANT.**

Pena argues that the Court should grant the Motion to Suppress, because Kucenski's affidavit does not establish probable cause and, thus, does not provide a sufficient basis for the Second Search Warrant on which Kucenski relied to search Pena's electronic devices for evidence of child pornography.  See Motion to Suppress at 2.  Specifically, Pena argues that the Kucenski Aff. to secure the Second Search Warrant does not establish probable cause, because: (i) the Kucenski Aff. alleges that Pena possessed only "pornography," and not "child pornography," Motion to Suppress at 17; (ii) the Kucenski Aff. also relies on Pena's use of file sharing software to conclude that he possessed child pornography, see Motion to Suppress at 18; (iii) the Kucenski Aff. improperly avers that Pena's "possible collection of 'pornography' indicates a proclivity to collect 'child pornography,'" Motion to Suppress at 19; and (iv) the file folder names that the Kucenski Aff. references "do not themselves provide a reasonable basis to believe the devices contained child pornography," Motion to Suppress at 20.  In response, the United States argues that Kucenski's affidavit presents several reasons for Magistrate Judge Ritter to issue the Second Search Warrant, and, under the totality of the circumstances, the Kucenski Aff. articulates probable cause to support the warrant's issuance.  See Response at 6.  The United States contends that: (i) Pena's admission to using peer-to-peer software; (ii) Pena's failure to answer expressly "no" when asked if agents would find child pornography on his devices; (iii) "the sheer volume of

Attachment 1

Defendant's large-capacity USB storage devices raised concerns that Defendant was engaged in collector behavior; and (iv) Kucenski's finding of file folders on Pena's devices with names such as "'hot young doll,' 'teens do porn,' 'teensx,' and 'teens obedience lesson,'" support Magistrate Judge Ritter's probable cause finding when he issued the Second Search Warrant.  Response at 6 (quoting Second Search Warrant ¶ 39, at 16-17).

In determining whether probable cause supports a search warrant, the Court looks to the totality of the circumstances, see Florida v. Harris, 568 U.S. 237, 244 (2013), to determine if, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place," Illinois v. Gates, 462 U.S. 213, 238 (1983).  Probable cause is "'a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules.'" Florida v. Harris, 568 U.S. at 244 (quoting Illinois v. Gates, 462 U.S. at 232).  An affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  While a reviewing court "should afford a magistrate's probable cause decision great deference," it must still ensure that there is a "substantial basis for concluding that probable cause existed." United States v. Danhauer, 229 F.3d at 1006.  Moreover, an affidavit in support of a search warrant for child pornography must provide sufficient information "such that a magistrate could independently assess whether the images meet the legal definition of child pornography." United States v. Loera, 923 F.3d 907, 924 (10th Cir. 2019).

In arguing that probable cause does not support the Second Search Warrant, Pena relies heavily on United States v. Edwards, 813 F.3d 953 (10th Cir. 2015), in which the Tenth Circuit ruled that probable cause did not support a search warrant where a Magistrate Judge issued the

warrant "based on Mr. Edwards's possession and sharing of child erotica, the law-enforcement officer affiant's opinion that people who possess child pornography are also likely to possess child erotica, and Mr. Edwards's sexually suggestive comments about the child in the photographs." 813 F.3d at 960.  In finding that probable cause did not support the search warrant, the Tenth Circuit relied on the fact that the affiant-officer "never alleged that any of the material Mr. Edwards posted to the internet constituted child pornography" and "averred only that Mr. Edwards was known to possess legal child erotica."  United States v. Edwards, 813 F.3d at 961.  The Tenth Circuit noted that "courts are reluctant to presume that persons are inclined to engage in certain illegal activity based on having engaged in a particular legal activity."  United States v. Edwards, 813 F.3d at 964 (citing cases).  "[I]nnocent or legal conduct," however, "may be infused with the degree of suspicion necessary to support a finding of probable cause when examined 'through the lens of'" law enforcement officers.  United States v. Edwards, 813 F.3d at 965 (quoting United States v. Biglow, 562 F.3d 1272, 1281 (10th Cir. 2015)).  Moreover, "[n]one of the detailed descriptions contained in the affidavit described photographs conforming to the definition of child pornography also included in the affidavit."  United States v. Edwards, 813 F.3d at 961.  The Tenth Circuit concluded that the affidavit relied on the fact that Edwards posted child erotica on a website, the defendant's comments suggesting a sexual attraction to the child depicted in the erotica, and the affiant-officer's conclusion that "those who possess *child pornography* are highly likely also to possess *child erotica*."  United States v. Edwards, 813 F.3d at 965 (emphasis in original).  Ultimately, based on the affidavit's totality of the circumstances, the Tenth Circuit concluded that probable cause did not support the search warrant.  See United States v. Edwards, 813 F.3d at 969.

- 52 -

In contrast to United States v. Edwards, the Tenth Circuit concluded in United States v. Haymond, 672 F.3d 948 (10th Cir. 2012), that probable cause supported a search warrant where, during the course of an undercover investigation involving peer-to-peer software, the affiant-officer "observed a user with an IP address[7] linked to Mr. Haymond's residence who had numerous files of child pornography available for other LimeWire[8] users to access, view, and download." United States v. Haymond, 672 F.3d at 959. The Tenth Circuit ultimately rejected the argument that the affidavit relied on stale information given that 107 days had passed between the initial incident linking the defendant to child pornography and the affidavit in support of the search warrant, because "images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes." United States v. Haymond, 672 F.3d at 959 (quoting United States v. Riccardi, 405 F.3d 852, 861 (10th Cir. 2005)).

---

7

An IP address is a unique number identifying the location of an end-user's computer. When an end-user logs onto an internet service provider, they are assigned a unique IP number that will be used for that entire session. Only one computer can use a particular IP address at any specific date and time.

United States v. Haymond, 672 F.3d 951 n.2 (quoting United States v. Renigar, 613 F.3d 990, 992 n. 2 (10th Cir. 2010)).

[8]LimeWire is a

peer-to-peer file sharing program that allows users to trade computer files over the Internet.[] When a user launches LimeWire and inputs a search term, the program seeks to match the term in the names of files that other users have designated for sharing. LimeWire then returns a list of available files containing that term, which the user may select and download.

United States v. Haymond, 672 F.3d at 950 (footnote omitted).

Attachment 1

Two subsequent cases, see United States v. Loera, 923 F.3d 907 (10th Cir. 2019), and

United States v. Kilgore, 856 F. App'x 783 (10th Cir. 2021)(unpublished), followed United States

v. Haymond and United States v. Edwards.  In United States v. Loera, the Tenth Circuit held that

the officers' search of four CDs in the course of a computer fraud investigation violated the Fourth

Amendment when the officer opened an image on the disk "specifically '[t]o write a description

of an image on the disc'" so that he could "'obtain a second warrant for child pornography,'"

because it demonstrated the officer was searching improperly for evidence of child pornography

on the discs.  United States v. Loera, 923 F.3d at 922 (quoting Record on Appeal ("ROA") Vol. II

at 72).  After considering the veracity of the affidavit in support of the second search warrant's

issuance without the improperly obtained evidence, the Tenth Circuit concluded that "Agent

Cravens' remaining statement that the CDs 'appeared to contain images of child pornography'

provides no detailed description of what the images depicted such that a magistrate could

independently assess whether the images meet the legal definition of pornography."  United States

v. Loera, 923 F.3d at 924 (quoting ROA Vol. 1 at 120).  In United States v. Kilgore, the Tenth

Circuit concluded that the affidavit contained sufficient information to support a search warrant,

because

> the affidavit specified that IP addresses assigned to Mr. Kilgore[] had been linked
> to images of child exploitation, identified him as a convicted sex offender (child
> pornography),[9] and stated that he was currently registered at a new address in

---

[9]The Tenth Circuit's footnote 4 states:

> Mr. Kilgore contends the affidavit lacked information which would establish
> whether the prior conviction was stale. But our caselaw counters the argument that
> an undated conviction for possession of child pornography cannot be used to
> support a search warrant for child pornography. See United States v. Perrine, 518
> F.3d 1196, 1205-06 (10th Cir. 2008)(citing cases).

United States v. Kilgore, 856 F. App'x at 785 n. 4.

Rogers County which was the subject of the warrant.  When considered together these facts established probable cause for the warrant.

United States v. Kilgore, 856 F. App'x at 785 (footnote in original).

The United States contends that Pena's case is distinguishable from each of the preceding Tenth Circuit cases.  Notably, the United States contends that, unlike the search warrant in United States v. Edwards, the search warrant in Pena's case expanded the scope of the search -- but only within the devices already in Kucenski's possession -- and did not grant an initial physical entry to a residence.  Response at 7.  Moreover, the United States argues that this case is distinguishable from United States v. Edwards, because the Kucenski Aff. mentions file folders with explicit references to "sex" and "teen" "in tandem with Pena's use of peer-to-peer software, Defendant's equivocation, and the large number of external hard drives."  Response at 8.  Further, the United States notes that this case is distinguishable from United States v. Loera in an important way: in United States v. Loera, a law enforcement officer re-opened a file containing child pornography to obtain a file description for the affidavit in support of a second search warrant; here, when Kucenski found file folders that he believed indicated child pornography's presence, he halted his search and sought the Second Search Warrant.  See Response at 8.

The Court concludes that the Kucenski Aff. establishes probable cause, and thus, supports Magistrate Judge Ritter's issuance of the Second Search Warrant.  While the Court should not rely solely on a suspect's engagement in legal activity to presume that a suspect has engaged in illegal activity, the Court may consider legal conduct in conjunction with suspicion when determining if the totality of the circumstances indicates a fair probability that a suspect has engaged in illegal activity.  See United States v. Edwards, 813 F.3d at 965 (concluding that "innocent or legal conduct may be infused with the degree of suspicion necessary to support a finding of probable cause when

- 55 -

examined 'through the lens of'" law enforcement officers (quoting <u>United States v. Biglow</u>, 562

F.3d 1272, 1281 (10th Cir. 2015)).  <u>See</u> <u>also</u> <u>United States v. Loera</u>, 813 F.3d at 963 (concluding

that the defendant's possession and publication of child erotica, which is legal activity, did not

establish probable cause that the defendant possessed child pornography).  The Kucenski Aff.

relies, in part, on Pena's acknowledged possession of pornography.  Officers relayed Pena's

statement that the electronic devices would contain "family photos" and "porn" to Kucenski before

he began his forensic investigation of the electronic devices for computer fraud, and he included

that information in the Kucenski Aff.  <u>See</u> Tr. at 19:14-15 (stating that "my understanding was that

Mr. Pena explained that there were family photos and pornography" on the devices officers

seized)(Kucenski); Kucenski Aff. ¶ 38, at 16.  Although Pena avers that Kucenski relies only on

Pena's legal pornography possession, Kucenski also relies on the incriminating file folder labels,

Pena's use of peer-to-peer software, and Pena's "collector behavior."  Kucenski Aff. ¶ 24, at 14.

First, the Court concludes that the file folder names Kucenski observed, "'HotYoungDoll' (sic),

'HotYoungThing' (sic), 'hotyoungthing-nude_xvid.avi' (sic), 'Casting Couch Teens Site Rip',

'Teens Do Porn SiteRip', 'teensx' (sic), 'DblTemedTens' (sic)[10], 'Teens Obedience Lesson Site

Rip', and 'Teen Sex Mania SiteRip' (sic)," Kucenski Aff., at 16-17 (alteration in Kucenski Aff.),

indicate child pornography.  The word "teen" indicates a person aged between thirteen and

nineteen.  Tr. at 92:23-24 ("In general nomenclature yes, teen would include 13-19.")(Chase).

---

[10]With the file name "DblTemedTens" in particular, the Court is unsure why Kucenski
included the notation "sic."  The Court believes that this file name may indicate pornography
involving ten-year-old children, and if so, this file name strongly indicates the presence of child
pornography.  <u>See, e.g.</u>, <u>United States v. Loera</u>, 923 F.3d at 929 (noting that a file labeled "Spycam
9yr Undress" suggested the presence of child pornography); <u>United States v. Haymond</u>, 672 F.3d
948, 950 (10th Cir. 2012)(nothing that "'8yo'" is an acronym for "'8 year old' which is associated
with child pornography.")

Attachment 1

While it is possible that the word "teen" implies pornography involving legal adults, it is more likely that the word "teen" indicates pornography involving a minor child aged thirteen through seventeen.  There are more minor teens than adult teens.  While Pena places much weight on the fact that the Kucenski Aff. states only that the file folder names "suggest the contents of pornography," Kucenski Aff. ¶ 39, at 16-17, the Court's inquiry centers on whether Kucenski provided sufficient information in the affidavit to allow a Magistrate Judge to independently assess whether the devices would likely contain child pornography.  See United States v. Loera, 923 F.3d at 924.  Thus, that Kucenski acknowledged that he was not sure that the file folder names indicated child pornography is not dispositive in the probable cause analysis.  See Tr. at 69:7-13 (Dodd, Kucenski).  Certainty is not required; only probable cause is required.  See Stonecipher v. Valles, 759 F.3d 1134, at 1141 ("Probable cause is a matter of probabilities and common sense conclusions, not certainties.").  In making a probable cause determination, a Magistrate Judge may rely on the statements of an affiant-officer but, ultimately, the Magistrate Judge must come to an independent conclusion that there exists "a fair probability that contraband or evidence" of child pornography "will be found in a particular place."  Illinois v. Gates, 462 U.S. at 238.

Further, the other indications of child pornography on which Kucenski relied support probable cause for the search warrant when considered within the totality of the circumstances. Namely, the United States argues Pena's use of peer-to-peer software, Pena's so-called equivocation about whether he possessed child pornography, and the volume of electronic devices Pena owned provide a sufficient basis for a probable cause determination.  In the Kucenski Aff., Kucenski states that, based on his experience and expertise, those who use peer-to-peer software often possess child pornography.  See Kucenski Aff. ¶ 6, at 3 ("Your Affiant knows that 'peer-to-peer' (P2P) networks are often used to obtain and share child pornography." (no citation for

quotation provided)).  Moreover, Kucenski averred that Pena's use of numerous hard drives and devices is indicative of "collector behavior" common among those who possess child pornography. Kucenski Aff. ¶ 24, at 14.  Magistrate Judge Ritter was entitled to rely on Kucenski's expertise in determining that those who possess child pornography often use multiple devices and use peer-to-peer file sharing software, because Kucenski also set out specific facts explaining why those who possess child pornography have many devices and use file sharing software.  See Poolaw v. Marcantel, 565 F.3d 721, 732 n. 10 (10th Cir. 2009)(noting that "[f]or an officer's experience and training to support a finding of probable cause, the affidavit must set out facts explaining why, based on this experience and training, there was reason to believe" that contraband would be found).  The United States further relies on Pena's answer to officers asking him if there was any child pornography on his computers, characterizing it as an "equivocation."  The Court is not persuaded that Pena's answer, "No," to the question whether he possessed child pornography constitutes an equivocation.  Kucenski Aff. ¶ 38, at 16.  Pena did not equivocate, but his response raises suspicion.  His caveat to the answer "No." -- that he "rips" pornography from "torrent" files -- suggests to the hearer that he knew that his computer contained child pornography and was moving towards an explanation.  Kucenski Aff. ¶ 38, at 16.  His mind jumped to a defense, mentally and subconsciously conceding -- despite his verbal denial -- that the computer contained child pornography.  Additionally, Pena immediately conceded to officers that his devices contained "porn," Aff. ¶ 38, at 16, indicating that he was concerned at the outset for what the officers might find.  The Court is persuaded, therefore, that Pena's statements, in conjunction with Kucenski's declarations that those who possess child pornography often use torrent files and peer-to-peer software, supports sufficiently a probable cause finding.  Kucenski Aff. ¶ 38, at 16.

Attachment 1

Consequently, the Court concludes that the Kucenski Aff. establishes probable cause, and thus, provides a sufficient basis for the Second Search Warrant.

Pena's defense counsel has worked hard to take each of the United States' and Kucenski's grounds for probable cause -- the file names, Pena's use of peer-to-peer software, Pena's equivocation, and the number of electronic devices Pena owned -- one at time.  Counsel arguing that each of these grounds is alone insufficient to support probable cause, however, is not the way that probable cause analysis works.  See D.C. v. Wesby, 138 S. Ct. 577, 588 (2018)(rejecting the lower court's probable cause analysis where the court analyzed each fact individually to determine if it supported probable cause).  The Anglo-American jurisprudence on probable cause is not an academic exercise; it is a profoundly practical one.  See Illinois v. Gates, 462 U.S. at 214 (emphasizing that determining probable cause is a "practical, common-sense" task).  The Court may and should consider the totality of the factors.  See D.C. v. Wesby, 138 S. Ct. at 588 (holding that "the whole is often greater than the sum of its parts -- especially when the parts are viewed in isolation.").  The Court is reluctant to adopt a rule that a suspect's careful labeling of folders means that there cannot be probable cause.  Instead, the Court must look to the entire context -- here, the file names in conjunction with Pena's peer-to-peer software use, his statements to officers, and the large number of devices he possessed -- to determine whether there is a fair probability that officers will find contraband.  Here, the Court concludes that the totality of the circumstances indicate that child pornography would be found on Pena's devices and, consequently, the Court concludes that the Kucenski Aff. supports Magistrate Judge Ritter's probable cause determination.

## II.    **KUCENSKI RELIED ON THE SEARCH WARRANT IN GOOD FAITH.**

Pena contends that the exclusionary rule's good faith exception does not apply, because "the warrant affidavit is completely devoid of credible facts indicating the devices contained child

Attachment 1

pornography."  Motion to Suppress at 21.  In response, the United States argues that, even if

probable cause does not support the Second Search Warrant, the Court should apply the good-faith

exception, because Kucenski relied on Magistrate Judge Ritter's determination of probable cause

in conducting the search for child pornography.  Response at 10.  Pena replies, contending that the

good faith exception should not apply, because the Kucenski Aff. solely relies on a suspicion of

pornography, not child pornography, and the Kucenski Aff. otherwise lacks probable cause to

support the Second Search Warrant's issuance.  See Defendant's Reply in Support of his Motion

to Suppress Evidence at 2-3, filed September 3, 2021 (Doc. 42)("Reply").

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights,

the United States will generally be prohibited from using that evidence in a criminal prosecution

of that person.  See Sanchez-Llamas v. Oregon, 548 U.S. at 332-33.  The exclusionary rule applies

if the defendant can show, by a preponderance of the evidence, a constitutional violation under the

Fourth Amendment and a causal nexus between the violation and the evidence sought to be

excluded.  See United States v. Torres-Castro, 470 F.3d at 999.  Once the defendant makes this

showing, the burden shifts to the United States to prove that an exception to the exclusionary rule

applies.  See United States v. Torres-Castro, 470 F.3d at 999.  Recognizing that the exclusionary

rule's "sole purpose" "is to deter future Fourth Amendment violations," the Supreme Court has

held that evidence will not be excluded where the officer who obtained the evidence -- through an

unlawful search or seizure -- acted in good faith.  United States v. Davis, 564 U.S. at 236-37.  To

determine whether the good-faith exception applies, courts must balance the deterrent effect of

excluding the evidence against "the 'substantial social costs' generated by the rule."  United States

v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)).

In <u>United States v. Loera</u>, the Tenth Circuit concluded that the good-faith exception to the

exclusionary rule did not apply, because "the illegality at issue" in the application for the search

warrant "stems from unlawful <u>police</u> conduct, rather than magistrate error, and therefore the

deterrence purposes of the Fourth Amendment are best served by applying the exclusionary rule."

<u>United States v. Loera</u>, 923 F.3d at 925 (emphasis in original).  The Tenth Circuit's focus in <u>United</u>

<u>States v. Loera</u> was on whether the error in a probable cause determination was attributable to

police officer misconduct or the Magistrate Judge's error in judgment.  <u>See</u> 923 F.3d at 925-26.

Because the exclusionary rule is meant to deter police officers from violating suspects' Fourth

Amendment rights, the Supreme Court has noted that "[p]enalizing the officer for the magistrate's

error rather than his own, cannot logically contribute to the deterrence of Fourth Amendment

violations."  <u>United States v. Leon</u>, 468 U.S. 897, 921.  The Tenth Circuit has held that a court

should "presume good faith when an officer acts pursuant to a warrant unless one of four contexts

appl[ies]."  <u>United States v. Barajas</u>, 710 F.3d at 1110.

"Under the good-faith exception to the exclusionary rule, '[i]f a warrant is not supported

by probable cause, the evidence seized pursuant to the warrant need not be suppressed if the

executing officer acted with an objective good-faith belief that the warrant was properly issued by

a neutral magistrate.'" <u>United States v. Augustine</u>, 742 F.3d 1258, 1262 (10th Cir. 2014)(quoting

<u>United States v. Campbell</u>, 603 F.3d 1218, 1225 (10th Cir.2010)(alteration in <u>United States v.</u>

<u>Augustine</u>)).  A law enforcement officer is presumed to act in good faith when he relies on and

executes a search warrant, because "'[i]t is a sound presumption that the magistrate is more

qualified than the police officer to make a probable cause determination."  <u>United States v.</u>

<u>Edwards</u>, 813 F.3d at 971 (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 346 n. 9 (1986)(alteration in

<u>United States v. Edwards</u>)).  "[P]olice officers should be entitled to rely upon the probable-cause

- 61 -

Attachment 1

determination of a neutral magistrate when defending an attack on their good faith for either

seeking or executing a warrant." United States v. Tuter, 240 F.3d 1292 (10th Cir. 2001)(quoting

United States v. Corral-Corral, 899 F.2d 927, 939 (10th Cir.1990)).   "The question . . . is not

whether the Magistrate erred in believing there was sufficient probable cause to support the scope

of the warrant he issued.  It is instead whether the Magistrate so obviously erred that any reasonable

officer would have recognized the error." Messerschmidt v. Millender, 565 U.S. 535, 556 (2012).

Moreover, the Supreme Court has identified four scenarios in United States v. Leon in which

suppression is the proper remedy for a search warrant's improper issuance:

> First, evidence should be suppressed if the issuing magistrate was misled by an
> affidavit containing false information or information that the affiant would have
> known was false if not for his "reckless disregard of the truth."  Second, the
> exception does not apply when the "issuing magistrate wholly abandon[s her]
> judicial role."  Third, the good-faith exception does not apply when the affidavit in
> support of the warrant is "so lacking in indicia of probable cause as to render official
> belief in its existence entirely unreasonable."  Fourth, the exception does not apply
> when a warrant is so facially deficient that the executing officer could not
> reasonably believe it was valid.

United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)(quoting United States v. Leon,

468 U.S. at 922).

Pena argues that the search warrant is so devoid of factual allegations to establish a nexus

between Pena and child pornography that Kucenski could not reasonably believe it was valid.  See

Motion to Suppress at 21.  The Court concludes, however, that Magistrate Judge Ritter's probable

cause determination is not obviously so unreasonable that Kucenski should have recognized the

error.  See United States v. Edwards, 813 F.3d at 972 ("Although the link between Mr. Edwards's

postings and the possession of pornography was logically fallacious, it is not so obviously unsound

that it rendered reliance on the warrant objectively unreasonable.").  See also United States v.

Corral-Corral, 899 F.2d 927, 934 (10th Cir. 1990)(holding that, although the agent's "affidavit was

not a model of specificity, we do not believe it was so lacking in probable cause as to render official

belief in its existence entirely unreasonable").  Moreover, there is no allegation that Kucenski acted

improperly in his initial search pursuant to the First Search Warrant.  Kucenski acted in contrast

to the officer in United States v. Loera, who improperly opened images of child pornography to

write a detailed search warrant, by pausing his search and filing the Kucenski Aff. in support of

the Second Search Warrant.  See 923 F.3d at 924.  Therefore, applying the exclusionary rule in

this case does not serve the exclusionary rule's purpose -- deterrence of Fourth Amendment

violations by law enforcement officers.  Because the Court concludes that Kucenski acted in good

faith by relying on the Second Search Warrant, the exclusionary rule does not apply.

## III.  KUCENSKI WOULD HAVE INEVITABLY DISCOVERED CHILD PORNOGRAPHY.

Pena contends that Kucenski would not have inevitably discovered the child pornography

during his fraud investigation.  See Motion to Suppress at 24.  Pena argues that, "[i]n light of the

vast volume of data on the devices, the government conducted the search by using keywords"

related to the fraud investigation to identify relevant documents, and the reviewing agent would

not have "randomly opened and reviewed any image or video files."  Motion to Suppress at 24-

25.  Moreover, Pena relies on Chase's testimony to contend that, "given the scope of the original

warrant and the type of crime being investigated, there would be no reason to review the image

and video files on the digital devices."  Motion to Suppress at 25 (quoting Sworn Declaration of

Brian Chase ¶¶ 11-16, at 4-5 (dated August 6, 2021), filed August 26, 2021 (Doc. 29-2)("Chase

Decl.").  Further, Pena relies on Chase's statement that Kucenski would not search manually for

evidence of fraud, but would instead employ search terms related to fraud, and thus, the probability

of Kucenski encountering child pornography was low.  See Motion to Suppress at 25 (citing Chase

Attachment 1

Decl. ¶¶ 11-16, at 4-5).  Finally, Pena relies on Chase's opinion that the use of the specialized software, Griffeye, "was necessary for the government to find what they describe as the roughly 1% of files constituting child pornography," and, even using such a method, Kucenski's report states that it only processed approximately 3.75% of the files on Pena's devices.  Motion to Suppress (quoting Chase Decl. ¶¶ 7-8, at 2-3).

The United States, on the other hand, contends that the exclusionary rule should not apply, because Kucenski would have discovered inevitably child pornography.  <u>See</u> Response at 14.  The United States first argues that Kucenski would have continued searching the devices pursuant to the fraud warrant and, thus, "it is exceedingly likely that his random review process would have led to the observation of additional file titles, leading to a search warrant."  Response at 15. Second, the United States contends that Kucenski would have observed additional file titles when he was "walking the scene" to understand the device's layout and materials.  Response at 15. Third, the United States notes that the First Search Warrant allowed Kucenski to search Pena's browsing history, which would have revealed the search terms "'Teen casting', 'teens', 'schoolgirls', 'Banging the Young', 'boysfuckteens', 'ClubSevenTeen', 'Jailbait Girls', and 'lola'."  Response at 16 (quoting Possible Child-Related Internet Artifacts Summary Report, filed August 20, 2021 (Doc. 32-3)("Internet Artifacts Report")).

Pena replies and disputes the reliability of the Internet Artifacts Report on which the United States relies.  <u>See</u> Reply at 11.  Pena argues that the Internet Artifacts Report was "generated by searching Internet Evidence Finder (IEF) reports for evidence relating to child pornography." Reply at 11.  Further, Pena argues that the "IEF reports are comprised of hundreds of thousands of rows of data, from which the agent, while specifically looking for evidence relating to child pornography, identified only a tiny fraction that could possibly relate to child pornography."  Reply

Attachment 1

at 11. Pena emphasizes that "there was a very low probability" that Kucenski would have discovered child pornography "by randomly clicking on images or videos or scrolling through internet history because of the vast volume of data." Reply at 11-12.

Under the inevitable discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'" United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005). For the inevitable discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. United States v. Owens, 782 F.2d at 152. "'[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search.'" United States v. Souza, 223 F.3d 1197, 1204 (10th Cir. 2000)(quoting United States v. Brown, 64 F.3d 1083, 1085 (7th Cir. 1995)(alteration in original)). "[A] court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. In United States v. Loera, the Tenth Circuit determined that agents would have discovered inevitably child pornography during an investigation for computer fraud. See 923 F.3d at 928. The Tenth Circuit concluded that, because the agent testified that he would have searched the electronic folders where he ultimately discovered child pornography, and at least one folder he would have lawfully opened contained a file called "Spycam 9yr Undress", the inevitable discovery doctrine applied. See 923 F.3d at 928-29.

Attachment 1

The Court concludes that Kucenski would have discovered inevitably child pornography on Pena's devices. Pena argues that the probability of Kucenski finding child pornography during his computer fraud investigation was exceedingly low, because of the vast numbers of files on Pena's devices. Pena's expert witness, Chase, testified that he found child pornography while conducting a manual search -- that is, a search without the assistance of a program. See Tr. at 94:20-95:3 (White, Chase). While Chase acknowledged that it was possible to discover child pornography during a manual search, Chase also testified that, to find an image of child pornography on Pena's computer, an agent "would have to be specifically clicking through images contained within folders that are clearly not related to any sort of procurement fraud." Tr. at 96:13-16 (Chase). Moreover, in his nearly year-long investigation of Pena's devices, Kucenski searched merely 3.75% of Pena's files and concluded that only one percent of those files potentially contained illegal child pornography. See Forensic Analysis at 7. Unlike United States v. Loera, where the agent testified that at least one folder he would have lawfully opened contained an incriminating file, here, Chase avers that the child pornography was not in the same location as evidence of fraud on Pena's devices. In fact, Kucenski testified that most of the child pornography was found on hard drive 4 and hard drive 7, and that he did not search hard drives 4 and 7 in connection with the fraud investigation, because the high-level review of the two hard drives indicated that they contained "only pornography." Tr. at 68:1-17 (Dodd, Kucenski). While the United States relies on the IEF to contend that Pena's browsing history -- which Kucenski could permissibly access pursuant to the First Search Warrant -- indicated Pena had child pornography, Chase testified that there were hundreds of thousands of items in the IEF and that the United States' exhibit lists only about 200 entries. See Tr. at 89:16-25 (Dodd, Chase). This fact implies an exceedingly low probability that Kucenski would have searched manually Pena's browsing history

rather than using search terms targeted at the fraud investigation.  Accordingly, the Court cannot

say with a high level of confidence that Kucenski would have found evidence of child pornography

absent the Second Search Warrant.

The Court concludes, however, that if Kucenski had continued the fraud investigation, he

would have uncovered additional evidence to support the Second Search Warrant's issuance.

Kucenski testified that, even if he had not paused his search to apply for a search warrant, he

believed he would have discovered child pornography in the course of the fraud investigation

because, "[a]t least in a couple of cases, the files were found at a pretty high level in the directory

structure [of] the device, so it was only a folder or two down where other key word[s] started

coming out that would suggest that something may be there."  Tr. at 32:22-34:1 (Kucenski).  Thus,

as the United States argues, Kucenski would have found more incriminating file folder names

while he was "walking the scene" of the devices' contents, and this discovery would have

supported probable cause for a search warrant.   If Kucenski had not paused his search to obtain

the Second Search Warrant, it is highly likely that he would have encountered more incriminating

file folder names that indicated child pornography's presence, thus supporting probable cause for

a search warrant.  Consequently, the Court concludes that the child pornography on Pena's devices

would have been discovered inevitably in the course of Kucenski's investigation.

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence, filed August 6, 2021

(Doc. 29), is denied.

_____
UNITED STATES DISTRICT JUDGE

Attachment 1

*Counsel*:

Fred J. Federici
  Acting United States Attorney
Sarah Jane Mease
Stephen A. White
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Vincent J. Ward
Christopher A. Dodd
Shammara H. Henderson
Freedman Boyd Hollander Goldberg Urias & Ward, P.A.
Albuquerque, New Mexico

       *Attorneys for the Defendant*

Attachment 1

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
**District of New Mexico**

UNITED STATES OF AMERICA

V.

**BOBBY PENA**

**Judgment in a Criminal Case**

Case Number:  **1:19CR03611-001JB &
1:19CR03609-001JB**
USM Number:  **08325-151**
Defendant's Attorney:  **Christopher Dodd, Retained**

**THE DEFENDANT:**

☒  pleaded guilty to count(s) **1 of Information and 1 through 28 of Indictment**.

☐  pleaded nolo contendere to count(s)  which was accepted by the court.

☐  was found guilty on count(s)  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. Sec. 2252A(a)(5)(B), 18 U.S.C. Sec. 2252A(b)(2), 18 U.S.C. Sec. 2256 | Possession of Visual Depictions of Minors Engaged in Sexually Explicit Conduct | 12/13/2017 | 1 of Information |

The defendant is sentenced as provided in pages 2 through 10 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 .

☐  The defendant has been found not guilty on count(s) .

☒  Count(s) **Indictment 19CR3611**  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**November 14, 2022**
_____
Date of Imposition of Judgment

**/s/ James O. Browning**
_____
Signature of Judge

**Honorable James O. Browning**
**United States District Judge**
_____
Name and Title of Judge

**December 27, 2022**
_____
Date

Attachment 2

AO 245B (Rev. 09/19)   Judgment in a Criminal Case                                          Judgment - Page 2 of
                       Sheet 1A                                                                              10

DEFENDANT: **BOBBY PENA**
CASE NUMBER: **1:19CR03611-001JB & 1:19CR03609-001JB**

## ADDITIONAL COUNTS OF CONVICTION

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 07/31/2015 | 1 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 08/31/2015 | 2 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 09/30/2015 | 3 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 10/31/2015 | 4 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 11/30/2015 | 5 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 12/31/2015 | 6 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 01/31/2016 | 7 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 02/28/2016 | 8 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 03/31/2016 | 9 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 04/30/2016 | 10 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 05/31/2016 | 11 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 06/30/2016 | 12 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 07/31/2016 | 13 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 08/31/2016 | 14 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 09/30/2016 | 15 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 10/31/2016 | 16 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 11/30/2016 | 17 of Indictment |

Attachment 2

| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 12/31/2016 | 18 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 01/31/2017 | 19 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 07/31/2015 | 20 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 07/31/2016 | 21 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 08/31/2016 | 22 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 09/30/2016 | 23 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 11/30/2016 | 24 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 07/31/2015 | 25 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 08/31/2016 | 26 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 10/31/2016 | 27 of Indictment |
| 18 U.S.C. Sec. 287, 18 U.S.C. Sec. 2(b) | False Claims Against the Government | 11/30/2016 | 28 of Indictment |

Attachment 2

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 2 - Imprisonment

Judgment - Page 4 of 10

DEFENDANT: **BOBBY PENA**
CASE NUMBER: **1:19CR03611-001JB & 1:19CR03609-001JB**

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:   **41 months**   .

**41 months is imposed as to Count 1 of Information 1:19CR3611-001JB; 41 months is imposed as to each of Counts 1 through 28 of Indictment 1:19CR3609-001JB; said terms shall run concurrently for a total term of 41 months.**

**For the reasons stated on the record at the sentencing hearing held November 14, 2022, the Court varies downward.**

☒ The court makes the following recommendations to the Bureau of Prisons:

   **The Court recommends that the Defendant be designated for placement at Federal Correctional Institution Englewood, CO, if appropriate. The Court recommends that the Defendant participate in the Bureau of Prisons sex offender program.**

☒ The defendant is remanded to the custody of the United States Marshal.
☐ The defendant shall surrender to the United States Marshal for this district:
   ☐ at  on .
   ☐ as notified by the United States Marshal.
☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
   ☐ before 2 p.m. on .
   ☐ as notified by the United States Marshal.
   ☐ as notified by the Probation or Pretrial Services Office.

### RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to

_____ at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

117

Attachment 2

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 – Supervised Release
Judgment - Page 5 of 10

DEFENDANT: **BOBBY PENA**
CASE NUMBER: **1:19CR03611-001JB & 1:19CR03609-001JB**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:  **5 years** .
**5 years is imposed as to Count 1 of Information 1:19CR3611-001JB; 3 years is imposed as to each of Counts 1 through 28 of Indictment 1:19CR3609-001JB; said terms shall run concurrently for a total term of 5 years.**

### MANDATORY CONDITIONS

1.  You must not commit another federal, state, or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(Check, if applicable.)*
4.  ☐   You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☒   You must cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable)*
6.  ☒   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state, local, or tribal sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐   You must participate in an approved program for domestic violence. *(Check, if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

### STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is

Attachment 2

not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10.   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11.   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12.   If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, require you to notify that person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13.   You must follow the instructions of the probation officer related to the conditions of supervision.

14.   You must undergo a sex offense-specific assessment to determine the level of risk for sexual dangerousness, recidivism, and amenability to treatment and formulate treatment recommendations if treatment is necessary. You may be required to pay all, or a portion of the cost of the assessment.

15.   You will waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer shall disclose the presentence report and/or any previous sex offender or mental health evaluations to the treatment provider.

16.   You must submit to a search of person, property, residence, vehicles, documents, businesses, computers [as defined in 18 U.S.C. 1030(e)(1)], and other electronic communications or data storage devices or media effects, at any time, by a probation officer with reasonable suspicion concerning a violation of a condition of probation or supervised release, or unlawful conduct by the person, in the lawful discharge of the officer's supervision functions. You must inform any other occupants that the premises may be subject to searches pursuant to this condition. Failure to submit to a search may be grounds for revocation of supervision.

17.   You will not have any direct or indirect contact or communication with the victim or his or her family, or go near or enter the premises where the victim or his or her family resides, is employed, attends school or treatment, except under circumstances approved in advance and in writing by the probation officer.

Attachment 2

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5 – Special Conditions                                                      Judgment - Page 7 of 10

DEFENDANT: **BOBBY PENA**
CASE NUMBER: **1:19CR03611-001JB & 1:19CR03609-001JB**

## SPECIAL CONDITIONS OF SUPERVISION

You must not incur new credit charges, negotiate or consummate any financial contracts or open additional lines of credit without prior approval of the probation officer.

You must provide the probation officer access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorneys Office.

You must undergo a sex offense-specific assessment to determine the level of risk for sexual dangerousness, recidivism, and amenability to treatment and formulate treatment recommendations if treatment is necessary.  You may be required to pay all, or a portion of the cost of the assessment.

You shall waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer and sign all necessary releases to enable the probation officer to monitor your progress. The probation officer shall disclose the presentence report, any previous sex offender evaluations and/or other pertinent treatment records to the treatment provider.

If recommended in the sex offense-specific assessment, you must begin attending and participating in sex offender treatment consistent with the recommendations of the evaluation.  You must follow the rules and regulations of that program. The probation officer, in conjunction with the treatment provider, will supervise your participation in the program (location, modality, duration, intensity, etc.).  Furthermore, you must submit to clinical polygraph examinations, as directed by the probation officer and/or treatment provider. You may be required to pay a portion or all of the cost of the assessments and treatment.

You are prohibited from viewing or possessing any material that depicts sexually explicit conduct as defined in 18 U.S.C. 2256, including images, books, writings, drawings, video games, or videos depicting actual sexual intercourse.  This also includes computer or computer-generated images or pictures, whether made or produced by electronic, mechanical, or other means.  Should the sex offense-specific assessment determine this factor is not a risk, then this condition shall not be enforced.

You must not have direct contact with children under the age of 18 years without written approval of the treatment provider in conjunction with the probation officer.  If you do have any direct contact with any child you know or reasonably should know to be under the age of 18 years, not including your own children, without the permission of the probation officer in conjunction with the treatment provider, you must report this contact to the probation officer within 24 hours. Direct contact includes written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

You are restricted from engaging in an occupation where you have access to children without prior approval of the probation officer.

You must not go to or remain within 100 feet of school yards, parks, playgrounds, arcades, or other places used primarily by children under the age of 18years old.

Attachment 2

**You must not volunteer for any activities in which you supervise children or adults with mental or physical disabilities.**

**You must cooperate and comply with the United States Probation Office's Computer Restriction and Monitoring Program (CRMP): You may possess or use a computer(s) (as defined in 18 U.S.C. 1030(e)(1)) or an internet capable device under certain conditions. This is not a prohibition on lawful computer or internet capable device use, but a restriction on the type of computer or internet capable device you may use. First, you must identify to the probation officer your computer or internet capable device(s), data storage device(s), or any other electronic equipment capable of storing, retrieving, and/or accessing data that you possess or use. You will agree to only use the computer or internet capable device(s) you have disclosed to the probation officer. Second, you must allow the installation of monitoring software/hardware on your computer or internet capable device(s), at your expense, and you must refrain from attempting to interfere with the operation of that software/hardware. Periodic searches shall be conducted to determine whether the monitoring software is functioning effectively after installation; and to determine whether there have been attempts to circumvent the monitoring software after installation. You understand that the software will record all activity on your computer or internet capable device(s), and you shall inform any other users that said computer or internet capable device(s) are subject to monitoring. A computer or internet capable device that is not able to be effectively monitored will not be approved for use. Third, you must disclose any username or identification(s) and password(s) for all computer or internet capable devices. Fourth, you must submit to the probation officer, upon request, any cellular or telephone/internet service provider billing records or receipts, to verify that you are not utilizing services that are prohibited.**

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: <u>www.uscourts.gov</u>.

Defendant's Signature _____     Date _____

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 – Criminal Monetary Penalties
Judgment - Page 9 of 10

DEFENDANT: **BOBBY PENA**
CASE NUMBER: **1:19CR03611-001JB & 1:19CR03609-001JB**

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

☐   The Court hereby remits the defendant's Special Penalty Assessment; the fee is waived and no payment is required.

| Totals: | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| | $2,900.00 | $70,125.00 | $173,478.00 | $ 15,000.00 (see below) | $5,000.00 |

☐   The determination of the restitution is deferred until .  An *Amended Judgment in a Criminal Case* will be entered after such
determination.
☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A   ☐   In full immediately; or

B   ☒   $2,900.00 (SPA) due immediately, balance due (see special instructions regarding payment of criminal monetary penalties).

**Special instructions regarding the payment of criminal monetary penalties: Criminal monetary penalties are to be made payable by cashier's check, bank or postal money order to the U.S. District Court Clerk, 333 Lomas Blvd. NW, Albuquerque, New Mexico 87102 unless otherwise noted by the court. Payments must include defendant's name, current address, case number and type of payment.**

**The Defendant will pay a fine of $173,478. This sum will be paid in full, or in monthly installments of $1,000.00 or 10% of the defendant's gross monthly income, whichever is greater.**

**As to Case No.: 1:19CR03611-001JB, pursuant to the Mandatory Restitution for Sexual Exploitation of Children Act and 18 U.S.C. 2259, are applicable in this case. It is ordered that the Defendant will make restitution to the victims in this matter in the following amounts: to BluePillow1, in the amount of $3,000; J_blonde, in the amount of $3,000; Linda&Patty1, in the amount of $3,000; Marineland1, in the amount of $3,000; and Tara, in the amount of $3,000; for a total amount of $15,000. The restitution will be paid in full, or in monthly installments of $1,000.00, or 10% of the Defendant's gross monthly income, whichever is greater.**

**As to Case No.: 1:19CR03609-001JB, pursuant to the Mandatory Victim Restitution Act, it is further ordered that the Defendant will make restitution to United States Department of Energy in the amount of $70,125. Restitution shall be submitted to the Clerk of the Court, Attention Intake, 333 Lomas Boulevard N.W. Suite 270, Albuquerque, New Mexico 87102, to then be forwarded to the victim(s). The restitution will be paid in full or in monthly installments of $1,000, or 10% of the Defendant's gross monthly income, whichever is greater.**

**As to Case No.: 1:19CR03611-001JB, the Defendant is subject to the provisions of the Justice for Victims of Trafficking Act of 2015, which requires the Court to assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under 18 U.S.C. Chapters 77, 109A, 110, 117; or Section 274 of the Immigration and Nationality Act (8 U.S.C. § 1324). The Court finds the Defendant is non-indigent and required to pay the $5,000.00 assessment, which is due after all other court-ordered monetary penalties have been paid.**

**Consistent with a stipulation in the Plea Agreement, the Defendant forfeits his rights, title, and interest identified in Paragraph 20(a)-(c) of the plea agreement.**

Attachment 2

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order:  (1) assessment,  (2) restitution principal,  (3) restitution interest,  (4)  AVAA assessment,  (5) fine principal,  (6) fine interest,  (7) community restitution,  (8) JVTA assessment,  (9) penalties, and  (10) costs, including cost of prosecution and court costs.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

Attachment 2

## *United States v. Ahrndt*

United States District Court for the District of Oregon, Portland Division

January 17, 2013, Decided; January 17, 2013, Filed

Criminal Case No. 3:08-CR-00468-KI

**Reporter**

2013 U.S. Dist. LEXIS 7223 *; 2013 WL 179326

UNITED STATES OF AMERICA, Plaintiff, v. JOHN HENRY AHRNDT, Defendant.

**Prior History:** *United States v. Ahrndt, 475 Fed. Appx. 656, 2012 U.S. App. LEXIS 6976 (9th Cir. Or., 2012)*

**Counsel:** [*1] For Plaintiff: S. Amanda Marshall, United States Attorney, District of Oregon, Gregory R. Nyhus, United States Attorney's Office, Portland, OR.

For Defendant: Francesca Freccero, Federal Public Defender's Office, Portland, OR.

**Judges:** Garr M. King, United States District Judge.

**Opinion by:** Garr M. King

# Opinion

OPINION AND ORDER ON MOTION TO SUPPRESS

KING, Judge:

John Henry Ahrndt moves to suppress evidence and statements obtained as a result of a warrantless search made by a police officer's connection to Ahrndt's personal wireless network and opening one of his shared files. Pending before me is Ahrndt's renewed Motion to Suppress [23, 69]. For the following reasons, I grant the motion and suppress evidence agents discovered on Ahrndt's storage media and the subsequent statements he made to them.

**BACKGROUND**

I. Procedural History of the Case

Ahrndt was indicted on October 16, 2008 with one count of Transportation of Child Pornography and one count of Possession of Child Pornography.

I denied Ahrndt's motion to suppress on January 28, 2010, and defendant entered a conditional guilty plea to Count 2. The government dismissed Count 1 and I sentenced Ahrndt to

the mandatory minimum of 120 months on Count 2. I allowed release [*2] pending appeal.

In an unpublished memorandum, the Ninth Circuit reversed and remanded for additional fact finding. *United States v. Ahrndt, 475 F. App'x 656, 657 (9th Cir. 2012)* [60] (hereinafter, "Ahrndt II"). While awaiting briefing for the second evidentiary hearing, I granted Ahrndt's motion to withdraw his previous guilty plea and I granted the United States' motion to dismiss Count 1. Accordingly, Possession of Child Pornography is the only remaining charge.

I held a second evidentiary hearing on November 15, 2012, again taking the testimony of Ahrndt's expert witness, Robert Young. The government declined to present additional evidence.

II. Background Facts

After the second evidentiary hearing, and considering the evidence adduced at the first evidentiary hearing, I find as follows:

On February 21, 2007, a woman referred to as JH was using her personal computer at her home in Aloha, Oregon. She was connected to the internet via her own wireless network, but, when her wireless network malfunctioned, her computer automatically picked up another nearby wireless network called "Belkin54G." Belkin54G refers to a wireless router, made by the company Belkin, that broadcasts a wireless signal [*3] in a roughly 400 foot radius. Its default setting has no security. At the second evidentiary hearing, defense expert Robert Young testified that JH's laptop would not have automatically connected to Belkin54G the first time she lost her own wireless signal. Instead, her computer would have sent a signal to search for wireless routers within range of her computer and the names of available wireless routers would have appeared in a list on her computer. JH would have clicked on Belkin54G to prompt her computer to connect to that wireless router. If the wireless router was secured, she would have had to enter a password to connect to the wireless router. Because the Belkin54G was not secured, JH connected without entering a password. From that time forward, her computer remembered the available connection and she did not have to select Belkin54G again when her own wireless

Attachment 3

signal failed. Nevertheless, even after that first time, in order to connect to Belkin54G, JH's computer needed to send a signal into Ahrndt's computer and the router's processor to use the wireless network.

A Belkin54G router comes with an installation CD containing a manual instructing on the "importance of security [*4] measures," according to the testimony of Agent Tony Onstad at the first evidentiary hearing. Tr. of Hr'g on Mot. to Suppress 31: 24-32:1 (Jan. 7, 2010) [59] (hereinafter, "First Hr'g Tr."). There is no evidence Ahrndt had read or received this manual. The government did not introduce the manual itself.

After JH connected to the internet via the Belkin54G wireless network, JH opened her iTunes software to listen to music. The iTunes software is designed to organize and play audio, video, and image files. The iTunes software also allows users to browse music and video that is stored in the iTunes libraries of other computers on the same network, if those libraries are enabled to "share." In addition, accepting Young's testimony, iTunes software installed on one computer ("computer 2") integrates with LimeWire installed on another computer ("computer 1") so that when the two computers are on the same network iTunes will display media on computer 2 available through LimeWire on computer 1. In this case, when JH opened her iTunes, she noticed another user's library—called "Dad's LimeWire Tunes"—was available for sharing. Young also testified that the name "Dad's LimeWire Tunes" was an automatically [*5] generated folder name.

JH opened Dad's Limewire Tunes and observed files with names that prompted her to call the Washington County Sheriff's Office a little before 10:45 p.m. The transcript reflects the following interaction:

> JH: Ok, Um, I just um was looking at my ITunes um and I, you can share music with people that are I guess in your area and I was just um sharing some music with this I guess it's a neighbor of mine, I have no way of knowing where they are or whatever but it's a whole bunch of um underage child pornography. I just wanted somebody to know about that.

Def's. Ex. 103 (First Hr'g).

She gave her name, address and phone number. When asked, "And how long ago did you get, receive that?" she answered,

> JH: Um, Its up there now. I just turned on my computer and turned on my Itunes and just saw that I was sharing music so I just checked it and um I just saw it. I mean I didn't open any of the stuff but the names are all stuff about 11 year old girls and 9 year olds you know, just stuff that I don't it sounds inappropriate.

Id.

Washington County Deputy John McCullough arrived a little less than an hour later. Deputy McCullough noted in his police report that JH showed him a "play [*6] list" of approximately 25 picture and video files. The files had pornographic titles that indicated the images were of underage children." Def's. Ex. 104, at 4 (First Hr'g). At first, they were not able to open the files or identify an owner. Deputy McCullough called his sergeant. Deputy McCullough testified at the first suppression hearing that he called his sergeant for two reasons: to advise him what he had learned and to "determine if it would be appropriate or not for me to look further into those files and try to determine what was enclosed within them." First Hr'g Tr. 8:8-12. After speaking with his supervisor, Deputy McCullough concluded it would be acceptable to investigate further and he requested that JH attempt to open one of the files.[1] The two saw a sexually explicit image of a boy masturbating. JH's computer then lost the signal and she was unable to open any other files.

JH informed [*7] Deputy McCullough that the Belkin54G showed as an available wireless network on her computer when she moved in. At that time, only one resident lived in her new development. She then pointed out an older house nearby, about 150 feet away, which was the only other home she knew was occupied when she moved in. Deputy McCullough subsequently ran the license plates of a car in the driveway of that house and learned that defendant John Henry Ahrndt, a convicted sex offender, lived there. Fredrick Harmon, a friend and tenant of defendant, also lived at the residence.

Two days later, on February 23, 2007, Washington County Sheriff's Office Detective Ray Marcom and Department of Homeland Security, U.S. Immigration and Customs Enforcement, Senior Special Agent James Cole interviewed JH further about the incident. JH repeated to Marcom and Cole much of what she had told Deputy McCullough. She also remembered one file name specifically: "11-yr old masturbating." She generally remembered words such as "tiny," "fuck," and "cunt," in conjunction with acronyms indicating age like "5yoa" and "8yoa." Def's. Ex. A, at AHRNDT R004 [25].

Agent Cole also spoke with Deputy McCullough, who could not remember [*8] specific filenames. He nevertheless

---

[1] In his report, Deputy McCullough wrote that while he was talking with his supervisor, JH informed Deputy McCullough that she could open one of the files. The government concedes, however, that JH was acting as an agent of the government when she opened the image. Gov't. Second Resp. 34 [72].

Attachment 3

2013 U.S. Dist. LEXIS 7223, *8

reported observing that some of the age acronyms in the files, like "5yoa," were followed by the words "getting raped" and "being raped." Id.

On April 2, 2007, Agent Cole applied to United States Magistrate Judge Dennis Hubel for a search warrant to access the Belkin54G wireless network for the purpose of determining the internet protocol ("IP") address associated with the router. An IP address would allow investigators to find out from an internet service provider who owned the Belkin54G wireless network. Judge Hubel granted the warrant the same day. On April 7, 2007, Agent Cole drove near the house, accessed the Belkin54G network, and determined the network's IP address. Through the American Registry for Internet Numbers, Agent Cole learned that the IP address belonged to Comcast. He served a summons on Comcast and learned that Ahrndt was the Comcast subscriber for the IP address in question.

On April 17, 2007, Agent Cole obtained a second search warrant from Judge Hubel allowing a search of the home for wireless routers, computers, and any files or storage media that could contain images of child pornography. The next morning officers searched defendant's [*9] home and seized one tower computer, a Belkin wireless router, various hard drives, numerous disc media and flash media.

Agents interviewed Ahrndt when they executed the second search warrant. They told him he was not under arrest and that he was free to leave at any time. Ahrndt stayed and agreed to speak to the agents. He admitted to downloading child pornography as recently as eight months previously using the peer-to-peer file-sharing software LimeWire, but that he had deleted any images he downloaded from that time. Def's. Ex. A, at AHRNDT R0027 [25]. He also told agents that he had deleted all the images he had previously obtained, but that they would find child pornography images if they were capable of recovering deleted images. Specifically, he told the agents they would find deleted images on his external hard drives, which he had converted from hard drives of his old computers. He denied, however, that there was any child pornography on his current computer, which he had obtained from a member of his church in January 2007. Ahrndt also told agents that no one else used his computer, but that Mr. Harmon, his friend and tenant, used the wireless network.

A subsequent computer [*10] forensic examination of the equipment found 20 images, 17 of which depicted children engaged in sexually explicit conduct. The first three images were advertising pages located in an "orphan" file, meaning its parent file had been deleted. The next four images were located in a Google Hello "scache," indicating the images had been sent or transmitted. Image 8 was a .mpg movie that had

been viewed in Windows Explorer or by using a My Computer thumbnail or filmstrip view. Image 9 was a deleted file recovered from Ahrndt's computer. The last ten images were deleted files recovered from the USB flash drive. Agent Cole's forensic report did not mention LimeWire, any share folder created by LimeWire, or iTunes.

Ahrndt's expert Young testified at the second evidentiary hearing that when LimeWire is installed, the user has the option of directing LimeWire to start automatically when he logs into his computer allowing the program to start faster. The default then becomes an automatic start for LimeWire when the user logs in to his computer, allowing LimeWire to run the entire time the user is on his computer. Young also explained LimeWire's default setting is to share content "on the Local [*11] Area Network and make it accessible for Itunes and other Digital Audio Access Protocol 'DAAP' enabled Players." Def's. Ex. 101 (Second Hr'g).

There is no evidence Ahrndt was using iTunes or deliberately sharing files. There is evidence Ahrndt had used LimeWire to download child pornography eight months before, but no evidence he had set his program to share files over the internet.

Ahrndt brought a motion to suppress all evidence seized after Deputy McCullough's initial access of Ahrndt's files through JH's computer, on the theory that without Deputy McCullough's actions the first and second warrants would not have issued.

## LEGAL STANDARDS

The *Fourth Amendment to the Constitution* establishes the rights of American citizens to be free from unreasonable searches and seizures by the government. *U.S. Const. Amend. 4*. A warrantless search is *per se* unreasonable unless it is justified by an exception to the general rule. *Horton v. California, 496 U.S. 128, 133, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990)*.

Private party conduct does not implicate the *Fourth Amendment*; only activity by government agents raises *Fourth Amendment* concerns. *United States v. Young, 153 F.3d 1079, 1080 (9th Cir. 1998)* (per curiam).

In order to invoke the *Fourth Amendment*, [*12] a defendant must show that his *Fourth Amendment* rights have been implicated; that is, he must show a "search" occurred at all before requiring the government to prove an exception to the warrant requirement. The Ninth Circuit spelled out the applicable standard in its opinion in this case as follows:

A search occurs when the government violates an individual's reasonable expectation of privacy. See *United States v. Jacobsen, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984)*. "An individual has a reasonable expectation of privacy if he can demonstrate a subjective expectation that his activities would be private, and he [can] show that his expectation was one that society is prepared to recognize as reasonable." *United States v. Heckenkamp, 482 F.3d 1142, 1146 (9th Cir. 2007)* (internal quotation marks omitted) (alteration in original). A search also occurs whenever "the Government obtain information by physically intruding on a constitutionally protected area." *United States v. Jones, 132 S. Ct. 945, 950 n. 3, 181 L. Ed. 2d 911 (2012)*.

*Ahrndt II, 475 F. App'x at 657*.[2]

## DISCUSSION

### I. The Private Search

"The *Fourth Amendment* limits searches conducted by the government, not by a private party, unless the private party acts as an 'instrument or agent' of the government." *Young, 153 F.3d at 1080*; *United States v. Black, 767 F.2d 1334, 1339 (9th Cir. 1985)* ("A wrongful search or seizure conducted by a private person does not violate the *Fourth Amendment*," describing personal assistant's disclosure of her employer's documents when she was not authorized to disclose them). Here, JH discovered the list of images contained in Ahrndt's LimeWire folder while using her own iTunes program and Ahrndt's unsecured wireless network.

Although I have already concluded JH did nothing illegal, *United States v. Ahrndt, Criminal No. 3:08-468-KI , 2010 U.S. Dist. LEXIS 7821, 2010 WL 373994, at * 8 (D. Or. Jan. 28, 2010)* [45] (hereinafter, Ahrndt I"), even if she have courts have declined to suppress evidence even when it was obtained by an individual who had no authorization to access the defendant's computer. See *United States v. Kline, 112 F. App'x 562, 564 (9th Cir. 2004)* **[*14]** (private individual searched defendant's computer using a "Trojan Horse" computer virus to illegally download files from the infected computer); see also *United States v. Jarrett, 338 F.3d 339*

*(4th Cir. 2003)* (child pornography recovered via hacker's actions on computer was not subject to suppression); *United States v. Steiger, 318 F.3d 1039 (11th Cir. 2003)* (individual's access to a computer by hacking not subject to the *Fourth Amendment*); see also *Walter v. United States, 447 U.S. 649, 656, 100 S. Ct. 2395, 65 L. Ed. 2d 410 (1980)* ("[A] wrongful search or seizure conducted by a private party does not violate the *Fourth Amendment* and . . . such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully.") (plurality opinion). Accordingly, JH's report of the filenames she viewed is not subject to suppression.

Although there is a question whether Deputy McCullough could reenact JH's search by asking her to connect to Ahrndt's unsecured wireless network, open her iTunes, and open the folder called "Dad's LimeWire Tunes," as a practical matter Deputy McCullough's duplication of JH's efforts revealed nothing new that would affect my analysis below. I do note that in my view, **[*15]** under Jacobsen, Deputy McCullough could properly view data on JH's computer when JH had previously performed the search. As the Supreme Court explained in Jacobsen, "Once frustration of the original expectation of privacy occurs, the *Fourth Amendment* does not prohibit governmental use of the now-nonprivate information . . . . The *Fourth Amendment* is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *466 U.S. at 117* (reliance on *Walter, 447 U.S. 649* in which private party opened mis-delivered package). I am not persuaded by Ahrndt's citation to *United States v. Young, 573 F.3d 711 (9th Cir. 2009)*, in which the court declined to expand Jacobsen to a search of a hotel room, deemed equivalent to a private residence; the invasive action at issue here is a remote search of computer data transmitted on an unsecured wireless network.

I agree with the government, then, that Deputy McCullough saw data on a network that the private party had previously searched. As a result, Deputy McCullough's view of the list of titles in Dad's LimeWire Tunes did not violate Ahrndt's *Fourth Amendment* rights. There would be no **[*16]** different outcome, however, even if I am wrong about that conclusion and Deputy McCullough's recollections of the filenames he saw must be excised from the affidavit.

I next consider whether Deputy McCullough's additional step of clicking the image, an action which exceeded the private search, violated Ahrndt's *Fourth Amendment* rights.

### II. Whether Opening of the Image Violated Ahrndt's *Fourth Amendment* Rights

---

[2] Because the search here is a remote search of transmitted data, I reject Ahrndt's argument that this was a presumptively unreasonable search inside his home. In addition, **[*13]** although Ahrndt made the same argument to the Ninth Circuit, the Circuit set out the test I quoted above for determining whether a search occurred. Appellant Reply Br. 2.

Attachment 3

2013 U.S. Dist. LEXIS 7223, *16

Deputy McCullough directed JH to open an image. She had not previously opened any of the images. The opened image was no longer within the purview of the private search. I liken the unopened image to the unviewed films at issue in *Walter*; in that case, the private party had not viewed the suspect films and, prior to the agents' action of watching the films, "one could only draw inferences about what was on the films. The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore could be characterized as a separate search." *447 U.S. at 657*. I, furthermore, reject the government's argument that the contents were already exposed. *Id. at 659 n.13* ("A partial invasion of privacy cannot automatically justify a total **[*17]** invasion.").

The next question is whether Deputy McCullough's action of clicking on the image violated Ahrndt's *Fourth Amendment* rights. In order to assess Ahrndt's *Fourth Amendment* rights, I must evaluate whether any subjective expectation of privacy was objectively reasonable. As the Ninth Circuit pointed out, my previous opinion incorrectly framed the issue as whether it is reasonable to have an expectation of privacy in the contents of a *shared iTunes library* on a personal computer connected to an unsecured home wireless network. In fact, the issue is whether it is reasonable to have an expectation of privacy in the contents of a LimeWire file, when there is no evidence of intentional sharing over the wireless network or the internet, on a personal computer connected to an unsecured home wireless network.

As an initial matter, I conclude Ahrndt's reasonable expectation of privacy in the contents of his computer was not eliminated when he attached it to his unsecured wireless network router. Indeed, as the court stated in *Heckenkamp*, "the mere act of accessing a network does not in itself extinguish privacy expectations, nor does the fact that others may have occasional access to **[*18]** the computer." *482 F.3d at 1146-47* (citing *Leventhal v. Knapek, 266 F.3d 64, 74 (2d Cir. 2001))*.

It is true the <u>Heckenkamp</u> court went on to comment that privacy expectations may be reduced if the user is advised the information may not remain confidential or communications may be monitored. Here, with respect to Ahrndt's Belkin54G wireless router, the default setting was unsecured. The quick set-up manual did not discuss security measures that could or should be taken. Although defense counsel stipulated the router came with a manual, and the government's expert testified the manual included detailed instructions on setting up wireless security, the only evidence in the record is that the manual warned of the importance of security. I underscore there is no evidence the manual warned Ahrndt that the *content* of files may be accessible to others, as opposed to just

internet access, by failing to secure his router. Accordingly, although Ahrndt's failure to secure his network suggests a lesser subjective expectation of privacy, I could not say he lost all expectation of privacy in the contents of files on his personal computer.

The situation is, of course, a bit more complicated; the evidence **[*19]** suggests the content became available to JH by virtue of the fact that the materials were contained in a LimeWire folder. Nevertheless, although the folder appearing in JH's iTunes directory was called "Dad's *LimeWire* Tunes," there is no evidence Ahrndt was sharing files on the peer-to-peer network, and the government concedes there is no evidence the image in Dad's LimeWire Tunes library that JH and Deputy McCullough opened was accessible over the internet by LimeWire users at the time JH and Deputy McCullough accessed the files, or at any time prior. Accordingly, I could not say Ahrndt had no right to privacy in those files just by virtue of his use of LimeWire to download images. Cf. *United States v. Ganoe, 538 F.3d 1117, 1127 (9th Cir. 2008)* (denying defendant's motion to suppress evidence on the ground the defendant had installed file sharing software on his computer and was "explicitly warned before completing the installation that the folder into which files are downloaded would be shared with other users in the peer-to-peer network").

Instead, accepting Young's testimony, the evidence suggests LimeWire was likely configured to run whenever Ahrndt turned his computer on. The **[*20]** evidence also suggests the program was set to its default mode of sharing content on Ahrndt's "Local Area Network" making that content "accessible for Itunes and other Digital Audio Access Protocol (DAAP) enabled Players." Def's. Ex. 101 (Second Hr'g). As a technical matter, with respect to the content itself, Young could not say whether iTunes was asking, "Anything to share?" or LimeWire was advertising that it had content to share. Regardless, in order to preclude LimeWire from sharing with iTunes on his network, Ahrndt would have had to seek out and uncheck the sharing option, or choose to require a password for those wishing to access the contents of his LimeWire file. Accordingly, in response to the Ninth Circuit's query, there is no evidence Ahrndt "intentionally" enabled sharing of his files over his wireless network. *Ahrndt II, 475 F. App'x at 658*. Rather, as Young explained, JH's iTunes software could detect files that were shared, by default, by Ahrndt's LimeWire program. The government offered no evidence to dispute Young's testimony.

The government suggests Ahrndt had no objective expectation of privacy as a result of the automated computer process that shared his folder, **[*21]** but I find the government's supporting case citations inapt. The government

Attachment 3

first quotes extensively from the *dissent's* opinion in *Lavan v. City of Los Angeles, 693 F.3d 1022, 1038-39 (9th Cir. 2012)*. The only other Ninth Circuit case referenced by the government is *United States v. Borowy, 595 F.3d 1045 (9th Cir. 2010)* (per curiam), but in that case the agent found the images via the internet by browsing the shared content stored in defendant's LimeWire file. Although the defendant had attempted to prevent LimeWire from sharing his files over the internet, his "subjective intention . . . did not create an objectively reasonable expectation of privacy in the face of such *widespread public access.*" *595 F.3d at 1048* (emphasis added); compare *United States v. Sawyer, 786 F. Supp. 2d 1352, 1356 (N. D. Ohio 2011)* (somewhat more reasonable expectation of privacy in content shared with "friends" over an open program, but no control over manner in which "friends" used their access, so no objective expectation of privacy). Here, the evidence suggests Ahrndt unknowingly, and by default of the program, shared the content stored in his LimeWire folder over his home wireless network. This was not **[*22]** the widespread public access found to have undermined Borowy's expectation of privacy.

Finally, both *United States v. Procopio, 88 F.3d 21 (1st Cir. 1996)*, and *United States v. O'Bryant, 775 F.2d 1528, 1534 (11th Cir. 1985)*, involved unintended disclosures of private documents as a result of third party actions, thereby destroying any objective expectation of privacy. Neither case is persuasive. In Procopio, a private party stole a safe, leaving it open in a park with papers inside and outside the safe, but the officer did not exceed the scope of the private search as Deputy McCullough did here. In O'Bryant, an officer found a stolen briefcase next to a dumpster and the court explained that abandoned valuable property may be inspected to determine the identity of the owner and to inventory the contents. Finally, both of these cases arose outside the Ninth Circuit.

In short, the government does not dispute a person has a reasonable expectation of privacy in the files on his home personal computer. There is no evidence Ahrndt was using iTunes software or any other program to deliberately share files. The evidence is that he had media-enabled files that JH was able to view using her own **[*23]** iTunes program because Ahrndt's files made themselves available, by default, through JH's iTunes. There is no evidence Ahrndt intentionally enabled sharing of his files over his wireless network, and there is no evidence he knew or should have known that others could access his files by connecting to his wireless network. Deputy McCullough's action of clicking on the image in JH's iTunes directory to open the image violated Ahrndt's *Fourth Amendment* rights. His description of the image, and any related tainted evidence, must be stricken from Agent Cole's affidavit.

## III. Single Purpose Container

The government justifies Deputy McCullough's additional click under the "single-purpose container" exception to the warrant requirement. Specifically,

> [n]ot all containers and packages found by police during the course of a search will deserve the full protection of the *Fourth Amendment*. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.

*United States v. Gust, 405 F.3d 797, 800 (9th Cir. 2005)* (quoting *Arkansas v. Sanders, 442 U.S. 753, 764 n.13, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979))*. **[*24]** Ultimately, "to fall within the [single-purpose container] exception of [Sanders] a container must so clearly announce its contents, whether by its distinctive configuration, its transparency, or otherwise, that its contents are obvious to an observer." *Id. at 801*. This evaluation is made "from the objective viewpoint of a layperson." Id. According to the government, the file names alone announced their content. It relies on the district court's decision in Borowy, which concluded, "Here, the filenames are explicit enough that the container is such that its contents may be said to be in plain view. Therefore, [the agent's] viewing of the files' content did not require a warrant." *577 F. Supp. 2d 1133 (D. Nev. 2008)*, aff'd, *595 F.3d 1045 (9th Cir. 2010)* (internal quotation marks and citation omitted).

The Ninth Circuit did not comment on the single purpose use exception in affirming the district court opinion in *Borowy, 595 F.3d 1045* (upholding decision; no search occurred because defendant had used peer-to-peer software to share images). Absent more compelling authority, I do not accept the government's invocation of the single purpose container exception particularly when I have relied **[*25]** on the opposite argument made in other cases. See *United States v. Kowalczyk, Criminal No. 3:08-95-KI, 2012 U.S. Dist. LEXIS 108879, 2012 WL 3201975, at *24, (D. Or. Aug. 3, 2012)* (accepting government's argument that, in executing a warrant, an investigator acted appropriately in opening images of child pornography while looking for identity theft and fraud because file names may be inaccurate and can be changed); see also *United States v. Giberson, 527 F.3d 882, 889 (9th Cir. 2008)* ("computer records are extremely susceptible to tampering, hiding, or destruction").

## IV. Whether the Affidavit Contains Probable Cause After Excising the Opened Image

The government contends that even if Deputy McCullough had not asked JH to open a single file, their observations of

129

the file names displayed openly in JH's iTunes library were sufficient to establish the existence of probable child pornography sufficient to support a warrant to search.

Probable cause exists when there is a "fair probability" of "finding evidence considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property," or the fruits of his crime. *United States v. Parks, 285 F.3d 1133, 1142 (9th Cir. 2002)*.

Without **[*26]** JH or Deputy McCullough's description of the single image they viewed, the magistrate would have only the following statements made by Agent Cole in his affidavit:

—"JH noted that approximately 25 to 30 of the file names had file names indicating that the file may be child pornography." Def.'s Ex. 106, Cole Aff. ¶ 10 (First Hr'g).

—"Deputy McCullough, duplicating what JH had already done, viewed the library list of Dad's Limewire Tunes and observed approximately 25 pictures and video files which had pornographic titles that indicated the files were of underage children." Id.

—When interviewed later, JH "could not specifically recall any other file names [other than the one she had opened]." She remembered that the file names included ages such as "5 yoa, . . . 8 yoa and 9 yoa. JH stated that none of the files had ages higher than 11 years old. JH also noted the words: "Tiny," "fuck," "sick" and "cunt" in the file names. JH believed that based on the filenames she observed that the filenames contained child pornography which is the reason that JH contacted law enforcement." Id. at ¶ 12.

—Deputy McCullough also could not remember specific filenames. He remembered seeing 25 filenames "which **[*27]** purported by their filenames to be files related to the sexual abuse of children." Id. at ¶ 15. He remembered the filenames "contained what appeared to be children's ages including 8 yoa, 9 yoa, 10 yoa and 11 yoa. Deputy McCullough stated that the filenames described sexual activity after the age such as 'being raped' and 'getting raped.' Deputy McCullough believed based on the filenames that the files depicted child pornography." Id.[3]

The government concedes file names are not always definitive

as to their contents, but argues the names viewed by JH and Deputy McCullough were highly indicative of child pornography. It cites two cases in support of its theory. The first, United States v. Miknevich, upheld a warrant affidavit based on a single file name, a confirmation that a different officer later viewed the contents, and a **[*28]** computerized file analysis. According to the court, "[t]he unmistakable inference which arises from the file name . . . is that its contents include material pertaining to the sexual exploitation of children" and because a computerized file analysis indicated the contents may have included child pornography. *638 F.3d 178, 185 (3rd Cir. 2011)*. The government concedes there was no computerized file analysis here, but the magistrate had multiple file names with similar titles, suggesting the files were what they said they were. The other case the government cites, United States v. Battershell, relied on a girlfriend's complaint that the computer contained photos of "kids having sex" and law enforcement officers' brief descriptions of two photographs they had viewed: a "young female (8-10 YOA)" and "another young female having sexual intercourse." *457 F.3d 1048, 1053 (9th Cir. 2006)*. This was enough for probable cause. The government argues that, here, seeing the actual image is an added benefit, but suggests probable cause may be satisfied where 25 to 30 files describe sexual acts found in the file sharing software LimeWire.

Ahrndt concedes a magistrate may have authorized the first search **[*29]** warrant to obtain Ahrndt's IP address based on JH's and Deputy McCullough's general assertions. He argues, however, lacking specific titles and the description of an image, a magistrate would never have authorized police to invade Ahrndt's home and search his personal computer.

I agree with Ahrndt. As an initial matter, the Ninth Circuit has described several acceptable ways for an affiant to show the existence of contraband images. The "ideal course" is to provide copies of the alleged pornographic photographs for the magistrate to view, but failing to include such pictures is not "fatal to the warrant[.]" *United States v. Smith, 795 F.2d 841, 847 (9th Cir. 1986)*. Alternatively, a magistrate may rely on an experienced officer's "factual descriptions of an image." *Battershell, 457 F.3d at 1053* (officer described in his police report the images he had personally viewed and the report was appended to forensic investigator's affidavit);[4] *New York v.*

---

[3] I do not accept Ahrndt's speculation that JH and Deputy McCullough's recollections of the filenames were tainted by their view of the single image, requiring the excision of paragraphs 11, 12 and 15 in their entirety. Other than JH's memory of the single file name, which matched the image she viewed, there is no evidence of taint and none is obviously apparent.

[4] In that case, for example, the government conceded a description of "a young female (8-10 YOA) naked in a bathtub" was "insufficient to establish probable cause that the photograph lasciviously exhibited the genitals or pubic area" of the minor, one of the statutory definitions for "sexually explicit conduct." *Battershell, 457 F.3d at 1051*.

Attachment 3

*P.J. Video, Inc., 475 U.S. 868, 874 n.5, 106 S. Ct. 1610, 89 L. Ed. 2d 871 (1986)* ("reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is **[*30]** obscene, and whether a warrant authorizing the seizure of the film should issue"). Finally, absent any description of the images, a magistrate may rely on an experienced affiant's representation that the photographs he viewed meet the statute's criteria. *Smith, 795 F.2d at 848* (magistrate could rely on statement of "experienced postal inspector that the photos depicted 'sexually explicit conduct' within the statute").

The government has not offered any authority where a partial recollection of file names provided sufficient probable cause. The cases cited by the government had more than a description of file names. Miknevich had the "digital fingerprint" supporting the assertion that the image was child pornography. *638 F.3d at 185*. Battershell had the statement from a witness that she had seen the images on her boyfriend's computer and described **[*31]** them as "kids having sex." *457 F.3d at 1052*. Although I recognize probable cause means a fair probability and "not certainty or even a preponderance of the evidence," given the dearth of case authority I am loathe to find probable cause here absent a view of one image. *United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006)* (en banc). Ahrndt suggests instead, and I agree, the deputy should have obtained a warrant to open one of the images. The partial recollections and characterizations of the file names JH and Deputy McCullough saw were too general to support the issuance of a warrant to enter Ahrndt's home and seize his computer and related equipment.

## V. Whether the Deputy's Actions were Reasonable, Making Suppression Unwarranted

The government argues Deputy McCullough had no idea the files came from somewhere entitled to *Fourth Amendment* protection, making suppression unwarranted. The government's argument goes like this: the content was viewed by JH and the deputy on JH's computer, using her network connection, in her residence, using her iTunes program with her permission, and the network on which they viewed the content provided no indication as to the source, or that the **[*32]** source was one that was of a type that would receive *Fourth Amendment* protections. Indeed, the name that appeared in JH's iTunes playlist did not indicate a privacy interest or ownership interest (not like "Dad's Medical Records" or "Dad's Tax Records"). Instead, according to the government, the name invited inspection—Dad's Limewire Tunes. JH did not have to seek out Ahrndt's network; it broadcast its signal and "essentially invited association[.]" Gov't. Second Resp. 10 [72]. The government argues it was

not known to the officers that the wireless signal came from another home until the officers got the address two months later from Comcast.

As an initial matter, I reject the government's recitation of the facts. The facts, as adduced at the evidentiary hearing and as reflected in Deputy McCullough's reports, are that JH knew the unsecured wireless signal was resonating from a place in her neighborhood. There is no description of any public place in her neighborhood from which the signal could be emanating. Rather, she and Deputy McCullough identified two places from which the signal could be emanating, both of which were residences. Contrary to the government's assertion, this evidence **[*33]** indicates Deputy McCullough more than likely knew he was directing JH to open a file on a computer in a private neighbor's residence. His testimony confirms he called his supervisor for guidance, also suggesting he knew he needed to be cautious in proceeding.

The government relies on *Herring v. United States, 555 U.S. 135, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009)*, *United States v. Leon, 468 U.S. 897, 906, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)*, and *Illinois v. Krull, 480 U.S. 340, 347, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987)*, for the proposition that where there is no police misconduct to deter, suppressing the evidence is improper. It argues Deputy McCullough did not evince any deliberate, reckless, or grossly negligent disregard for Ahrndt's *Fourth Amendment* rights. All of what the government says may be true, but "[t]he good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search." *United States v. Wanless, 882 F.2d 1459, 1466 (9th Cir. 1989)*; *United States v. Song Ja Cha, 597 F.3d 995 (9th Cir. 2010)* (Ninth Circuit cases holding that the good faith exception does not apply to mistakes of law are still good law after Herring).

I decline to apply the good faith exception to save the warrant here.

## VI. Supreme **[*34]** Court Case United States v. Jones

The Ninth Circuit asked me to consider whether the analysis in *United States v. Jones, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012)* directed suppression. Since I find suppression is warranted under the framework set forth above, I need not address this issue.

## CONCLUSION

For the foregoing reasons, Ahrndt's Motion to Suppress evidence obtained from his storage media and the statements he made to the agents is GRANTED.

Attachment 3

IT IS SO ORDERED.

DATED this 17th day of January, 2013.

/s/ Garr M. King

Garr M. King

United States District Judge

---

**End of Document**

Attachment 3

## *United States v. Beatty*

United States District Court for the Western District of Pennsylvania

December 31, 2009, Filed

Case No. 1:08-cr-51-SJM

**Reporter**
2009 U.S. Dist. LEXIS 121473 *; 2009 WL 5220643

UNITED STATES OF AMERICA, v. ROBERT EUGENE BEATTY

**Subsequent History:** Affirmed by *United States v. Beatty, 2011 U.S. App. LEXIS 14464 (3d Cir. Pa., July 14, 2011)*

**Counsel:** **[*1]** For ROBERT EUGENE BEATTY, Defendant: Thomas W. Patton, LEAD ATTORNEY, Federal Public Defender's Office, Erie, PA.

For USA, Plaintiff: Christian A. Trabold, LEAD ATTORNEY, United States Attorney's Office, Erie, PA.

**Judges:** SEAN J. McLAUGHLIN, United States District Judge.

**Opinion by:** SEAN J. McLAUGHLIN

# Opinion

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

Defendant Robert Eugene Beatty has been charged in this criminal action with one count of receiving/distributing or attempting to receive/distribute and one count of possessing visual depictions of a minor engaging in sexually explicit conduct, in violation of *18 U.S.C. §§ 2252(a)(2)* and *2252(a)(4)(B)*, respectively. Presently pending before the Court is the Defendant's motion to suppress evidence of contraband taken from his home computer and statements which the Defendant made in connection with that search and seizure. For the reasons set forth below, this motion will be denied.

### I. BACKGROUND

The challenged search in this case was conducted pursuant to a warrant obtained by Special Agent Tom Brenneis of the FBI on July 30, 2008. The affidavit in support of the warrant states

that, on April 13, 2008, Trooper Robert Pearson of the Pennsylvania State Police conducted **[*2]** an online undercover investigation using the Gnutella network in a "peer-to-peer" (P2P) environment. [1] (Brenneis Affidavit [49-

---

[1] As the affidavit explains, peer-to-peer file sharing is a "growing phenomenon on the Internet." (Affidavit of Tom Brenneis [49-2] at P 13.) It involves the use of special software which enables individual internet users to link their computers via a network that allows the direct sharing of digital files (*id.*):

> These P2P networks are commonly referred to as decentralized networks because each user of the network is able to distribute information and queries directly through other users of the network, rather than relying on a central server to act as an indexing agent, where all of the information is first deposited before its [sic] is distributed. A user first obtains the P2P software, which can be downloaded from the Internet. In general, P2P software allows the user to set up files **[*3]** on a com puter to be shared with others running compatible P2P software. However, only files that are specifically stored in shared folders are exchanged. Therefore, a user needs simply to move a file from one folder to another to prevent distribution across the Internet. Further, once a file is placed in a shared folder its distribution is dependant only on the machine being turned on and connected to the Internet. A user obtains files by opening the P2P software on the user's computer, and conducting a search for files that are currently being shared on the network. Limewire, one type of P2P software, sets up its searches by keyword. The results of the keyword search are displayed to the user. The user then selects files from the results for download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer containing the file.
>
> 14. For exam ple, a person interested in obtaining child pornographic images would open the P2P application on his/her computer and conduct a search for files using a phrase such as "preteen sex." The search is sent out over the network of computers using compatible P2P software. The results of **[*4]** the search are returned to the user's computer and displayed. The user selects from the results displayed the files he/she wants to download. The file is downloaded directly from the computer hosting the file. The downloaded file is stored in the area previously designated by the user. The downloaded file will remain there until moved or deleted.

Attachment 4

2] at P 21.) Employing a file sharing program known as "Phex," [2] Trooper Pearson entered "search terms [known] to be utilized by those interested in child pornography" and, in doing so, obtained a list of shared files located on computers attached to the Gnutella network. (*Id.*)

Trooper Pearson's investigation revealed that an individual assigned Internet Protocol (IP) number 76.188.64.82 [3] was using the Gnutella network and his/her own P2P software to broadcast for download numerous shared [*5] files with titles suggestive of child pornography. (Brenneis Affidavit at P 23.) In particular, the affidavit references the titles of eleven files; nearly all of the file names include graphic references to specific sexual acts involving children and/or terms such as "child_sex," "pedofilia," "illegal pedo sex," "incest" or "Lolita." (*Id.*) [4] Trooper Pearson found that the Secured Hash Algorithm ("SHA1") [5] values of these files matched those in a

---

(*Id.* at PP 13-14.) The affidavit further states that, the strength of the Gnutella network is that "it bases all of its file sharing on the Secure Hash Algorithm" (Brenneis Affidavit at P 17), the significance of which is explained in more detail, *infra*, at n. 5.

[2] "Phex" is a "simple file sharing program which allows a user to share and

download any type of files from other users on the Gnutella network," regardless of the file sharing software program being run by other users. (Brenneis Affidavit [49-2] at P 20.) Because it is based on Java technology, it is available for many different systems including Windows, MAC, and others. (*Id.*)

[3] As explained in the search warrant affidavit, an Internet Protocol (IP) address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session. (Brenneis Affidavit at P 18.) The IP address provides a unique location making it possible for data to be transferred between computers. No two identical IP addresses can operate on the same segment of the Internet simultaneously. (*Id.*)

[4] By way of example only, the Court sets forth below [*6] a sample of some of the file names as they are recorded in the affidavit:

> * r@ygold - pedo - 13yo brother fucks 11yo sister and sperm inside 61 943 812.mpg

> * (Pthc) 14yo Isabel - (Rape and Fuck) (R@ygold) .mpg

> * Little young girl hardfucked by me - 7 yrs R@ygold illegal pedo sex.mpg

> * (Hussyfan) (pthc) (r@ygold) (babyshivid) Jessica 11yo get fuckt good.mpg

[5] Agent Brenneis' affidavit explains that the Secure Hash Algorithm, also known

national database of "known child pornography computer files" maintained by the Wyoming Internet Crimes Against Children (ICAC) Task Force. (*Id.*) Further investigation revealed that the Defendant was the subscriber to IP number 76.188.64.82 on the date in question.

Based largely on the foregoing information, Agent Brenneis obtained a warrant to search the Defendant's home. During the course of the search, the Defendant's computer was seized and, according to the Government, was later found to contain hundreds of movies depicting minors engaged in sexually explicit activity. On August 4, 2008, several days after the search of his home, the Defendant was interviewed by the FBI and gave incriminating statements. This indictment followed.

## II. DISCUSSION

### A. *Reasonable Expectation of Privacy*

According to the Government, the overwhelming majority, if not all, of the alleged child pornography movies that were discovered on the Defendant's computer were located in his shared LimeWire folders. Thus, the first issue we must address is whether the Defendant maintained a reasonable expectation of privacy in the files that were obtained as a result of the Government's search.

The *Fourth Amendment*, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable [*8] searches and seizures," and which ensures that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized," *U.S. CONST. amend. IV*, is a personal right. *Minnesota v. Carter, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998)*. To claim the protection of the *Fourth Amendment*, therefore, an individual must

---

as the SHA1 hash set, is a "mathematical algorithm that allows for the fingerprinting of files." (Brenneis Affidavit at P 17.) Once a file is located using a software application capable of generating the SHA1 value, that SHA1 value becomes a unique identifier for that particular file. (*Id.*) The SHA1 is termed "secure" because it is "computationally unfeasible to find files (i.e. computer data, in this case child pornography image/movies) which produce the same message digest (SHA1 hash value result)." (*Id.*) Indeed, according to Agent Brenneis' affidavit, "[t]here is no known instance of two different computer files having the same SHA1 hash value." (*Id.*) Because any change to a message in transit will, "with extremely high probability, result in a different [*7] message digest, and alteration of the signature," the SHA1 "digital fingerprint" is "more unique to a data file than DNA is to the human body." (*Id.*)

Attachment 4

2009 U.S. Dist. LEXIS 121473, *7

demonstrate that he personally has an expectation of privacy in the place searched and that his expectation is reasonable. *Id.* (citing *Rakas v. Illinois, 439 U.S. 128, 143-44, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978))*.

Here, the Government contends that the Defendant has no reasonable expectation of privacy in the files retrieved from his computer, at least to the extent the files were located in a shared folder. The Government cites *United States v. Stults, 575 F.3d 834, 843 (8th Cir. 2009)*, *United States v. Ganoe, 538 F.3d 1117, 1127 (9th Cir 2008)*; *United States v. Perrine, 518 F.3d 1196, 1205 (10th Cir. 2008)*; *United States v. Barrows, 481 F.3d 1246, 1249 (10th Cir. 2007)*; *United States v. Brese, 2008 U.S. Dist. LEXIS 28916, 2008 WL 1376269, at *2 (W.D. Okla. 2008)*; *United States v. Borowy, 577 F. Supp. 2d 1133, 1136 (D. Nev. 2008)*; and *United States v. Meysenburg, 2009 U.S. Dist. LEXIS 34619, 2009 WL 1090664 (D. Neb. 2009)*, **[*9]** as supporting the proposition that an individual using peer-to-peer software to share files on his computer cannot claim the protection of the *Fourth Amendment* relative to those shared files.

The Government's argument would have more force if the Defendant were challenging Trooper Pearson's use of P2P software to remotely access his shared files, but that is not the situation here. As the Defendant points out, the cases cited by the Government generally recognize that law enforcement officers do not violate the *Fourth Amendment* by using P2P software to remotely access files contained on a defendant's computer that are being shared by the defendant inasmuch as the defendant has no reasonable expectation of privacy regarding the remote accessing of those files. *See Stults, 575 F.3d at 843* (agent's use of file-sharing program to access child pornography files on the defendant's computer did not constitute an illegal warrantless search where defendant had made those files accessible to others for sharing and thus lacked any reasonable expectation of privacy in files); *Ganoe, 538 F.3d at 1127* (no illegal warrantless search where agent used LimeWire to access child pornography files on defendant's **[*10]** computer; defendant lacked reasonable expectation of privacy in those files); *Borowy, 577 F. Supp. 2d at 1136* (same); *Brese, 2008 U.S. Dist. LEXIS 28916, 2008 WL 1376269 at *1-2* (same); *Meysenburg, 2009 U.S. Dist. LEXIS 34619, 2009 WL 1090664 at *2* (rejecting defendant's claim that his privacy interests were violated by officer's use of Phex software to remotely locate child pornography on defendant's computer; court found no support for defendant's factual contention that he had previously disabled his file-sharing program). *Accord Perrine, 518 F.3d at 1205 (10th Cir. 2008)* (defendant, who utilized peer-to-peer software so as to allow other internet users to access at least certain folders in his computer had no reasonable expectation of privacy in the subscriber information given to his internet provider). [6]

However, none of the cases cited by the Government stand for the proposition that an individual running P2P software thereby loses his *Fourth Amendment* "standing" [7] to challenge a search which involves entry into his home and the seizure and subsequent search of his entire computer. [8] Were that the case, Agent Brenneis could have entered the Defendant's home and downloaded from his computer any shared files

---

[6] The case of *United States v. Barrows, supra*, is somewhat inapposite, as it involved a law enforcement officer viewing first-hand pornographic images which the defendant, a municipal employee, had stored on his personal computer, where the computer was located at the defendant's workplace and had been networked to the city computer for the express purpose of file-sharing. In *Barrows*, the court held that, because the defendant had moved **[*11]** his personal computer into a public space and took no measures to protect its contents from public inspection, he lacked a reasonable expectation of privacy in the files that were viewed by the police officer. *See 481 F.3d at 1249*.

[7] As the Third Circuit Court of Appeals has explained,

[t]he "standing" inquiry, in the *Fourth Amendment* context, is shorthand for the determination of whether a litigant's **[*12]** *Fourth Amendment* rights have been implicated. *See United States v. Kimball, 25 F.3d 1, 5 (1st Cir.1994)* ("We use the term 'standing' as a shorthand method of referring to the issue of whether the defendant's own *Fourth Amendment* interests were implicated by the challenged governmental action. 'Technically, the concept of 'standing' has not had a place in *Fourth Amendment* jurisprudence for more than a decade, since the Supreme Court in *Rakas v. Illinois, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed.2d 387 (1978)*, indicated that matters of standing in the context of searches and seizures actually involved substantive *Fourth Amendment* law.' *United States v. Sanchez, 943 F.2d 110, 113 n. 1 (1st Cir. 1991)*.").

*United States v. Mosley, 454 F.3d 249, 253 n. 5 (3d Cir. 2006)*.

[8] Some of the authority relied on by the Government implicitly suggests the contrary. Many of the cases cited by the Government involve situations like the case at bar where a law enforcement officer initially obtains remote access to the defendant's share pornographic files via P2P software and then uses this information as a basis to obtain a broader search warrant. While these cases generally recognize that no *Fourth Amendment* **[*13]** violation occurs by virtue of the law enforcement officer's warrantless, remote accessing of the defendant's shared files (or other publicly available information), several of these cases then go on to address probable cause challenges to the broader search warrant without any reference to *Fourth Amendment* standing issues. *See, e.g., Stults, 575 F.3d at 841-44*; *Perrine, 518 F.3d at 1204-05*; *Borowy, 577 F. Supp. 2d at 1137-38*.

Attachment 4

without having first obtained any warrant at all. In short, even if the Defendant suffered no *Fourth Amendment* intrusion by virtue of Trooper Pearson's conduct in remotely accessing certain shared computer files, the Defendant nevertheless retained a reasonable expectation of privacy in his computer and in his home such that he possesses "standing" to challenge the merits of the subject search.

### B. *Probable Cause*

We turn next to the merits of the Defendant's suppression motion, which concerns the fundamental question whether the search warrant affidavit established probable cause to believe that evidence of a crime would be found on the Defendant's computer. The standards governing a probable cause determination are well-established:

> [t]he task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place, and the duty of a reviewing court is simply to ensure that the magistrate **[*14]** had a "substantial basis for … concluding" that probable cause existed.

*Illinois v. Gates, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)* (quoted in *United States v. Shields, 458 F.3d 269, 277 (3d Cir. 2006)* (ellipsis in the original)). In making this assessment, the affidavit is to be construed in its entirety and in a common sense and non-technical fashion. *Id., 462 U.S. at 230-31*. Importantly, "[s]ufficient information must [have been] presented to the magistrate to allow that official to determine probable cause; his action cannot [have been] a mere ratification of the bare conclusions of others." *Id. at 239*. Accordingly, "a mere conclusory statement" in an affidavit "that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" will not suffice. *Id*.

Here, the Defendant concedes that Agent Brenneis' affidavit supported a finding of probable cause to believe: (i) that the files which Trooper Pearson located through peer-to-peer networking were located on the Defendant's computer and (ii) that they matched the files in the Wyoming ICAC Task Force's national data base. "But what the affidavit fails to do," according to the Defendant, "is provide any information for **[*15]** [the issuing magistrate judge] to use to determine that there was a fair probability that those were contraband or evidence of a crime." (Def.'s Mot. to Suppress [49] at p. 10.)

I do not agree that Agent Brenneis' affidavit was so deficient

as to leave the magistrate judge without a substantial basis upon which to conclude that there was a fair probability that contraband or evidence of criminal activity would be found on the Defendant's computer. Here, two key pieces of information -- *i.e.*, the highly graphic titles of the files which the Defendant was making available to other P2P users and Trooper Pearson's confirmation that these same files were among those identified by the Wyoming ICAC Task Force as "known child pornography" -- provided a substantial basis for the magistrate judge's probable cause determination. The Defendant challenges the probative value of each of these two pieces of information.

#### (i) The Computer File Names

The Defendant vigorously disputes the idea that the titles of the 11 computer files could meaningfully inform the magistrate judge's probable cause analysis. He contends that, in order to find a fair probability that the files in question were contraband **[*16]** or evidence of a crime, the magistrate judge either had to view the files personally or have at her disposal (*i.e.*, contained within the affidavit) a sufficiently detailed description of the contents of the files as supplied by someone who had actually viewed them. Defendant argues that neither of these situations occurred here and, therefore, probable cause was lacking.

In the context of obscenity laws, the Supreme Court has stated that an issuing magistrate judge is not required to review the allegedly obscene material personally; rather, "a reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene, and whether a warrant authorizing the seizure of the film should issue." *New York v. P.J. Video, Inc., 475 U.S. 868, 874 n.5, 106 S. Ct. 1610, 89 L. Ed. 2d 871 (1986)*. A number of federal courts have applied this principle in the context of child pornography cases. *See, e.g., United States v. Battershell, 457 F.3d 1048, 1052 (9th Cir.2006)* ("[A] judge may properly issue a warrant based on factual descriptions of an image."); *United States v. Chrobak, 289 F.3d 1043, 1045 (8th Cir.2002)* **[*17]** (ruling that a magistrate may base probable cause on viewing images or on a description of them); *U.S. v. Brunette, 256 F.3d 14, 18 (1st Cir. 2001)* ("A judge cannot ordinarily make this determination [whether an image constitutes child pornography] without either a look at the allegedly pornographic images, or at least an assessment based on a detailed, factual description of them.").

Here, as I have noted, the affidavit did not state that Trooper Pearson had personally viewed the files in question, nor did the affidavit provide a detailed recitation of what the files were observed to contain. The question therefore becomes

136

Attachment 4

whether the Magistrate Judge could draw a reasonable inference as to the probable content of the files based upon the highly descriptive names assigned to them.

Herein lies the central point of contention, for the Defendant strongly insists that the file names at issue in this case cannot support a finding of probable cause to believe that the files *actually contained* images of child pornography. He cites two reasons -- one general, one specific -- in support of this argument.

The Defendant's first reason for disputing the probative value of the file names is his assertion [*18] that, as a general proposition, file names are not a reliable indicator of the actual content of any given computer file obtained through P2P file sharing. He contends that the search warrant affidavit provides no information to establish that the actual contents of files obtained through the use of peer-to-peer software correspond to their titles and, in fact, he extrapolates from the affidavit the opposite conclusion. He cites an article (apparently published by the "IEEE Computer Society" as part of the "Proceedings of the 41st Hawaii International Conference on System Sciences - 2008") [9] in support of the proposition that computer hackers will, in some instances, place malicious programs such as a virus, worm or spyware into a purposefully mislabeled file in order to infect and gain access to the searcher's computer. In fact, the Defendant suggested at oral argument, against the possibility that this Court might rely on the file names as an indicator of probable cause, that he would request an evidentiary hearing to establish as a factual proposition that file names do not necessarily correspond to actual file content. (*See* [*19] Tr. of 11/9/2009 Oral Argument [58] at pp. 25-27; 34-35.)

As is invariably the case, however, the ultimate determination as to whether an affidavit is supported by probable cause -- and the degree to which any particular factor may be relied on as an indicator of probable cause -- depends on the specific facts at hand. *See Gates*, 462 at 232 ("[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules."). That is no less true in the case at bar.

As a generic proposition, the Government would likely [*20] stipulate -- and this Court would agree -- that file names are not a definitive indication of actual file content and, therefore, only after downloading and viewing a particular file can one know with certainty whether the content of the file is consistent with its designated name. But "certainty has no part in a probable cause analysis." *U.S. v. Frechette, 583 F.3d 374, (6th Cir. 2009)*. On the contrary, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates, 462 U.S. at 244 n.13*.

Moreover, determining the existence (or lack) of probable cause involves making a "practical, common-sense decision" as to whether, given the totality of facts, a "fair probability" exists that contraband will be found in a particular place. *Gates, 462 U.S. at 238. See also United States v. Williamson, 439 F.3d 1125, 1136 (9th Cir. 2006)* ("[N]o more is required in issuance of a warrant than that the judge has made a 'practical, common-sense decision' that there was a 'fair probability' that actual child pornography would be found in the suspect's residence."); *United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000)* [*21] (affidavit must be read in its entirety and in a commonsense and nontechnical manner).

As a matter of common sense, one can easily envision circumstances where a computer file name will fail to provide meaningful insight concerning specific file content, particularly if the file name involves a popular name or a term that is abstract, generic, or otherwise capable of differing interpretations. The Defendant postulates, for example, that:

> if the searcher is using the peer to peer software to search for music and wants to download Imagine by John Lennon he could use the search term Imagine or "John Lennon" and receive a list with hundreds of file names containing the term Imagine or "John Lennon." However, if the person downloads several of the files whose titles contain the search term, he might discover that a number of the files do not really contain the song Imagine by John Lennon but rather a different song altogether, or the song Imagine performed by an artist other than John Lennon, or a movie clip of John Lennon, or some content completely unrelated to the song Imagine or John Lennon. …

(Def.'s Mot. to Supp. [49] at p. 2.) Clearly, a P2P file search conducted under the foregoing [*22] circumstances might well produce a large quantum of files whose titles fail to spell out the precise nature of their content. Thus, the Court is perfectly willing to credit the Defendant's hypothetical as far as it goes.

Moreover, the producer of a digital file is master of his own

---

[9] *See* M. Eric Johnson, Dan McGuire, Nicholas D. Wiley, *The Evolution of the Peer-to-Peer File Sharing Industry and the Security Risks for Users* (2008). We note that, generally, on review of an allegedly defective search warrant affidavit, courts are confined to an examination of the four corners of the affidavit and those reasonable inferences which arise from it, *U.S. v. Porter, 438 F. Supp. 2d 554, 555 n.4 (E.D. Pa. 2006)* (citing *United States v. Conley, 4 F.3d 1200, 1204 (3d Cir.1993)*), so it is questionable whether this Court is permitted to consider this information.

universe, so to speak, and can choose to name his file anything his imagination can conceive. Therefore, common knowledge dictates that actual file content cannot be definitively determined from the file name alone. One individual's usage of a particular term might differ from another person's. Some words or phrases are inherently ambiguous. As one court has observed:

> … the file name "Lolita,"… on its own could as easily reference an English term paper, a discussion of teacher-student relations, or contain adult or child pornography. [10] Likewise, in a vacuum, the title "Teen Angel" could as likely reference a popular 1960s song as it could be a video file containing child pornography. …

*United States v. Leedy, 65 M.J. 208, 215 (C.A.A.F. 2007)*. In addition, as the Defendant points out, computer hackers sometimes deliberately mislabel files with the goal of infecting an unsuspecting file sharer's computer.

However, it does not necessarily follow as an inevitable corollary from all of this that *no* file name can *ever* be regarded as a logical indication of the file's salient features. Just as one can envision circumstances where a particular file name might provide no basis for drawing inferences concerning the actual file content, one can also envision circumstances where the file name is so explicit and detailed in its description as to permit at least a reasonable inference as to what the actual file is likely to show. Many, if not most, of the files at issue here had titles that contained highly graphic references to specific sexual acts -- including ejaculation, sexual intercourse, oral sex, and anal sex -- involving children ranging in age from 7 to 13 years. Several of the files also reference terms such as "child_sex," "pedofilia," "illegal pedo sex," "incest," or "Lolita." The unmistakable [*24] inference which arises from such highly descriptive file names, then, is that the content includes material pertaining to the sexual exploitation of children -- *i.e.*, evidence of criminal activity, if not outright contraband. Given the number of files in question and the pointed references in their titles to specific sexual acts involving young children -- described in the most coarse and vulgar terms -- this inference is a strong one.

The Defendant nevertheless reads the affidavit as supporting his proposition that the names of files obtained through P2P software cannot serve as meaningful indicators of the actual file content. He points in particular to the following paragraph

in which Agent Brenneis discusses the utility of SHA1 values to law enforcement:

> SHA1 hash values are also extremely helpful to law enforcement because an investigator can be certain that an image being disseminated on the Gnutella network is child pornography simply by comparing that subject image's SHA1 hash value with a national database's listing of SHA1 hash values for known child pornography. This allows an extremely high degree of confidence that a known hash value represents a given file, in this case an image [*25] of child pornography, *regardless of the title utilized by the distributor or possessor of the image*.

(Brenneis Affidavit [49-2] at P 17 (emphasis added).) According to the Defendant, this language demonstrates that "[t]he whole point of using the SHA1 hash value to identify files rather than file names is that the file names do not necessarily correspond to the file contents." (Def.'s Mot. to Supp. at 13.)

When considered in proper context however, the cited language merely establishes that use of SHA1 values provides an extremely high level of precision in identifying specific file content -- a level of precision which, according to the affidavit, is more unique than DNA matching. Such precision likely exceeds the exactitude necessary to establish proof beyond a reasonable doubt; certainly, it exceeds what is necessary under general probable cause standards. Thus, the affidavit may be fairly read as implying a fairly obvious principle -- that SHA1 values provide a more reliable means of identifying actual file content than is possible by virtue of file names alone. This principle, however, does not lead ineluctably to the conclusion that file names thereby always constitute meaningless [*26] information.

On the contrary, a fair reading of the affidavit supports the relevance of the file names in question. Agent Brenneis' affidavit discusses in some detail the process of peer-to-peer filing sharing and, in particular, the fact that users conduct searches for particular file content based on the use of keywords, which in turn produces a list of files in which the keyword appears. (*See* Brenneis Affidavit at PP 13-14.) For example,

> a person interested in obtaining child pornographic images would open the P2P application on his/her computer and conduct a search for files using a phrase such as "preteen sex." The search is sent out over the network of computers using compatible P2P software. The results of the search are returned to the user's computer and displayed. The user selects from the results displayed the files he/she wants to download. …

---

[10] This [*23] Court notes that other appellate courts have recognized that the term "Lolita" is a "well-known moniker for minor girls," *United States v. Syphers, 426 F.3d 461, 466 (1st Cir. 2005)*, and "often a code word for child pornography." *United States v. Grimes, 244 F.3d 375, 379 n. 7 (5th Cir. 2001)*.

(*Id.* at P 14.) [11]

As a matter of common sense, the very fact that individuals utilize search terms with P2P software to produce results (i.e., *file names*) consistent with their chosen search terms suggests a substantial degree of correlation between file names and file content; if file names were, as a general rule, completely random and bearing no relation whatsoever to their content, then there would be no point in conducting a search in the first place and the whole purpose of peer-to-peer file sharing would be frustrated because there would be no meaningful method for locating the sought-after file content. Here, the Magistrate Judge could logically infer that, by using search terms associated with child pornography, and in locating numerous files with names highly suggestive of such material, Trooper Pearson had probably been successful in identifying actual contraband.

In sum, I conclude that the extent to which a particular file name provides insight into the likely content of that file depends uniquely on the particular facts at hand. I also conclude that, **[*28]** at least in this case, it is a matter susceptible to a common sense evaluation and not dependent upon expert testimony.

The Defendant maintains, however, that he is entitled to an evidentiary hearing on this point. Under *Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)*, a defendant is entitled to receive an evidentiary hearing upon request if he makes a substantial preliminary showing that the search warrant affidavit included a false statement, made knowingly and intentionally or with reckless disregard for the truth, which was material to a showing of probable cause. Here, however, there has been no preliminary showing of any false statement in the affidavit, nor does this Court perceive one; therefore, there is no occasion for an evidentiary hearing under *Franks*. Moreover, with regard to the Defendant's central thesis -- that the titles or file names assigned by peer-to-peer users are not always a reliable indicator of what, exactly, is contained in the file -- this Court has already accepted that premise as a matter of common sense, albeit one whose relevance in any given situation is highly fact-driven.

Defendant next argues that, regardless of the foregoing, the file names could not support **[*29]** a probable cause finding

---

[11] As the Defendant explains it, "A person running peer to peer software can type in a search term and the software will then search the computers of all other individuals connected to the internet running the peer to peer software *for files with a file name that contains the search term. The software will then present* **[*27]** *the searcher with a list of files whose file names contained the search term.*" (Def.'s Mot. to Suppress [49] at p. 2 (emphasis supplied).)

---

in this particular case because Agent Brenneis employed an improper, and unconstitutional, definition of "child pornography" in his affidavit. This point requires some background discussion.

In the section of his affidavit entitled "Statutory Basis," Agent Brenneis represented that the subject investigation is based on various provisions of *18 U.S.C.A. §§ 2252* and *2252A*, which are part of the Child Pornography Prevention Act of 1996 (CPPA), *18 U.S.C.A. § 2251 et seq.*. *Section 2252 of the CPPA* defines certain offenses in terms of activity involving visual depictions of minors engaging in "sexually explicit conduct," while *§ 2252A* defines certain offenses in terms of activity involving "child pornography." *See generally 18 U.S.C.A. §§ 2252* and *2252A* and Brenneis Affidavit [49] at P5(a)-(e). The affidavit then goes on to provide the statutory definitions of "sexually explicit conduct" (*see id.* at P 5(f)) [12] and "child pornography" (*see id.* at P 5(g)), as (purportedly) set forth in *18 U.S.C.A. § 2256*.

At issue here is the definition of "child pornography" which, according to Agent Brenneis' affidavit, is contained at *18 U.S.C.A. § 2256(8)* and means:

> any visual depiction including any photograph, film, video, picture or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, [of] sexually explicit conduct, where:
>
> > (a) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
> >
> > (b) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;
> >
> > (c) such visual depiction has been created, adapted or modified to appear that an identifiable minor is

---

[12] "Sexually explicit conduct" is statutorily defined as "actual or simulated":

(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, **[*30]** whether between person of the same or opposite sex;

(ii) bestiality;

(iii) masturbation;

(iv) sadistic or masochistic abuse; or

(v) lascivious exhibition of the genitals or pubic area of any person.

*18 U.S.C.A. § 2256(2)(A)*. There is no contention here by the Defendant that the definition of "sexually explicit conduct" employed by Agent Brenneis differed in any material respect from this statutory definition or was otherwise inaccurate.

Attachment 4

engaging in sexually explicit conduct; or

(d) such visual depiction is advertised, [*31] promoted, presented, described or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct.

(Brenneis Affidavit at P 5(g) (citing *18 U.S.C.A. § 2256(8)(A)-(D)*).

As the Defendant points out, this definition comports with the version of *§ 2256(8)* which was extant prior to the Supreme Court's decision in *Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002)*. In *Free Speech Coalition*, the Supreme Court struck down as overbroad and unconstitutional two of the definitions of "child pornography" contained in Agent Brenneis' affidavit as set forth above in *subsections (B)* and *(D)*.

Prior to *Free Speech Coalition*, the Supreme Court had held in *New York v. Ferber, 458 U.S. 747, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982)*, that pornography depicting actual minors falls outside the protection of the *First Amendment* and may therefore be lawfully prohibited regardless whether the images would be considered "obscene." *See generally Miller v. California, 413 U.S. 15, 24-30, 93 S. Ct. 2607, 37 L. Ed. 2d 419 (1973)* (discussing standards for determining "obscenity"). In *Free Speech Coalition*, the Court found that *§ 2256(8)(B)* was unconstitutional because it covered material beyond [*32] the categories recognized as proscribable under *Ferber* and *Miller* and, in doing so, abridged the freedom to engage in a substantial amount of lawful speech. *535 U.S. at 256*. The Court interpreted the statutory proscription of "any visual depiction" that is, "or appears to be," of minors engaging in sexually explicit conduct, as "captur[ing] a range of depictions, sometimes called 'virtual child pornography,' which include computer-generated images, as well as images produced by more traditional means." *535 U.S. at 241*. This definition, the Court noted, prohibited a substantial amount of speech which might not necessarily appeal to the prurient interest or which might be patently offensive and which might well possess serious literary, artistic, political, or scientific value. *Id. at 246*. As examples of lawful speech which might be prohibited by the statute, the Court cited "a Renaissance painting depicting a scene from classical mythology" or movies filmed without any child actors wherein the actor "appears to be a minor" engaging in actual or simulated sexual intercourse. *Id. at 241*. [13]

In addition, the Court found *§ 2256(8)(D)* to be overbroad and unconstitutional insofar as it proscribed sexually explicit materials that "convey the impression" that minors are being depicted. *Free Speech Coalition, 535 U.S. at 257*. The Court noted that, "[e]ven if a film contains no sexually explicit scenes involving minors, it could be treated as child pornography if the title and trailers convey the impression that the scenes would be found in the movie." *Id*. Moreover, while the Court had previously recognized in *Ginzburg v. United States, 383 U.S. 463, 474, 86 S. Ct. 942, 16 L. Ed. 2d 31 (1966)*, that pandering may have evidentiary relevance bearing on the question whether particular materials are obscene, the *Free Speech Coalition* Court found that *§ 2256(8)(D)* went beyond proscribing pandering by prohibiting the mere "possession of material described, or pandered, as child pornography by someone earlier in the distribution chain." *Id. at 258*. As the Court interpreted *§ 2256(8)(D)*, "[t]he provision prohibits a sexually explicit film containing no youthful actors, just because it is placed in a box suggesting [*34] a prohibited movie. Possession is a crime even when the possessor knows the movie was mislabeled." *Id*.

In short, the statutory language utilized by Agent Brenneis in his affidavit to give meaning to the term "child pornography" incorporates two definitions which have been found to be overbroad and unconstitutional by the Supreme Court. Given this fact, the Defendant reasons, the Magistrate Judge could not have found a fair probability that the content of the eleven files would contain actual contraband. While the Defendant concedes that "[t]he file names certainly present and describe the contents of the files in a manner that *convey the impression* that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct," (Def.'s Supp. Motion at p. 14 (emphasis supplied)), he argues that this is no longer a legitimate basis for classifying material as prohibited child pornography. In other words, the argument goes, the magistrate judge here had no basis for determining that the eleven files located by Trooper Pearson contained child pornography involving the use of actual minors, as opposed to something more innocent. For all the Magistrate Judge knew, the [*35] Defendant posits, the actual content of the eleven files could have involved only images of actors who were over the age of 18 but appeared to be minors engaging in sexually explicit conduct or material that included no such images but which had merely been pandered as involving minors engaged in sexually explicit conduct.

It bears repeating, however, that our enterprise at this juncture is concerned only with fair probabilities, not with certainties,

---

[13] The Court expressed concern that modern productions of *Romeo and Juliet* or films such as *Traffic* and *American* [*33] *Beauty*, as well as countless others, might conceivably run afoul of the statute. *See 535 U.S. at 247-48*.

Attachment 4

nor proof beyond a reasonable doubt, nor even *prima facie* evidence of criminal activity. *See Illinois v. Gates, 462 U.S. at 235.* Moreover, it involves viewing the evidence at hand in a "practical, nontechnical" sense. *Id. at 231.* As the Supreme Court has explained:

> Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same -- and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*Id. at 231-32.*

Given the highly descriptive titles of the computer files **[\*36]** at issue, it would be entirely logical for a magistrate judge to find a fair probability that the actual file content would contain contraband (*i.e.*, images involving the sexual exploitation of real children), as opposed to constitutionally protected speech. That the file titles bespeak content of a graphic sexual nature is not seriously disputed by the Defendant. The fact that many of the titles explicitly reference the involvement of children ranging in ages from 7 years to 14 years makes it less likely that the true content would involve actors of majority age. In addition, the fact that certain file names referred to the children by name (e.g., "14yo Isabel" and "Jessica 11yo") permits a reasonable inference that identifiable minors were used in the actual images. The other possibility -- that the content might have involved sexual images of minors produced through the use of computer morphing -- is of no obvious benefit to the Defendant. As the Supreme Court has explained, computer morphing involves a process whereby pornographers, "[r]ather than creating original images, … **[\*37]** can alter innocent pictures of real children so that the children appear to be engaged in sexual activity." *Free Speech Coalition, 535 U.S. at 242.* The Court has noted that, "[a]lthough morphed images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in *Ferber*." *Id.* Such images are proscribed under the language of *18 U.S.C.A. § 2256(8)(C)*, which the Supreme Court did not address in *Free Speech Coalition*, and which stands as a currently valid proscription on virtual child pornography under the definition utilized by Agent Brenneis.

Furthermore, the warrant also sought evidence concerning possible violations of *18 U.S.C.A. § 2252*, which concerns visual depictions that involve the use of minors engaging in "sexually explicit conduct." "Sexually explicit conduct" is, in turn, defined partly in terms of specific actual or simulated

sexual acts, including masturbation or "sexual intercourse -- including genital-genital, oral-genital, anal-genital or oral-anal," irrespective of whether it involves persons of the same or opposite sex. *18 U.S.C.A. § 2256(2)(A)(i)* and *(iii)*. Based on the file names **[\*38]** in question, the Magistrate Judge could have found a fair probability that a search of the Defendant's computer would reveal evidence of minors engaged in sexually explicit conduct. [14]

In sum, given the unique facts of this case, the Magistrate Judge was entitled to infer from the **[\*39]** highly descriptive and graphic file names and the other information presented in the affidavit that there was a fair probability that the Defendant's computer would contain material prohibited under either *18 U.S.C.A. § 2252* or *§ 2252A*. The fact that the file names were not conclusive proof of their content, and the fact that actual content could only be ascertained with certainty upon a viewing of the files, does not change this result. Once again, we are concerned only with fair probabilities and, more specifically, whether the Magistrate Judge had a substantial basis for finding a fair probability that evidence of criminal activity would be found on the Defendant's computer. In making her probable cause determination, the Magistrate Judge was not required to rule out all other possible inferences as to the content of the eleven files, particularly where the most logical inference pointed to unlawful content. [15] *See, e.g., United States v. Carmel, 548*

---

[14] The Defendant insists that we cannot consider this theory because the affidavit averred only that the content of the files was "child pornography." However, both the warrant and supporting affidavit clearly reference the fact that evidence was being sought relative to visual depictions of minors engaged in "sexually explicit conduct" that might violate *18 U.S.C.A. § 2252(a)*. (*See, e.g.*, Search Warrant [49-2] at pp. 2-4 and supporting affidavit at PP 2, 5(a), (b), (c), (f).) Moreover, the definition of "child pornography," for purposes of establishing a violation of *18 U.S.C.A. § 2252A*, incorporates the concept of minors engaged in sexually explicit conduct. *See 18 U.S.C.A. § 2256(8)* and Brenneis Affidavit at P 5(g). Accordingly, to the extent material is classified as "child pornography" within the meaning of *§ 2256(8)*, it necessarily involves depictions of minors engaging in "sexually explicit conduct."

[15] The Court notes that, in the wake of *Ashcroft v. Free Speech Coalition, supra*, Congress enacted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act ("PROTECT Act"), which amended the definition of "child pornography" formerly contained in *18 U.S.C.A. § 2256(8)(B)* and which repealed the definition contained in *§ 2256(8)(D)*. *See* Pub. L. No. 108-21 (April 30, 2003), § 502(a)(1), (a)(3); *18 U.S.C. § 2256(8)(B)*. In conjunction with the passing of the PROTECT Act, Congress made express findings concerning the child pornography trade including, among others, the following:

Attachment 4

*F.3d 571, 576 (7th Cir. 2008)* (defendant's possession of top handles, which could potentially be utilized in both lawful and unlawful weapons, supported finding of probable cause to believe that defendant possessed unregistered machine **[*40]** gun; the potential lawful use of the top handles did not negate the other incriminatory inference); *United States v. Colquitt, No. 07-CR-55, 2007 U.S. Dist. LEXIS 90352, 2007 WL 4305551 at *7 (E.D. Wis. Dec. 7, 2007)* (competing inferences arising from affidavit as to whether evidence of child pornography would be found on the defendant's home computer did not defeat issuing authority's finding of probable cause).

(ii) The WICAC Task Force Information

The second piece of information supporting the Magistrate Judge's probable cause determination is Agent Brenneis' representation that the SHA1 values of the eleven shared files "matched the SHA1 values of files in the Wyoming Internet Crimes Against Children (ICAC) Task Force's national [database] of SHA1 values for known child pornography computer files." (Brenneis Affidavit at P 23.) The Defendant contends that this information is insufficient in that the affidavit gives no description of the content of the files from the Wyoming ICAC Task Force database that would explain how that entity determined that its "known" files are in fact child pornography, nor is any explanation given as to what the Wyoming ICAC Task Force is or how it has the expertise to determine **[*42]** what is or is not child pornography.

I first consider the affidavit's lack of detail concerning the Wyoming ICAC Task Force. The Defendant suggests this is fatal because, for all the Magistrate Judge knew, the Task Force could have been some self-appointed group of private citizens with no particular expertise in evaluating what constitutes child pornography.

I am not persuaded, however, that the Magistrate Judge was left without any basis whatsoever for determining the

---

(7) There is no substantial evidence that any of the child pornography images being trafficked today were made other than by the abuse of real children. …

***

(11) Leading experts agree that, to the extent **[*41]** that the technology exists to computer generate realistic images of child pornography, the cost in terms of time, money, and expertise is -- and for the foreseeable future will remain -- prohibitively expensive. As a result, for the foreseeable future, it will be more cost-effective to produce child pornography using real children. …

Pub. L. No. 108-21, § 501 Findings, 117 Stat. 650, 677-78.

---

reliability of the information pertaining to the Wyoming ICAC Task Force. Judicial officers reviewing search warrant applications are entitled to draw reasonable inferences from the information contained in the supporting affidavit, *see United States v. Wallace, 550 F.3d 729, 732 (8th Cir. 2008)*, and the very name "Wyoming Internet Crimes Against Children Task Force" connotes a state-authorized law enforcement body possessing particular expertise relevant to "internet crimes against children." [16] In fact, the term "task force" is commonly understood to mean, among other things, a body possessing special expertise on a particular subject matter. *See Dictionary.Com* (defining "task force" as "a group or committee, usually **[*43]** of experts or specialists, formed for analyzing, investigating, or solving a specific problem") (available at "*http://dictionary.reference.com/browse/task+force*") (citing the Random House Dictionary, 2009). Moreover, as a law enforcement body, the Task Force could generally be regarded as a reliable source of information. *See U.S. v. Lapsins, 570 F.3d 758, 764 (6th Cir. 2009)* ("[I]n general, 'another law enforcement officer is a reliable source and …

---

[16] In any event, magistrate judges passing on warrant applications are permitted to take judicial notice of adjudicative facts which are not subject to reasonable dispute. *See United States v. Ellsworth, 647 F.2d 957, 963 (9th Cir. 1981)*, *United States v. Sevier, 539 F.2d 599, 603 (6th Cir. 1976)*. *See also Fed. R. Evid. 201(b)* ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court *or (2) capable of accurate and ready determination by resort to sources* **[*44]** *whose accuracy cannot reasonably be questioned*.") (emphasis added). The Wyoming ICAC Task Force's identity as one of many regional law-enforcement agencies comprised of state and federal agents and supported by the United States Department of Justice, Office of Juvenile Justice and Delinquency Prevention -- is both readily ascertainable and not subject to any reasonable dispute. According to the Wyoming Attorney General's website, the Task Force is organized under the Wyoming Division of Criminal Investigation. Further,

> The ICAC Team is located in Cheyenne, WY and is comprised of five (5) Special Agents, one Immigration and Customs Enforcement Agent and one Federal Bureau of Investigations Agent. The ICAC team concentrates on the use of the Internet to exploit children. The agents are trained in Internet undercover operations as well as computer forensic examinations. The team is partially funded by the Office of Juvenile Justice and Delinquency Prevention.

See "*http://attorneygeneral.state.wy.us/dci/about.html*." *See also* Internet Crimes Against Children Task Force Training & Technical Assistance Program ("About Us") (located at "*http://www.icactraining.org/About.htm*"); Wyoming Attorney **[*45]** General, Division of Criminal Investigation - Overview (located at "*http://attorneygeneral.state.wy.us/dci/about.html*").

Attachment 4

consequently no special showing of reliability need be made as a part of the probable cause determination."') (citing 2 Wayne R. LaFave, Search and Seizure § 3.5(a) (4th ed.2008)).

The Defendant objects that the affidavit provides no information as to how or why the Task Force categorized the files in question as "known child pornography." According to the Defendant, we should assume the Task Force employed the same overly broad definition of "child pornography" set forth in the affidavit. Thus, the Defendant argues, as far as the Magistrate Judge knew, the Task Force member who made the determination that the images in the national database were "child pornography" could have believed that the images at issue here involved youthful looking actors who were over the age of 18 who "appeared to be" minors engaging in sexually explicit conduct, or they could have believed that the material was otherwise lawful but merely being pandered as images involving minors engaging in sexually explicit conduct.

As an initial matter, it is not clear to this Court that the errant definition of "child pornography" incorporated into the affidavit should logically be attributed to the presumably independent determination made by the Task Force that particular computer **[*46]** files constitute child pornography. In any event, however, assuming *arguendo* that the reviewing Magistrate Judge was required to presume that the WICAC Task Force would have utilized the same overly broad definition of "child pornography" as was set forth in the affidavit, it does not follow that probable cause is lacking. I have previously determined that, considering the names of the files in question, the Magistrate Judge could logically infer that the content of the files probably contained images of "child pornography" as that term is currently (and legally) defined -- *i.e.*, depictions of actual children engaged in sexually explicit conduct and/or depictions created, adapted or modified to appear that identifiable minors are engaging in sexually explicit conduct. That being the case, the Magistrate Judge could have likewise assumed that the Wyoming ICAC Task Force had categorized the files as "child pornography" because their actual content satisfied one or more of those same criteria.

The Defendant makes the further point that, even if we assume that whomever made the determination that the images in the Task Force's database were child pornography did so based on the valid definitions **[*47]** of "child pornography" contained in the affidavit, *i.e.*, *18 U.S.C.A. § 2256(8)(A)* and *(C)*, the affidavit still fails to establish probable cause because it simply states in conclusory fashion that someone else -- *i.e.*, the Task Force -- has determined that the images in the database are "child pornography." Thus, Defendant reasons, the Magistrate Judge had no independent

basis from which to make her own probable cause determination; instead, she merely ratified the determination of another entity. In support of this conclusion, the Defendant relies upon *United States v. Diyn, Criminal No. 3:2006-37, 2008 U.S. Dist. LEXIS 54910, 2008 WL 2795942 (W.D. Pa. July 18, 2008)*, wherein the court found that "the conclusions of [the National Center for Missing and Exploited Children ("NCMEC")] that the two images in question were 'both confirmed child pornography' certainly does not establish probable cause." *Diyn, supra at *6*. The court explained that, "[a] nude picture of a minor is not per se violative" of Pennsylvania and federal child pornography laws and "it is unknown from the affidavit of probable cause that NCMEC … made its evaluation of the images in conformity with what is outlawed by the Pennsylvania statute." **[*48]** *Id. at *6*. "Without further explanation," the court found, "NCMEC's conclusion that matter is 'child pornography' can include a wide spectrum of images that are both legal and illegal under the Pennsylvania law and such a conclusion cannot form the basis for a determination of probable cause." *2008 U.S. Dist. LEXIS 54910, 2008 WL 2795942 at *6 n. 7*.

In assessing probable cause, however, we are not permitted to view one piece of information in isolation but must consider, instead, the totality of information contained in the affidavit. *United States v. Whitner, 219 F.3d at 296* ("[S]tatements in an affidavit may not be read in isolation -- the affidavit must be read as a whole.") (alteration in the original) (citation omitted). Here, there is more in the affidavit than simply the conclusory determination by another entity (albeit one that ostensibly possesses special expertise in the area of internet crimes against children) that the images in question constitute "child pornography." In addition to the Wyoming ICAC Task Force's confirmation that the files in question constituted known child pornography, the Magistrate Judge could consider the fact that Trooper Pearson had conducted a peer-to-peer search using terms **[*49]** associated with child pornography and had located on the Defendant's computer numerous files whose titles contained highly graphic references to specific sexual acts involving prepubescent minors and which included terms such as "child_sex," "incest," "illegal pedo sex," "pedofilia," and "Lolita." Thus, the Magistrate Judge could infer that the Wyoming ICAC Task Force had classified the files as "child pornography" because they contained depictions of minors engaging in sexually explicit conduct for purposes of *18 U.S.C.A. § 2256(8)(A)*, or depictions that had been "created, adapted, or modified to appear" as though identifiable minors were engaging in sexually explicit conduct for purposes of *§ 2256(8)(C)*.

In sum, based upon the totality of circumstances presented in Agent Brenneis' affidavit, the Magistrate Judge had a

substantial basis from which to find a fair probability, or a "substantial chance," that material in violation of *18 U.S.C.A. § 2252* and/or *§ 2252A* would be found on the Defendant's computer. Accordingly, neither the fruits of Agent Brenneis' search, nor the Defendant's subsequent statements, need be suppressed.

### C. *Good Faith*

Finally, even if the affidavit did not establish **[*50]** probable cause to believe that contraband or evidence of a crime would be found on the Defendant's computer, the Court would find that the good faith exception to the exclusionary rule, as set forth in *United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984)*, is applicable here. Pursuant to the good faith exception, suppression "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Williams, 3 F.3d 69, 74 (3d Cir.1993)*. "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Loy, 191 F.3d 360, 367 (3d Cir.1999)* (quoting *Leon, 468 U.S. at 922 n. 23*).

Under Third Circuit precedent, the mere "fact that an officer executes a search pursuant to a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. $ 92,422.57, 307 F.3d 137, 146 (3d Cir.2002)* (internal quotation omitted). However, the Circuit has identified four situations in which suppression is appropriate -- *to wit*, situations **[*51]** where:

(1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;
(2) the magistrate abandoned his judicial role and failed to perform his neutral and detached function;

(3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Williams, 3 F.3d at 74 n. 4* (internal citations and quotation omitted).

Here, the Defendant argues only the third exception -- that the warrant affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." He essentially faults the executing officers in two respects. For one, he argues, any reasonably well-trained officer would have known that the affidavit was legally deficient in that it lacked a detailed, factual description of the images depicted in the eleven computer files. For another, he argues, good faith cannot be found to exist where the affidavit incorporates an unconstitutional definition of the term "child pornography."

I have already **[*52]** determined that, when read in a holistic, non-technical, and common sense fashion, the affidavit provided the issuing Magistrate Judge a substantial basis for her determination that there was a fair probability, *i.e.*, a "substantial chance," of finding material on the Defendant's computer in violation of *18 U.S.C.A. § 2252* or *2252A*. The fact that eleven files located on the Defendant's files had been among those catalogued by the Wyoming ICAC Task Force as "known child pornography," coupled with the fact that the eleven file names included terms such as "pedofilia," "illegal pedo sex," "incest," "Lolita," and "child_sex" and referenced acts of ejaculation, cunnilingus, sexual intercourse, incest, and fellatio involving young children, provided ample ground to support an objectively reasonable assumption by Agent Brenneis that probable cause had been established.

The Defendant insists that no good faith could exist here, however, because Agent Brenneis' affidavit included a definition of "child pornography" which has been struck down, in part, by *Ashcroft v. Free Speech Coalition*. The Defendant notes that good faith may shield an officer where the officer acts in reliance on a statute **[*53]** which is subsequently found to be unconstitutional, *see Illinois v. Krull, 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987)*, but, he insists, "it is beyond dispute that good faith does not exist when a police officer relies on a statute that the Supreme Court has found unconstitutional six years earlier and which no longer is present in the United States Code." (Def.'s Mot. to Supp. at 21.) In support of this principle the Defendant cites *Ryan v. County of DuPage, 45 F.3d 1090, 1094 (7th Cir. 1995)* ("If there is probable cause to believe that the defendant has committed a crime by violating some rule, the rule's invalidity, while a defense to a conviction for the crime, is not a ground for his challenging the arrest for violating the rule under the *Fourth Amendment*, … unless the invalidity of the rule was or should have been plain to the arresting officers.") (internal citations omitted); and *Buffkins v. City of Omaha, Douglas County, Neb., 922 F.2d 465 (8th Cir. 1990)* (arrest made pursuant to unconstitutional city ordinance, which City had failed to repeal, violated *Fourth Amendment*).

This principle has relevance where there is no valid basis for finding probable cause absent reliance on an unconstitutional law. **[*54]** That is not the case here, however. For the reasons I have previously discussed, probable cause existed to believe that the Defendant had on his computer materials depicting minors engaged in sexually explicit conduct, within the

Attachment 4

meaning of *18 U.S.C.A. § 2256(2)(A)* and/or material which constituted "child pornography" within the meaning of *18 U.S.C.A. § 2256(8)(A)* or *(C)*, either of which would have violated federal law. *See 18 U.S.C.A. §§ 2252* and *2252A*. At the very least, a reasonably well-trained officer could have believed that there was adequate probable cause to support the search, notwithstanding the unconstitutional provisions that were included in the affidavit.

The Defendant criticizes this line of analysis on the ground that we cannot know the Magistrate Judge's subjective intent in approving the warrant and, therefore, he believes, the entire warrant must fail. But the concept of probable cause is generally understood to be an objective one in the sense that a reviewing court "must determine only that the magistrate judge had a 'substantial basis' for concluding that probable cause existed to uphold the warrant." *Whitner, 219 F.3d at 296* (quoting *Gates, 462 U.S. at 238*). [*55] In determining whether a "substantial basis" exists for the magistrate judge's decision, we recall that the task of the issuing magistrate judge is simply to "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Gates, 462 U.S. at 238*). Accordingly, even assuming that the Magistrate Judge subjectively relied on an unconstitutional definition of "child pornography" in issuing the warrant, it is of no legal moment because the affidavit supplied a sufficient legal basis for establishing probable cause on valid, independent grounds.

Defendant interprets the cases following *New York v. P.J. Video, Inc., supra*, as establishing the rule that "a search warrant in child pornography cases must provide at least **some** description of the alleged images of child pornography." (Def.'s Mot. to Supp. [49] at p. 17 (citing *P.J. Video, Inc.; United States v. Christie, 570 F. Supp. 2d 657, 689 (D.N.J. 2008)*, and *United States v. Diyn, No. Crim. 3:2006-37, 2008 U.S. Dist. LEXIS 54910, 2008 WL 2795942 (M.D. Pa. Jul. 18, 2008))* (emphasis in the original). The [*56] purpose of this requirement, as he notes, is to prevent the Magistrate Judge from being a "rubber stamp" for law enforcement. (*Id.* at p. 16.) The Defendant apparently interprets my recent ruling in *United States v. Dennington, No. 1:07-cr-43-SJM-1, 2009 U.S. Dist. LEXIS 74372, 2009 WL 2591763 at *24 (W.D. Pa. Aug. 21, 2009)* as declining to recognize this principle. (Def.'s Mot. to Supp. [49] at pp. 16-17.)

It should be noted, however, that *Dennington* was concerned with the sufficiency of an affidavit in the particular factual context of child pornography defined in terms of the alleged "lascivious exhibition of the genitals or pubic area" of a minor. *See 18 U.S.C.A. § 2256(2)(A)(v)*. The specific point raised by the defense in *Dennington* was whether the affidavit had provided sufficiently descriptive language to the issuing magistrate judge where the affidavit stated that an investigating officer had observed and downloaded from a particular website numerous images which she felt "depicted minors engaged in a lascivious display of their genitalia." *2009 U.S. Dist. LEXIS 74372, [WL at *20* (quoting the affidavit). The Defendant relied heavily on the rulings in *Brunette, 256 F.3d 14, 17-18 (1st Cir. 2001)* and *Battershell, 457 F.3d 1048, 1051 (9th Cir. 2006)*, [*57] as establishing the rule that it is critical to supply the issuing magistrate a detailed description of the content of an alleged "lascivious display" image because the concept of "lasciviousness" is highly subjective and inherently imprecise. (Def.'s Mot. to Suppress [62] at p. 17 (arguing that the failure to supply the issuing magistrate with the actual images or a detailed factual description of the images is "fatal" when the images are alleged to depict minors engaging in the lascivious display of their genitalia "because the phrase 'lascivious exhibition of the genitals' is not self-defining" (citing *United States v. Villard, 885 F.2d 117 (3d Cir. 1989)*.) *See also Brunette, 256 F.3d at 18* (noting that "'the identification of images that are lascivious will almost always involve, to some degree, a subjective and conclusory determination on the part of the viewer,'" and "[t]hat inherent subjectivity is precisely why the determination should be made by a judge, not an agent.") (citation omitted); *Battershell, 457 F.3d at 1053* (contrasting other, more concrete definitions of "sexually explicit conduct" with the "lascivious display" definition and noting that "the more demanding standard [*58] for establishing probable cause" as annunciated in *Brunette* does not apply in non-"lascivious" cases).

In *Dennington*, this Court opined that the rule of *Brunette* and *Battershell* was not necessarily the well-settled law in this circuit, at least as of 2006. The Court also observed that those cases had not necessarily been viewed as well-settled law by courts of other circuits:

> One district court has interpreted *Brunette* as "prohibit[ing] the issuance of a search warrant for child pornography without an independent review by the judge of the images used to establish probable cause or without a minutely detailed (read lurid) description of those images by the police officer." *United States v. Grant, 434 F. Supp. 2d 735, 746 (D. Neb.2006)*. The Grant court went on to reject *Brunette* on the ground that it conflicted with controlling circuit law, and it cited *United States v. Chrobak, 289 F.3d 1043, 1045 (8th Cir.2002)*, for the controlling rule that an affidavit is "sufficient when it recite[s] the language of the statute, such as 'graphic files depicting minors engaged in sexually explicit conduct.'" (Here, the search warrant affidavit's description of the

images copied from [the allegedly [*59] pornographic website] tracked the statutory "lascivious" language that is used to describe "sexually explicit child pornography." [] which, in turn, is one term used to describe "child pornography." *See* 18 U.S.C. § 2256(8).) A different district court from the Second Circuit, commenting on the rule of *Brunette* and *Battershell*, has observed that "the requirement that, in the lasciviousness context, law enforcement officials append the warrant affidavit, or include therein a reasonably detailed description of, the allegedly proscribed material is relatively new and, at least within the Second Circuit, "unclear." *United States v. Genin, 594 F. Supp. 2d 412, 426 (S.D.N.Y.2009)* (upholding search on good faith grounds where affidavit contained agent's bare conclusion that videos contained "child pornography") (citing *United States v. Jasorka, 153 F.3d 58 (2d Cir.1998)). See also United States v. Simpson, 152 F.3d 1241, 1246-47 (10th Cir.1998)* (where affidavit neither presented to the issuing judge copies of unlawful materials believed to be in the defendant's possession, nor described in detail the content of those materials, but merely informed the judge that the material was "child pornography," [*60] the information in affidavit was nevertheless sufficient for the judge to find probable cause for the search).

*Dennington, supra, 2009 U.S. Dist. LEXIS 74372, [WL] at *24* (internal footnote omitted).

In citing this authority, this Court was not denying the viability of the principle announced in *P.J. Video, Inc.*. Rather, the Court was simply attempting to illustrate the point that courts which have endeavored to apply that principle in the context of child pornography cases have arrived at somewhat differing -- and highly fact-driven -- conclusions concerning the level of description that is necessary to permit the magistrate judge to make an independent evaluation of probable cause. *See, e.g.*, *United States v. Gatherum, No. 08-4683, 338 Fed. Appx. 271, 2009 U.S. App. LEXIS 14863, 2009 WL 1931229 at * 5 (4th Cir. July 7, 2009)* (affidavit which stated that the subject images depicted a minor engaged in "sexually explicit behavior," and which included the relevant statutory definition of "sexually explicit conduct," was sufficient and consistent with the type of language which other courts have found to be sufficient to establish probable cause) (citing cases); *United States v. Battershell, 457 F.3d 1048 (9th Cir. 2006)* (officer's description of picture showing prepubescent [*61] female naked in bathtub did not establish probable cause to believe that picture contained the lascivious exhibition of a minor's genitals, but description of second photo as depicting another young female having sexual intercourse with an adult male provided probable cause to believe that the image involved minors engaged in sexually

explicit conduct); *United States v. Chrobak, 289 F.3d 1043, 1045 (10th Cir. 2002)* (affidavit sufficient where officer described images as "graphic files depicting minors engaged in sexually explicit conduct"); *United States v. Brunette, 256 F.3d 14, 17 (1st Cir. 2001)* (affidavit, which asserted merely that images linked to the defendant depicted "a prepubescent boy lasciviously displaying his genitals," was insufficient to establish probable cause, absent any descriptive support and without an independent review of the images, but search upheld on good faith grounds); *United States v. Diyn, supra, at *7* (affidavit, which described images as ones that "appear to involve child pornography" and depicting "young female children between the ages of 7 and 12 in various states of undress" was sufficient to adequately represented that the images involved nudity [*62] of a nature intended "for the purpose of sexual stimulation or gratification or any person who might view such depiction" in violation of *18 Pa. C.S.A. § 6312(a)*); *United States v. Grant, 434 F. Supp. 2d 735, 746 (D. Neb. 2006)* (affidavit which stated that computer repairman claimed to have seen "child pornography" on a computer was sufficient to establish probable cause).

In this case, I do not believe that the rule of *P.J. Video* was violated, much less violated in a manner obvious to any well-trained officer. The Magistrate Judge here was aware that the actual content of the Defendant's files had been classified as "known child pornography" by the Wyoming ICAC Task Force, and the highly descriptive names of those files provided the Magistrate Judge a logical basis for inferring what the actual content would depict and why the content had been classified as child pornography. Thus, notwithstanding the authority relied upon by the Defendant, I conclude that a reasonably well-trained officer could hold a sincere and objectively reasonable, good faith belief that the information in the affidavit provided the Magistrate Judge with an adequate basis for making an her own independent determination [*63] that a search of the Defendant's computer would probably turn up evidence of unlawful material.

The Court recognizes that the Defendant has taken strong exception to the idea that the eleven file names at issue could serve as a sufficient indication of their probable content. Other courts have recognized, however, that file names and like evidence may have probative value in a probable cause determination. *See, e.g.*, *United States v. Eichert, 168 Fed. Appx. 151, 152, 2006 WL 279019 at ** 1 (9th Cir. 2006)* (issuing judge had substantial basis for probable cause finding where affidavit stated that defendant's computer screen displayed about 100 newsgroup listings, including newsgroups regarding "teens, preteen, sex, children and young girls," and his computer hard drives and storage media contained files whose titles referenced girls' names and terms

such as "teens, too young, early teens, preteens," and sex words); *United States v. Roller, No. CR-08-00361-RMW, 2009 U.S. Dist. LEXIS 109633, 2009 WL 3762417 at * 4 (N.D. Cal. Nov. 9, 2009)* (affidavit supplied sufficient factual basis to assert that website to which defendant purchased access was a child pornography website; apart from three images described **[*64]** in the affidavit, "[s]ome of the titles of the subject identifiers by their titles alone" suggested child pornography (e.g. "Underage Home," "Spycam Lolitas," "Kidz Index")); *United States v. Borowy, 577 F. Supp. 2d 1133, 1138 (D. Nev. 2008)* (finding that file name entitled "CPTVG 13 bond 10-11-12yo Childlover little collection video39girl" and others detected on the defendant's computer through a P2P file sharing program were named in such a way as to suggest that the files contained child pornography; these filenames alone provided the magistrate probable cause to issue a warrant even without reference to the affidavit). *Accord United States v. Leedy, 65 M.J. at 214-16* (magistrate properly found probable cause to search defendant's computer for child pornography where defendant's roommate reported that he had observed play list of files displayed on the defendant's computer with titles that roommate perceived as describing pornographic material, including one named "three black guys and one white girl," and these files appeared alongside another file named "14 year old Filipino girl").

Finally, the Court notes the Supreme Court's admonition in *Herring v. United States, ___ U.S. ___, 129 S. Ct. 695, 172 L. Ed.2d 496 (2009)*, **[*65]** that, to justify application of the exclusionary rule, "the benefits of deterrence must outweigh the costs." *Id.* at 700. As the Court explained:

> [t]he principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that "offends basic concepts of the criminal justice system." *Leon, supra, at 908, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed.2d 677*. "[T]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *Scott, supra, at 364-365, 524 U.S. 357, 118 S. Ct. 2014, 141 L. Ed.2d 344* (internal quotation marks omitted); *see also United States v. Havens, 446 U.S. 620, 626-627, 100 S. Ct. 1912, 64 L. Ed.2d 559 (1980)*; *United States v. Payner, 447 U.S. 727, 734, 100 S. Ct. 2439, 65 L. Ed.2d 468 (1980)*.

*129 S. Ct. at 701*. "To trigger the exclusionary rule," the Court wrote, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 702. Thus, the rule is best suited to deter "deliberate, reckless, or grossly negligent conduct, or in some **[*66]** circumstances recurring or systemic negligence." *Id.*

To the extent probable cause could be found lacking in Agent Brenneis' affidavit, the degree of police misconduct involved fails to rise to the level necessary to justify application of the exclusionary rule. Though the Defendant would likely characterize Agent Brenneis' reference to two unconstitutional statutory provisions as reckless, or at the very least, grossly negligent conduct, his culpability must be judged not by that conduct alone but by reference to his reliance on the warrant as a whole. For the reasons previously stated, I conclude that Agent Brenneis did not act recklessly or in a grossly negligent manner in presuming the warrant's validity. Nor am I persuaded, under the circumstances here, that the benefits which would result from the deterrence of Agent Brenneis' alleged misconduct would outweigh the costs.

In sum, I conclude that Agent Brenneis' affidavit contains sufficient evidence to warrant a sincerely held and objectively reasonable belief that a fair probability existed that materials in violation of *18 U.S.C.A. §§ 2252* and/or *2252A* would be found on the Defendant's computer. Given the unique facts of this case, **[*67]** this Court cannot conclude that the warrant so lacked the requisite indicia of probable cause that it was "entirely unreasonable" for an official to believe otherwise.

### III. CONCLUSION

Based upon the foregoing reasons, the Defendant's motion to suppress will be denied. An appropriate order follows.

### ORDER

AND NOW, *to wit*, this 31st day of December, 2009, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion [49] to Suppress Evidence is DENIED.

/s/ Sean J. McLaughlin

SEAN J. McLAUGHLIN

United States District Judge

Attachment 4